```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF TENNESSEE
2                       NASHVILLE DIVISION

3   SABRINA RECHELLE CORLEY,        )
                                    )
4                 Plaintiff,        )
              v.                    )  No. 3:12-CV-01250
5                                   )
    WAL-MART,                       )
6                                   )  JURY TRIAL
                  Defendant.        )
7   _____)  VOLUME II OF IV

8

9
    ------------------------------------------------------------
10
                BEFORE THE HONORABLE KEVIN H. SHARP
11                 TRANSCRIPT OF PROCEEDINGS
                      NOVEMBER 5, 2014
12
    ------------------------------------------------------------
13
    APPEARANCES:
14

15  For the Plaintiff:        ROCKY MCELHANEY, ESQ.
                              AFSOON HAGH, ESQ.
16                            Rocky McElhaney Law Firm, P.C.
                              1311 Sixth Avenue North
17                            Nashville, Tennessee  37208

18  For the Defendant:        GEORGE ANDREW ROWLETT, ESQ.
                              Howell & Fisher
19                            300 James Robertson Parkway
                              Court Square Building
20                            Nashville, Tennessee  37201-1107

21

22
    PREPARED BY:     WYNETTE C. BLATHERS, RMR, CRR
23                   Official Court Reporter
                     801 Broadway - Room A-837
24                   Nashville, TN  37203
                     (615) 401-7221
25
```

```
 1                    INDEX TO EXAMINATIONS

 2   WITNESS                                          PAGE

 3   DOROTHY JEAN PYE

 4        Direct Examination By Ms. Hagh                6

 5        Cross-Examination By Mr. Rowlett             13

 6   SABRINA RECHELLE CORLEY

 7        Direct Examination By Mr. McElhaney          15

 8        Cross-Examination By Mr. Rowlett             55

 9        Redirect Examination By Mr. McElhaney        78

10   MONTESHA LECHEL CORLEY

11        Direct Examination By Ms. Hagh               83

12        Cross-Examination By Mr. Rowlett             96

13   WILLIAM GAVIGAN, M.D.

14        Direct Examination By Mr. Rowlett           105

15        Cross-Examination By Mr. McElhaney          124

16        Redirect Examination By Mr. Rowlett         144

17

18   DR. SCOTT DUBE (Videotaped deposition played)     6

19   DR. SCOTT DUBE (Videotaped deposition played)    14

20

21                    INDEX TO EXHIBITS

22           P L A I N T I F F ' S   E X H I B I T S

23                              IDENTIFIED   ADMITTED

24   7-9      Photographs from surveillance     5          5
              video
25
```

INDEX TO EXHIBITS (Cont'd.)

P L A I N T I F F ' S   E X H I B I T S

| | | | IDENTIFIED | ADMITTED |
|---|---|---|---|---|
| 10 | Drawing of knee | | 6 | 6 |
| 11 | Operative Note dated 12/23/11 | | 6 | 6 |
| 12 | Operative Report dated 8/15/13 | | 6 | 6 |
| 13 | Drawing of knee | | 6 | 6 |
| 14 | Summary of dates | | 6 | 6 |
| 15 | Value Code Report | | 6 | 6 |
| 16 | Photograph of knee | | 38 | 38 |
| 17 | Photograph of legs | | 38 | 38 |
| 18 | Photograph of knee | | 39 | 39 |
| 19 | Medical report | | 14 | 14 |
| 20 | Operative Report dated June 26, 2014 | | 14 | 14 |
| 21 | Plaintiff medical expenses since May 15, 2014 | | 14 | 14 |
| 22 | Value Code Report | | 14 | 14 |
| 23 | Medical records | | 14 | 14 |
| 25 | X-ray Report | | 143 | 143 |

1          The above-styled cause came on to be heard on

2   November 5, 2014, at 10:15 a.m., before the Honorable Kevin H.

3   Sharp, when the following proceedings were had, to-wit:

4          COURTROOM DEPUTY:  All rise, please.

5          THE COURT:  Thanks.  Y'all can be seated.

6          All right.  Anything we need to talk about before you

7   start again?  Anything?

8          MR. MCELHANEY:  Your Honor, we have a dispute we

9   haven't been able to resolve about which life table to use

10  when we ask you to take judicial notice of the life

11  expectancy.  Mr. Rowlett submitted one.  We've submitted one.

12  At some point we may need a ruling on that.  His -- we've used

13  the Tennessee Code Annotated table.  Mr. Rowlett has got

14  something off the internet, and it's eight years less life

15  than the one we've proposed.  I don't think -- just before we

16  get to the close of plaintiff's proof we need to resolve it,

17  and I just want to bring it to the Court's attention.

18         THE COURT:  Okay.  All right.  Thanks.  Anything

19  else?

20         MR. ROWLETT:  No, your Honor.

21         THE COURT:  No?  All right.  Let's bring them back.

22         You're starting with video?

23         MR. MCELHANEY:  Dr. Dube, yes, your Honor.

24         (Whereupon, the jurors entered the courtroom.)

25         THE COURT:  All right.  Thanks.  Y'all can be seated.

1    Okay. Here's how I know that the jury has really

2 gotten into their job, is when you come in in order and you

3 know how to sit down. A lot of times it takes juries a couple

4 of days to figure out don't let the person who's going to sit

5 first come in first. Then everybody has got to climb over

6 them. So excellent job.

7    Everyone followed my instruction? You didn't talk

8 about the case? Didn't research anything? Okay. All right.

9 Ready to go.

10    MR. MCELHANEY: Yes, your Honor. Thank you. Your

11 Honor, my agreement with Mr. Rowlett, a couple of -- one

12 housekeeping matter from yesterday is to introduce Plaintiff's

13 Exhibits 7, 8 and 9, which are still photographs taken from

14 the surveillance video that we talked about yesterday during

15 the testimony of --

16    THE COURT: Okay. They're just still shots from the

17 video?

18    MR. MCELHANEY: Yes, your Honor.

19    THE COURT: Okay. All right. No objection to

20 admitting this?

21    MR. ROWLETT: Right.

22    THE COURT: All right.

23    (Whereupon, Plaintiff's Exhibits 7 through 9 were

24 marked for purposes of identification and admitted into

25 evidence.)

1          MR. MCELHANEY:  The next witness, your Honor, would

2     be Dr. Scott Dube's deposition from April of 2014.  As a part

3     of that there are exhibits I'd like to move in, Plaintiff's

4     Exhibits 10 through 15.  They will be shown during the

5     deposition.

6               THE COURT:  Okay.

7               MR. ROWLETT:  No objection.

8               THE COURT:  All right.  Admitted.

9               (Whereupon, Plaintiff's Exhibits 10 through 15 were

10    marked for purposes of identification and admitted into

11    evidence and a video played of Dr. Scott Dube's deposition.)

12              THE COURT:  All right.  Mr. McElhaney, you're ready

13    to call your next witness?

14              MS. HAGH:  Yes, your Honor.  Dorothy Pye.

15              THE COURT:  Ms. Pye, if you'll just come forward.

16    When you get up here, raise your right hand to be sworn in.

17              COURTROOM DEPUTY:  Raise your right hand, please.

18                        DOROTHY JEAN PYE,

19              herein, having been first duly sworn, was examined

20    and testified as follows:

21              COURTROOM DEPUTY:  State your full name for the

22    record, please, and spell your last.

23              THE WITNESS:  Dorothy Jean Pye, P-y-e.

24                        DIRECT EXAMINATION

25    BY MS. HAGH:

```
1    Q    Good morning, Ms. Pye.

2    A    Good morning.

3    Q    Ms. Pye, you are Ms. Corley's mother; is that correct?

4    A    Yes.

5    Q    And do you have any other children?

6    A    No.

7    Q    So Sabrina is your only child?

8    A    Yes.

9    Q    If you can, for the ladies of the jury describe your

10   relationship with Sabrina.

11   A    My relationship with Sabrina is very, very, very good.

12   She's always been an excellent daughter, very caring.

13   Q    And Sabrina has how many children?

14   A    Three.

15   Q    And are you actively involved in their lives?

16   A    Yes.

17   Q    Now, you drove a school bus for 33 years; is that correct?

18   A    Yes.

19   Q    And you had to retire due to health reasons?

20   A    Yes.

21   Q    Can you tell --

22           MR. ROWLETT:  Object to leading, your Honor.

23           THE COURT:  I'm going to allow it just to get this

24   through.  It's not substantial testimony here.  Overruled.

25   BY MS. HAGH:
```

1    Q    Could you explain to the jury the reason that you had to

2    retire.

3    A    2009 I was diagnosed with sarcoidosis, and I had it in my

4    feet, my lungs, and my eyes.  2010 I retired from Metro.

5    Q    And when you retired in 2010 until Sabrina's injury in

6    November of 2011, did Sabrina help you in any way?

7    A    Yes.  Sabrina -- because I couldn't walk I needed a

8    driver.  Because I had vision problems I couldn't see.  I

9    couldn't cook.  Basically I laid in the bed for six months,

10   and she brought me my dinner.  She picked my medicine up.  She

11   ran errands.  She was always there.  Not only did she prepare

12   food for me, she also prepared food for her grandparents.

13   Q    And she was able to do all these things for you?

14   A    Yes.

15   Q    How would you describe Sabrina prior to this injury?

16   A    Sabrina has always been an outgoing person, very active

17   with her children.  She went skating, swimming.  We played

18   ball, bowling.  She's always been very active.

19   Q    You mentioned skating, swimming.  When she engaged in

20   these activities, did she ever complain of knee pain?

21   A    No.

22   Q    Did she ever complain of right knee pain?

23   A    No.

24   Q    Did she ever have any problem skating?

25   A    No.

1  Q    Did she ever have to take any breaks when you were at
2  these different venues?
3  A    No.
4  Q    What are some other things that you guys would do as a
5  family?
6  A    Thanksgiving we had gathering, everybody, pot luck,
7  amusement parks, traveling.  We bowled.  We'd ice skate.
8  Q    And how has this changed or has this changed since her
9  injury?
10 A    Yes.
11 Q    And how?
12 A    She's not able to walk long distance.  She can't skate.
13 The bowling is out.  So everything is very limited.
14 Q    And how has Sabrina's inability to engage in these
15 activities affected her?
16 A    She's not as jolly as she used to because she can't
17 participate.  She can't take Josh -- Josh is her youngest
18 child.  He's confined to the house because he can't go outside
19 without some kind of supervision.  So it has really affected
20 Sabrina.
21 Q    And how old is Joshua?
22 A    11.
23 Q    And was Sabrina very involved with him in his school
24 activities?
25 A    Well, Josh is in like charter school, so there's no school

1   after hour activities.

2   Q    She would take him skating or bowling outside of school?

3   A    Yes.

4   Q    Now, you were there for Sabrina when she had her first

5   surgery in December 23rd, 2011; correct?

6   A    Yes.

7   Q    Tell, if you can, the ladies of the jury what you did for

8   her that day.

9   A    Well, I live in east Nashville.  I drove to Antioch,

10  picked Sabrina up, went to Mt. Juliet for her surgery.  After

11  the surgery, we stopped, got dinner for the kids, picked up

12  her prescription.  Then we returned to her house.

13  Q    And how was Sabrina feeling that day?

14  A    That afternoon when we got home, she slept, and we had to

15  give her pain pills.  And she had a -- she was -- had her leg

16  and foot elevated.

17  Q    And the next day would have been Christmas Eve; correct?

18  A    Yes.

19  Q    Did you see her that day?

20  A    Yes.

21  Q    Okay.  And how did you all spend Christmas that year?

22  A    Christmas, we spent Christmas Eve basically trying to do

23  what Sabrina normally do, putting all the toys together, and

24  we had carry-in dinner.  And I drove back home.

25  Q    Was Sabrina able to put up her tree?

```
1   A    No.

2   Q    Was she able to wrap any of the presents?

3   A    No.

4   Q    Was she able to put any of the toys together?

5   A    No.

6   Q    And how was that different from the prior years, the prior

7   Christmases?

8   A    Sabrina, she'd get the kids to bed, stay up putting all

9   the toys together, putting all the presents under the tree.

10  Then the next day she's up.  Everything is laid out for each

11  child.  As they unwrap the gifts, she's picking up paper

12  putting it in the trash.  That's Sabrina.  She's always

13  picking up, cleaning up, but, like I said, that Christmas she

14  was not able to do it.

15  Q    And who would usually cook Christmas dinner or Christmas

16  lunch?

17  A    Sabrina.

18  Q    Was she able to do that that year?

19  A    No.

20  Q    And throughout -- following her first surgery, she's had

21  two other surgeries; correct?

22  A    Yes.

23  Q    And during these last three years, she's been back and

24  forth to the doctor.  What role have you played in her medical

25  treatment, if anything?
```

1  A   My biggest role that I've played is leaving my house,

2  picking up Josh from school -- because Josh has asthma --

3  taking him to the doctor, taking Sabrina back and forth for

4  therapy, picking up meals, prescriptions.  That's what I

5  normally did.

6  Q   And do you still do that today?

7  A   Well, I do it as much as I can because I'm on medication.

8  I can't sleep at night, so I sleep in the daytime.  But

9  normally I call Sabrina every morning, and I ask, you know,

10  how was your night?  And she'll say, Mama, I had a bad night

11  because of the pain, and I'll pick up her medicine.  I still

12  transport her to and from the doctor's office and therapy.

13  Q   And how often do you see Sabrina now?

14  A   I see Sabrina at least three to four times a week.

15  Q   And you described her earlier as being active prior to

16  this injury; correct?

17  A   Yes.

18  Q   What's the biggest change you've seen in Sabrina since her

19  injury at Wal-Mart?

20  A   The biggest change is that she's basically confined to the

21  house.  Most of the time she's in the bed with her leg

22  elevated.  I just think she really misses not being able to

23  participate with the children.  She really like taking them to

24  the ZOO.  She missed "Frozen" with her granddaughter.  I think

25  that really upset Sabrina.

1   Q    And how do you think she's been dealing with this

2   emotionally?

3   A    I think she deal with it the best she can, but she's not

4   the old Sabrina.

5   Q    And what do you mean by that?

6   A    She's always jolly.  She's always active.  She's always on

7   the go with going to the mall, eating out.  She'll go to the

8   movie because she can just sit there.  But as far as going out

9   participating and being involved in activities, she can't do

10  that.

11  Q    How has Sabrina's injury affected you, Ms. Pye?

12  A    Well, it affects me because I have to leave my house in

13  east Nashville, go all the way to Antioch, and sometimes it

14  takes me an hour just to get to her house because of the

15  traffic.  Then I have issues with my eyes being blurry, and I

16  have to try to be back in before it get dark.  She used to

17  be -- she would always bring me meals, so now I try to do as

18  much as I can.  And she's always calling me to see what she

19  can do for me.

20          MS. HAGH:  Thank you, Ms. Pye.  I don't have any

21  other questions for you this morning.

22                          CROSS-EXAMINATION

23  BY MR. ROWLETT:

24  Q    Good morning, Ms. Pye.

25  A    Good morning.

```
 1   Q    Ms. Pye, do you love your daughter?
 2   A    I love her.  I can't tell you how much I love her.
 3              MR. ROWLETT:  Thank you, ma'am.
 4              THE COURT:  All right.  Thanks.  You can step down.
 5              Ready to call your next witness?
 6              MS. HAGH:  Yes, your Honor.  It's going to be the
 7   second videotaped deposition of Dr. Dube.
 8              THE COURT:  Okay.
 9              MR. MCELHANEY:  Your Honor, we have exhibits to move
10   in, Nos. 19 through 23, your Honor.
11              THE COURT:  Any objections?
12              MR. ROWLETT:  No, your Honor.
13              THE COURT:  Okay.  Admitted.
14              (Whereupon, Plaintiff's Exhibits 19 through 23 were
15   marked for purposes of identification and admitted into
16   evidence.)
17              MR. MCELHANEY:  Just edit -- audit myself one second,
18   your Honor.
19              THE COURT:  Okay.
20              MR. MCELHANEY:  Thank you.
21              (Whereupon, there was a brief pause, and then a
22   videotaped deposition of Dr. Scott Dube was played.)
23              THE COURT:  All right.  Do you have another witness?
24              MR. MCELHANEY:  Yes.  Ms. Corley is here, your Honor.
25              THE COURT:  How long do you think she'll take?
```

1    MR. MCELHANEY:  More lengthy than what we've had so
2    far this morning.
3    THE COURT:  All right.  We'll get started with her
4    and probably stop five or ten minutes, depends on where your
5    questioning is at the time, probably five or ten minutes
6    before noon.
7    All right.  So, Ms. Corley, if you'll come up, raise
8    your right hand when you get up here to be sworn in.
9                     SABRINA RECHELLE CORLEY,
10   herein, having been first duly sworn, was examined
11   and testified as follows:
12   COURTROOM DEPUTY:  State your full name for the
13   record, please, and spell your last.
14   THE WITNESS:  I am Sabrina Rechelle Corley,
15   C-o-r-l-e-y.
16                     DIRECT EXAMINATION
17   BY MR. MCELHANEY:
18   Q   Are you Sabrina Corley?
19   A   Yes.  I am Sabrina Corley.
20   Q   Ms. Corley, you have a brace on your right leg; correct?
21   A   Yes.
22   Q   Is that the brace that Dr. Dube talked about in his first
23   deposition this morning of prescribing to you?
24   A   No.
25   Q   Okay.  How did you get this brace here?

1  A   After my third surgery, Dr. Dube recommended --

2          THE COURT:  The microphone doesn't move.  You have to

3  scoot into it.

4  BY THE COURT:

5  Q   Can you get comfortably in the box?

6  A   I can't straighten my leg out because it won't -- I can't

7  sit with it bent.

8  Q   Are you okay?

9  A   Yes.

10 Q   Okay.  After your third surgery what happened?

11 A   Dr. Dube recommended me -- recommended a guy that he works

12 with to fit me for a special made brace.

13 Q   Where did that fitting take place at?

14 A   In Dr. Dube's office.

15 Q   Is that how you got this brace?

16 A   Yes.

17 Q   Okay.  If you need to stand or move around, you let us

18 know.  Okay?

19 A   Okay.

20 Q   How old are you today, ma'am?

21 A   I'm 47 years old.

22 Q   And are you married?

23 A   No.

24 Q   Do you have any children?

25 A   Yes.

```
 1  Q   How many children do you have, Ms. Corley?
 2  A   I have three children.
 3  Q   Okay.  Who's the oldest child?
 4  A   Montez Corley.
 5  Q   How old is Montez?
 6  A   He's 26.
 7  Q   And what's Montez doing now?
 8  A   Montez is working.
 9  Q   Does he live in the Nashville area?
10  A   Yes.
11  Q   How often do you see Montez?
12  A   Every day.
13  Q   Okay.  Does he have children?
14  A   Yes.
15  Q   How many children does Montez have?
16  A   Montez has a six-year-old daughter, and Montez has a
17  daughter on the way, December 21st.
18  Q   And who's your next oldest child?
19  A   Montesha Corley.
20  Q   How old is Montesha?
21  A   Montesha is 23.
22  Q   And what's Montesha doing?
23  A   Montesha is going to cosmetology school.
24  Q   Does she live in the Nashville area?
25  A   Yes.
```

1  Q   How often do you see Montesha?

2  A   Every day.

3  Q   Now, do they live with you?

4  A   Yes.

5  Q   All right.  Does Montesha have any children?

6  A   Yes.  Montesha has a three-year-old daughter.

7  Q   And your third child, the youngest, is Joshua?

8  A   Joshua Kelton (phonetic).

9  Q   And how old is Joshua?

10 A   Joshua is 11 years old.

11 Q   Now, is Joshua your biological child?

12 A   No.

13 Q   How did you come to have Joshua as a child?

14 A   Joshua's mom was a co-worker of mine.  She was pregnant at

15 the time.  She was thinking about not keeping her baby.  I

16 talked to her, well, let me help you.  Let me be the

17 godmother.  She said okay.  Joshua was born July the 10th,

18 2003.  I was there when she had her C-section that morning.

19 I'm home cleaning waiting on, you know, in preparation for the

20 baby.  I got a call from the hospital, Joshua's biological

21 mom.  Please get here now.  Joshua, I guess when they do the

22 blood test, had drugs in his system.

23         At this time Joshua had a three-year-old sister,

24 which DCS got involved, had a placement plan to help Joshua's

25 mom get on her feet, get her habit under control so she can

```
1   have her kids back.  We did that for a couple of months.  We
2   went to court.  The judge awarded her her kids back.  We
3   walked out of the courtroom.  She said, you know I don't want
4   him.  I did carry him every day of his life.  Josh was my son,
5   my son.  She never wanted him, so I've had him since July the
6   10th, 2003.
7   Q   Is that when he came home from the hospital?
8   A   He came home from the hospital July the 11th or 12th, the
9   following day.
10  Q   And he calls you mom?
11  A   Yes.
12  Q   Does he know anything about his biological mother?
13  A   No.
14  Q   Okay.  And so you've raised him as a single mother since?
15  A   Yes.
16  Q   Do you have any papers that, legal papers, that make you
17  his mother or guardian or --
18  A   I have paperwork that the judge ordered legal
19  guardianship.
20  Q   Have you adopted Joshua yet?
21  A   No, not yet, but I'm going to.
22  Q   Tell me about your education.  Did you go to high school?
23  A   Graduated from high school.
24  Q   Which high school did you graduate from?
25  A   John Overton.
```

1  Q   And do you remember the year you got out?

2  A   1985.

3  Q   And at that point in time, what plans did you make for

4  your life after school?

5  A   Just work, enjoy life, have fun.

6  Q   And did you go on to college at that point?

7  A   No, I didn't.  I just worked.

8  Q   Where were you working in the '85, '86, '87 time period?

9  A   After I graduated, I worked at a daycare center.  I always

10  loved kids.  I always had somebody's child with me.

11  Q   And what did you do at the daycare center?

12  A   I was working in the three- and four-year-old room.

13  Q   And what did you do after that?

14  A   I worked, stayed and enjoyed my life.  I didn't have any

15  kids.

16  Q   How old were you if -- Montez is 27?

17  A   Yes.

18  Q   So you were about what?

19  A   About 20.  He was born August 30th.  I was turning 21

20  September the 10th.

21  Q   And tell me about -- soon after that, you had Montesha

22  about a year later, year and a half?

23  A   Three years later.

24  Q   Three years later.  Okay.  And tell me about your life

25  with your children.

1    A    My kids are my life.  I'm mommy.  I'm the cook.  I clean.

2    Whatever they're involved in I'm going to be there.  I don't

3    depend on anyone to take my kids to basketball games.

4    Montesha was a cheerleader so I'm very -- I lived at McGavock

5    High School.  Competitions.  I'm driving.  I'm a very involved

6    parent.

7    Q    Was your house the gathering house for the kids?

8    A    My house was the house.  For some reason all of the

9    friends wants to come to Montesha's house, all of the

10   cheerleaders, every day after cheerleading practice because we

11   know Ms. Sabrina is going to cook.  On Sunday's Ms. Sabrina is

12   going to cook.  Mama, that's what I am to all of them, mama.

13   They've had cheerleader games where we're all stuck at

14   Glencliff in the snow.  We all piled in two cars drove to my

15   house.

16   Q    And what kind of meals are these at this time we're

17   talking about when Montesha is in school?

18   A    Meat, greens, vegetables, no fast food, no hot dogs.  I'm

19   a soul food cook, dessert and all.

20   Q    And you'd make a big enough spread for all the

21   cheerleaders?

22   A    I'd make a big enough spread for the cheerleaders, the

23   cheerleaders' mom, my mom.

24   Q    And you'd be up on your feet doing this?

25   A    I'm up on my feet four, five, six hours cooking.

1  Q   I want to go ahead and get a question out of the way real

2  quick.  It's an important one.  Before you went to Wal-Mart on

3  November 7, 2011, did you ever have any problems with either

4  of your knees?

5  A   No.

6  Q   Before you went to Wal-Mart on November 7, 2011, did you

7  ever have any problems with your right knee?

8  A   No.

9  Q   Since you slipped and twisted in that water, has there

10 been a moment in your life you haven't had trouble with your

11 knee since?

12 A   No; daily, every day.

13 Q   Tell me more about some of the work you did as you were

14 raising those kids, that boy and that girl, Montez and

15 Montesha.  You have not had a career, have you, ma'am?

16 A   No.

17 Q   Tell me some of the jobs you've done.

18 A   Customer service, worked in collections, worked for

19 Medicare D filling, you know, 65 plus, filling their refills

20 for their medication, making sure they have refills on

21 diabetic supplies that they're needing, customer service.

22 Q   Do these jobs, some of them, cause you to be on your feet

23 for long periods of time?

24 A   Some of them required me to be on my feet.

25 Q   Did you ever have any trouble being up on your feet to

1  work?

2  A    Prior to November the 7th, no.

3  Q    And at the time you went to Wal-Mart, did you have a job

4  at that time?

5  A    Actually, my job had just -- assignment had ended, and

6  they had found me another one a couple of weeks later, which I

7  was unable to take.

8  Q    You were working through a temp agency?

9  A    Yes.

10  Q    Okay.  And where had the assignment been that had just

11  ended?

12  A    I was working at the Tennessee Towers doing data entry

13  where we were going paperless.  Every piece of paper that they

14  had they wanted inputted in the computer.

15  Q    And so you were doing that job, and that temp assignment

16  ended?

17  A    Yes.

18  Q    Do you know where the next place would have been?

19  A    The Department of Safety.  And it was a temp to hire.

20  Q    Now, before you got Joshua, I want to talk in that

21  timeframe about your adult life.  Your kids would have been

22  teenagers, your biological children.  When you got Joshua,

23  they would have been teenagers; right?

24  A    Yes.  I think Montesha was 12.

25  Q    Okay.  Tell me a little bit more about -- you've told me

```
1   about the cheerleaders coming to your house and talked about
2   how that was at your house, but tell us some more about how
3   your life was outside your house, activities that you enjoyed
4   doing that were physical.
5   A   We'd skate.  We bowled.  We shopped.  Cheerleader
6   competition.  I helped base.  I helped with routines,
7   cheerleading routines.
8   Q   Do you like to dance?
9   A   I love to dance.  Family gatherings, Sabrina teach us the
10  twang because I know you know it.
11  Q   Is this -- I've seen some cheerleading stuff on ESPN from
12  time to time.  Is this like the hiphop dancing?
13  A   Hiphop.  Montesha was in dance.  She'd ballet.  So we'd do
14  it all.  We did it all.
15  Q   Did you ever have any trouble with your knee when you were
16  dancing?
17  A   No.
18  Q   When you say you'd base, that's a cheerleading term?
19  A   Yes.  If they would miss, you know, a back spot --
20  Montesha was a flier -- I would get in the back when they're
21  working on a routine and get down and base her, actually help
22  hold her up.
23  Q   Did you have any trouble with your knee doing that?
24  A   No.
25  Q   Okay.  Tell me about your life with Joshua.  As he got
```

1  into school and activities, how was your life then?

2  A   Well, I was, again, very involved, go on field trips,

3  going to school, eating lunch with the child -- they enjoyed

4  having mom come to the school -- go to the parent teacher

5  conferences, just daily activities, taking him.  We'd go to

6  the park.  We'd go to Opryland Hotel during Christmastime,

7  look at the lights.  We'd drive around Christmastime looking

8  at all the lights.

9  Q   Did you go to ICE up there at Opryland?

10  A   We went to ICE, the Rockettes, the snow.  I would take

11  him.  Mom, can we go to the movies?  Yes.  Mom, can we go

12  skating?  Yes.  Mom can we go bowling?  Yes.  He's 11.  Enjoy

13  your life, baby.

14  Q   How old was he at the time you were injured?

15  A   Nine.

16  Q   Okay.  And is this --

17  A   Sorry.  Eight.

18  Q   Eight.  And is this what was going on then, when he was

19  eight?

20  A   Yes.

21  Q   Okay.  Did you have any trouble doing the activities

22  with him?

23  A   No.

24  Q   Now, you were talking about going to the park.  I've got

25  some small kids.  I've been to the park.  Some moms sit.  Some

1  moms play.  What were you doing at the park before you were

2  injured?

3  A   I'd play.

4  Q   What kind of playing did you do at the park with your son?

5  A   I would sit in -- I can swing.  I can slide with him.  I

6  can run around, monkey bars.  I interact with him.  I don't

7  just sit and watch.

8  Q   You spoil him?

9  A   He's been spoiled rotten.

10  Q   Let's talk about the day of going to Wal-Mart on

11  November 7.  What was -- how did that day start out?

12  A   That morning I had Joshua.  I'd take him to the school.

13  Back at home preparing.  When I wake up, fix him some lunch.

14  That day there was not any salad dressing, so he went ahead

15  and took his lunch without salad dressing.  I went ahead with

16  my daily activities, come back, clean, cook, wash, laundry,

17  whatever, go check on my mom because that's what I do, make

18  sure she's okay, pick Joshua up from school.  He said, Mom,

19  can we go get the salad dressing for my lunch?

20  Q   When you say salad dressing?

21  A   Miracle Whip.

22  Q   When you and I had that discussion, I thought maybe you

23  were talking about ranch or --

24  A   No; Miracle whip for his sandwiches.

25  Q   Okay.  All right.  I don't eat mayonnaise, so I was

1  confused.  You had to explain it to me.  Okay.  So you go to

2  Wal-Mart?

3  A    Yes.

4  Q    And is the Hamilton Church Road your normal Wal-Mart that

5  you would go to?

6  A    Yes.

7  Q    Okay.  You've been there times before?

8  A    Yes.

9  Q    And what's your -- when you're going to Wal-Mart, what's

10  been your experience there with -- as far as your purchasing

11  experience and things of that nature?

12  A    Wal-Mart is a one-stop shop.  You go in.  You can -- I'm a

13  female.  I'm going to go in the clearance departments.  I'm

14  going to go through different aisles.  But it's been clean,

15  safe, and good prices.

16  Q    What's important to you in picking a place to go shop,

17  Ms. Corley?

18  A    Clean, safe, and good prices.

19  Q    And do you feel like that Wal-Mart had provided that to

20  you up to that point?

21  A    Up to that point, yes.

22  Q    Did -- do you think they provided you a safe environment

23  that day?

24  A    No.

25  Q    When you came down the aisle and you made the turn into

1  Aisle 6, did you see any water on the floor?

2  A    No.

3  Q    Have you ever worked at a place where you ever received

4  training to look out for things like that?

5  A    No.

6  Q    You were there to shop?

7  A    Yes.

8  Q    Now, were you being safe for your own -- were you looking

9  out for yourself that day?

10  A    Yes.

11  Q    When you turned down that aisle, do you remember what was

12  down there you were looking at or for?

13  A    Miracle Whip.  It's the aisle the salad dressing, ketchup,

14  pickles, and all that is on.

15  Q    So that's on that aisle.  Okay.  Now, were you in the

16  courtroom yesterday when Mr. Hicks took the stand?

17  A    Yes.

18  Q    And did you hear him say that Wal-Mart's position now is

19  that the water may have been spilled by somebody in that aisle

20  after you turned down it?

21  A    Yes.

22  Q    Was there anybody in that aisle besides you, Ms. Corley,

23  when you turned down it?

24  A    Me, Sabrina, and Joshua, my son.

25  Q    Did you or Joshua have water that you spilled?

```
1   A    No.
2   Q    Did Joshua kick anything or knock anything off the shelf?
3   A    No.
4   Q    Did you kick anything or knock anything off the shelf?
5   A    No.
6   Q    Is there any way, based on you being in that aisle, that
7   after Ms. Smith walked by on the video, somebody inside that
8   aisle made that spill?
9   A    No.
10  Q    And how do you know that?
11  A    I was the only one in the aisle, me and Joshua.
12            MR. MCELHANEY:  Your Honor, you want to take the
13  break now?
14            THE COURT:  Yeah.  You're ready?
15            MR. MCELHANEY:  I was just going for ten minutes like
16  you had said.
17            THE COURT:  Okay.  Yeah.  That works.  All right.
18  We're going to take a lunch.  We'll be back here at 1:00
19  o'clock.
20            (Whereupon, the jurors exited the courtroom.)
21            THE COURT:  All right.  I'll see y'all back here at
22  1:00.
23            MR. ROWLETT:  Your Honor, are we going to talk just a
24  second about witness planning and timing or when I need to
25  have people here and that kind of thing?
```

1          THE COURT:  Well, I don't know --

2          MR. MCELHANEY:  We can talk about it, your Honor.

3          THE COURT:  Yeah.  Y'all can talk about it.

4          COURTROOM DEPUTY:  All rise, please.

5          (Whereupon, a recess was taken from 11:52 a.m. until

6   1:14 p.m.)

7          COURTROOM DEPUTY:  All rise, please.

8          THE COURT:  Thanks.  Y'all can be seated.  All right.

9   You're ready?

10         MR. MCELHANEY:  Yes, your Honor.

11         THE COURT:  Okay.  We'll bring them back in.

12         (Whereupon, the jurors entered the courtroom.)

13         THE COURT:  All right.  Thanks.  Y'all can be seated.

14         Go ahead.

15  BY MR. MCELHANEY:

16  Q   Ms. Corley, when you came out of Aisle 6, did you see the

17  water on the floor then?

18  A   No.

19  Q   What happened?

20  A   Walking down the aisle, and I slipped.

21  Q   Speak up.

22  A   Walking down the aisle, and I slipped, twisted.

23  Q   And did you -- what happened then with your knee, anything

24  that you remember?

25  A   It twist and then like a little -- I felt a little pop.

1    Q    Okay.  And can you describe what the pop --

2    A    It's like if I'm -- if you're holding your knuckles, and

3    you feel it.  And it just felt like a pop.  It's hard to

4    describe, but it's like if you're -- say if your hand is

5    locked or something, like my wrist just popped with a sudden

6    movement.

7    Q    Had you ever had anything like that ever happen to your

8    knee before?

9    A    No.

10   Q    What happened after that?  Was your knee okay or were you

11   having pain?

12   A    No.  I was having pain.

13   Q    And you can see on the video you were looking around.  Did

14   you look down and see what you were -- stepped in?

15   A    Yes.  I looked.  I felt -- did the pop and twist, and I

16   looked down.  And then it was water on the floor.  I looked

17   up, just a basic reaction.

18   Q    Did you see anything when you looked up that you could

19   tell?

20   A    No.  I thought I -- I thought I saw a drip, but I can't

21   say.

22   Q    You can't say for sure?

23   A    I can't say for sure.  But I'm more focusing on okay, oh,

24   what, you know, I see the water on the floor.

25   Q    And then what did you do next?

```
1   A    I stood there for a minute.  Then I went to go find
2   someone to tell, a Wal-Mart worker.
3   Q    And did you find someone?
4   A    Yes.
5   Q    Do you remember who you found?
6   A    Katrina.
7   Q    And do you remember anything about your conversation with
8   Katrina?
9   A    I told Ms. Katrina that I had slipped on some water and I
10  showed her -- pointed to the aisle where I slipped.  And she
11  told me to go up to the service desk and file an incident
12  report, and she went toward the spill.
13  Q    Did she tell you -- did she ask how you were doing or
14  anything else?
15  A    No.
16  Q    And then what did you do next?
17  A    I limped on up to the -- going toward the service desk we
18  passed the check out.  I paid for my couple of items, and I
19  went right to the service desk.  And I filled out an incident
20  report along with Ms. Katrina.  She filled out an incident
21  report.
22  Q    She met you up there?
23  A    She met me up there.
24  Q    Now, when you say you limped off, you saw the video.  Is
25  that what you were talking about, when you went up the aisle?
```

1  A    Yes.

2  Q    Okay.  Now, has there been a time that you recall since

3  you started up that aisle after talking to Katrina, that you

4  haven't limped?

5  A    No.  I've never limped.

6  Q    Before this you had never limped?

7  A    Before the issue, before the incident.

8  Q    Since then, have you ever gotten to the point where you've

9  gotten better where you didn't limp?

10  A    No.  I have a limp.

11  Q    And do you limp every day of your life?

12  A    Yes.

13  Q    How do you deal with that?  How do you deal with that

14  emotionally?

15  A    It's mentally, physically.  You know, you're walking.

16  People are looking at you.  You know, it's painful because

17  when you're walking different, you're putting more -- you

18  know, you're off balance.  It puts pain -- you know, my lower

19  back was -- and I was hurting in my lower back from the

20  shifting.

21  Q    And you told Dr. Dube about that?

22  A    Yes.

23  Q    Now, during the break, before the ladies of the jury came

24  back in, we repositioned you in that seat.  And why did we

25  need to do that?

1  A    It's hard sitting a certain way, sitting for a long time.

2  You see me take my foot, now put my right leg on top of my

3  left foot to keep my leg -- to try to lift it up.  Staying in

4  one position or if I stay too long, get up, and I may feel,

5  you know, a little -- my leg crack or pop.  Staying in one

6  position is hard.  That's why I stand up.

7  Q    And have you been doing anything else during the last two

8  days of trial to try to make yourself feel better in the

9  courtroom?

10  A    Yes.

11  Q    Tell us about that.

12  A    I use Mr. Rocky's briefcase to prop my foot up on, my leg

13  up on, and I occasionally get up.  I take my foot, take my

14  left foot, and hold it up and put my leg on the top of the tip

15  of my foot.

16  Q    You've been using my briefcase as a footstool?

17  A    Yes.

18  Q    How does that help you to lay your foot up on that?

19  A    It's uncomfortable.

20  Q    How does it make it feel better?

21  A    It doesn't make it feel better.  It's just repositioning.

22  I can't stay positioned for a long time.

23  Q    Okay.  When you paid for your items and did the incident

24  report, did you fill out a handwritten report?

25  A    Yes.

1  Q   Okay.  And did you go home or did you go straight to the

2  doctor or what happened after you left Wal-Mart?

3  A   I went home.

4  Q   How were you feeling?

5  A   In pain.

6  Q   On a scale of one to ten, what was your pain level?

7  A   It was about eight and a half.

8  Q   Okay.  And when did you first go to the doctor?

9  A   The following morning.

10 Q   Where did you go?

11 A   The Hope Family Medical Center.

12 Q   Was that your primary doctor at the time?

13 A   Yes.

14 Q   Okay.  Do you recall what they did for you?

15 A   She gave me pain medicine and prescribed me some crutches

16 to kind of stay off it.

17 Q   Did they take any x-rays?

18 A   She did an x-ray.

19 Q   And --

20 A   Sent me home.

21 Q   How was the next few days at home?

22 A   The pain got worse.

23 Q   And what do you mean by that?

24 A   I was hurting, pain.  The pain medicine wasn't helping.

25 Q   Were you having to put any weight on it?

1    A    No.

2    Q    Did you use the crutches as the doctor told you to?

3    A    Yes.

4    Q    What else -- did you go back to Hope at that point, at

5    some time?

6    A    Yes.

7    Q    Okay.  What did they do then?

8    A    She referred me -- I had a -- to get an MRI and referred

9    me to Dr. Dube.

10   Q    Now, this may be an important question.  Did you have

11   anything to do with picking Dr. Dube as your surgeon?

12   A    No.

13   Q    At that point in time you had not talked to any lawyers,

14   had you?

15   A    No.

16   Q    So just for the record, your lawyers had nothing to do

17   with picking Dr. Dube?

18   A    No.

19            MR. ROWLETT:  Object to leading.

20            THE COURT:  Sustained.

21   BY MR. MCELHANEY:

22   Q    Did anyone that you know, besides your primary care

23   doctor, have anything to do with you going to Dr. Dube?

24   A    No.

25   Q    Okay.  Do you remember when you first saw him?

1    A    Yes.

2    Q    And that was in early December?

3    A    Yes.

4    Q    Now, between November 7, when you were injured, and

5    December 6, when you finally got to see Dr. Dube, how was your

6    pain in that month?

7    A    Always hurting, taking pain medicine.  Pain medicine

8    wasn't helping, couldn't put weight on my leg, unable to

9    drive.

10   Q    How were you able to take care of Joshua?

11   A    My mom, Montesha, they would take him to school, pick him

12   up from school.  My mom would bring a meal because I was

13   unable to stand up and cook.

14   Q    What did Dr. Dube recommend for you?

15   A    The surgery.

16   Q    And how did you feel when you heard that?

17   A    Surgery on December the 23rd wasn't good at all.  It was

18   Christmas.

19   Q    Why did you go ahead and do it?

20   A    It needed to be done, and I wanted to get better.

21   Q    How did surgery go after -- when you got home from

22   surgery, how were you feeling?

23   A    I was in pain.  I had compressors on my leg that I had to

24   keep on there while I was -- any time I was sitting and

25   laying, pain medicine, laying in the bed.

```
 1              MR. MCELHANEY:  I've got marked Exhibit 16, please,
 2   the photograph that's been shared.
 3              THE COURT:  Objection?
 4              MR. ROWLETT:  No objection.  Sorry.
 5              THE COURT:  Admitted.
 6              (Whereupon, Plaintiff's Exhibit 16 was marked for
 7   purposes of identification and admitted into evidence.)
 8   BY MR. MCELHANEY:
 9   Q   Ms. Corley, we've got Exhibit 16 on the screen.  Can you
10   tell me what this is?
11   A   My right knee.
12   Q   Is this after the first surgery?
13   A   Yes.
14   Q   And is this how it looked after Dr. Dube did the surgery
15   when you got home?
16   A   Yes.  But I had -- when I first got home, I had a bandage.
17              MR. MCELHANEY:  Okay.  I have a couple more pictures.
18   Could I move in No. 17, your Honor?
19              MR. ROWLETT:  No objection.
20              THE COURT:  Admitted.
21              (Whereupon, Plaintiff's Exhibit 17 was marked for
22   purposes of identification and admitted into evidence.)
23   BY MR. MCELHANEY:
24   Q   Is this your legs, Ms. Corley?
25   A   Yes.
```

1  Q   And is this some of the bandaging that Dr. Dube put you on

2  when you came home?

3  A   Yes.

4  Q   What's the device laying on the floor and the cords going

5  to those stockings?

6  A   It keeps my blood flowing so it squeezes.  It's like

7  something you have to use to keep your blood flowing after

8  surgery to prevent blood clots.

9  Q   How was your pain level at this point?

10 A   Beyond a 10.

11 Q   Were you able to get around at all?

12 A   No.

13 Q   How long were you confined after the first surgery?

14 A   Oh, the weekend, Christmas Eve, Christmas day.  I kept

15 those on until I went back to see Dr. Dube.

16         MR. MCELHANEY:  All right.  I've got one more

17 photograph, No. 18, your Honor.

18         MR. ROWLETT:  No objection.

19         THE COURT:  Admitted.

20         (Whereupon, Plaintiff's Exhibit 18 was marked for

21 purposes of identification and admitted into evidence.)

22 BY MR. MCELHANEY:

23 Q   Here's another photograph of you laying after surgery?

24 A   (No response.)

25 Q   Yes, ma'am?

1  A    Yes.

2  Q    And you've still got those stockings on?

3  A    The compressors, yes.

4  Q    All right.  And you heard your mom talk about Christmas.

5  Can you -- from your standpoint what was it like not being

6  able to do the stuff for Joshua that you had always done for

7  eight years before?

8  A    It was the worse Christmas of my life.  I'm the one that

9  does all the wrapping, putting up the tree, putting the toys

10  together, you know, doing marshmallows in the fireplace, you

11  know.  We had furniture, but we still made pallets on the

12  floor in front of the fireplace and watched Christmas movies.

13  Christmas Eve I wasn't at the stove cooking dinner.  I was in

14  so much pain I just laid.  Christmas day I'm laying.  I'm not

15  enjoying Christmas like I had previous done with Joshua.  I'm

16  just laying in pain.

17  Q    How important to you -- and you were in your forties at

18  this point.  How important to you were the holidays just in

19  general?

20  A    Holidays are very important to me.

21  Q    And have the holidays been the same for you since you were

22  injured at Wal-Mart?

23  A    No.

24  Q    How is it different?

25  A    I can't decorate.  I can't do all the standing up, the

1  cooking, you know.  I'm the type after Christmas, I want my

2  tree down.  I want all the gifts, you know, put where they go,

3  all the clothes.  I want my living room cleaned back up.

4  Q   And we grew up leaving the Christmas tree up after

5  January 1st, but you got it down quicker?

6  A   I clean up.  I clean.

7  Q   Okay.

8  A   In the evening everything is back to normal.  The kids are

9  still playing.

10  Q   But you're getting your house in order?

11  A   I get my house in order.

12  Q   Now you can't do that?

13  A   No.

14  Q   You said you decorated.  Before you were injured would you

15  decorate up on ladders and things like that?

16  A   Yes.

17  Q   Doing the high decorating in the house?

18  A   The high decorating.

19  Q   Can you do that now?

20  A   No.

21  Q   Who decorates for you?

22  A   My daughter, she decorates, but she don't decorate like I

23  decorate.

24  Q   So every Christmas since has just not been the same for

25  you?

1   A   Christmas is not the same at all.

2   Q   Let's go back to the surgery.  How did you recover?  Take

3   us through the recovery period.

4   A   Had my surgery Friday the 23rd.  Tuesday I was in physical

5   therapy.

6   Q   What did you do at physical therapy?

7   A   Dr. Dube -- next to Dr. Dube's office there's a therapy

8   center right there.  Right next door to his office, he has the

9   therapies there.

10  Q   And how was therapy?  Was it easy?  Was it hard?

11  A   Hard, painful.  I still have stitches in there, trying to

12  make you bend your knee, trying to get on the bike, work it

13  out, try to work.  I'm swollen.  It's painful.

14  Q   Did you give it your best effort?

15  A   Yes.

16  Q   Did the surgery help you?

17  A   The surgery helped temporarily.

18  Q   Then what happened?

19  A   I was -- had to go get gel injections, cortisone shots,

20  continue physical therapy.

21  Q   Now let's talk about the gel shots and the cortisone

22  shots.  When those were given to you, do they feel the same or

23  can you tell the difference in what shot you're getting?

24  A   The cortisone -- well, both of them hurt, but the gel,

25  it's a liquid there injected in your knee with a needle.  And

1  it's gel, so it's a little more painful.

2  Q    When they put the needle in, on a one to ten scale how is

3  that pain?

4  A    Ten.

5  Q    And then does -- are you in pain for a while after the

6  shot or do you immediately start feeling better?

7  A    No.  You're still in pain after the shot.

8  Q    How long does it take for the gel to work?

9  A    A couple of days.

10  Q    Has it worked for you in the past, the gel, to make you

11  feel better?

12  A    The gel has worked temporarily.  I would feel better for a

13  while.

14  Q    How many days or weeks or ever how you can describe it

15  does the gel work for you?  How long does it work?

16  A    Well, I would have to go get a gel shot once a week.

17  Q    Is that every week or just for a series?

18  A    For a series.

19  Q    And then how long would it be before you would get another

20  series?

21  A    Couple of -- maybe a couple of months.

22  Q    Okay.  So as you went through this -- are you okay?  Do

23  you need a break?

24  A    No.  I'm fine.

25  Q    As you would go through your treatment with Dr. Dube,

1  would you be telling him your complaints when you went in?

2  A    Yes.

3  Q    And then did there come a time when you and Dr. Dube

4  discussed another operation?

5  A    Yes.

6  Q    Did you ask for it?  Did he bring it up?  What happened?

7  A    No.  I continued to have pain with going down -- up the

8  steps and felt a little -- a pop.  And so I called Dr. Dube's

9  office and let them know.

10 Q    Are steps hard for you or easy?  Are they different from

11 the way they were before?

12 A    Yes.

13 Q    Tell us about that.

14 A    Well, it takes me so much longer.  I go up the steps like

15 my grandbaby, step, step, step.  And I always hold the rail,

16 otherwise my walking -- my knee could give out on the steps.

17 Coming down I hold the rail.  I step, step, step by step.

18 Q    Do you have steps in your home?

19 A    Yes.

20 Q    And where is your bedroom located?

21 A    Upstairs.

22 Q    Where is the washer and drier located?

23 A    Downstairs.

24 Q    Has that impacted your life?

25 A    Yes.

```
1   Q    Tell us about it.
2   A    When I do the laundry, I take a pile, and I just go to the
3   top of the steps and just throw it down to the bottom of the
4   steps.
5   Q    Did you do it that way before?
6   A    No.
7   Q    How do you get it back upstairs?
8   A    Montesha, Montez, Joshua.
9   Q    Who took care of the laundry before you were injured?
10  A    I did.
11  Q    Has the location of your bedroom being on the second floor
12  impacted your movement in your house any other way other than
13  just the laundry?
14  A    Daily if I don't have to go downstairs, I don't go or if I
15  have to go downstairs, I do everything I need to do while I'm
16  downstairs so when I go back upstairs, I don't have to go back
17  down.
18  Q    When you go up or down your steps, does it make your pain
19  increase?
20  A    It increases the pain.
21  Q    Okay.  And how long does it take for the pain then to go
22  away if you go up or down the steps and make the pain worse?
23  A    Take pain pills.  It may take a couple of hours to work.
24  It may work for temporarily.  Then the pain comes back.
25  Q    Ms. Corley, did you have a second surgery with Dr. Dube?
```

1  A    Yes.

2  Q    Okay.  And how did that go?

3  A    Again, physical therapy all over again, the pain all over

4  again, anesthesia all over again.

5  Q    And how did that process go?  Was it as painful a second

6  time as the first time?

7  A    It was a little painful.  It took a little longer.

8  Physical therapy was longer.

9  Q    Now, you've had a third surgery; correct?

10 A    Yes.

11 Q    And have you and Dr. Dube discussed what we heard him talk

12 about, ultimately you'll need a knee replacement?

13 A    Yes.

14 Q    And what's your thoughts about that?

15 A    I want to get my life back.  I want -- I'm okay with it.

16 He's my doctor.  I want my life back.  If a knee replacement

17 is going to help, I want it done.

18 Q    So far have you been able to get your life back?

19 A    No.

20 Q    Is anything about this for you getting better over time?

21 A    No; worse.

22 Q    It's getting worse?

23 A    (Nods head.)

24 Q    Tell us.

25 A    When I'm in pain management, take pain medicine every day.

1  I sleep most of the day.  I can't drive, take Joshua to

2  school, pick Joshua up.  I take a pain pill, I can't do

3  anything.

4  Q   Dr. Dube referred you to pain management after the third

5  surgery?

6  A   Yes.

7  Q   What are your thoughts about that?

8  A   Pain management, pain pills, I don't want to get addicted

9  to just pain pills.  I don't want my life, every day of my

10 life sleeping, unable to -- you know, I'm a mother.  I'm a

11 grandmother.  My life is very limited.  I just don't want to

12 be taking pills for the rest of my life.  I don't want to hurt

13 the rest of my life.  I want to be able to get around, do

14 things for my son, my grandbaby.  I can't even keep my own

15 grandbaby because I'm sleep.  I can't give my grandbaby a

16 bath.  I can't enjoy family time like I used to.

17 Q   How are you handling this emotionally, Ms. Corley?

18 A   It's hard.  It hurts.  Taking a bath I have to sit on the

19 tub, turn myself around to get in the tub, take a bath, get

20 up, sit back on the tub.  I can't take a normal shower or

21 nothing, you know.  It's -- can't do it.  I can't -- sometimes

22 I have an accident trying to get to the bathroom because I

23 can't move as fast as I can, wake up and have to go.  I don't

24 always make it.

25 Q   Has that happened to you in public?

1  A    Yes.  If I go out, I can't go to a public bathroom.  You

2  can't just -- because you're not going to -- you can't squat

3  as hard.  But it's why I just stay home.  I walk, and my knee

4  give out.  I don't ever know when it's going to happen, so I

5  stay home.

6  Q    Ms. Corley, do you need a break, ma'am?  Are you okay?

7  A    (Nods head.)

8  Q    We heard you say a few minutes ago that you take Joshua to

9  the movies still because that's something you can do?

10  A    Yes.

11  Q    Has your movie going -- when you get there, how does that

12  go?

13  A    I'll get there early because the movies we go to they have

14  one seat that's like a loveseat.  I try to get there so I can

15  sit in that seat and prop my leg up.

16  Q    Can you sit inside the regular aisles long enough to watch

17  a movie?

18  A    No.

19  Q    Has the injury impacted your church activities at all?

20  A    Yes.

21  Q    How important to you before this was church?

22  A    Church is very important to me.

23  Q    Where were you going at the time of this?

24  A    We were going to Mt. Zion.

25  Q    And are you still going there or have you changed?

```
1   A    Now I'm at Lake Providence.

2   Q    Okay.  And you've been going your whole life?

3   A    Yes.

4   Q    How is your church different now because of your leg?

5   A    Well, I have to dress different.  I was raised

6   well-dressed, stockings, heels to church.  You dress

7   appropriate for church.  Now I have to wear leggings.  I have

8   to sit on a pew that I can prop my leg up on.  Sometimes

9   church is crowded.  I may have to get up and go out because I

10  can't put my leg up and other people are trying to sit on the

11  pew, and I can't sit a long time with my leg just straight

12  because people are trying to walk back and forth.

13  Q    Has it impacted your ability to participate to be in the

14  choir, things like that?

15  A    Oh, yes.

16  Q    Tell us.

17  A    No more standing up singing in the choir, rocking, going

18  to choir rehearsal.  When I'm on pain pills, can't drive

19  myself to church.  I don't want to be standing up there in

20  church on pain medicine, so I just don't do it.

21  Q    Has your family helped you out?

22  A    Yes.

23  Q    What role has your family played in you being able to deal

24  with this?

25  A    Well, my daughter, she does a lot of driving, my errands,
```

1  cleaning.

2  Q    What about your mom?

3  A    My mom is awesome.  Even with my mom having an illness she

4  put her illness aside to take -- to help me.

5  Q    Ms. Corley, when do you not have pain now in your life?

6  A    I have pain every day.

7  Q    And when you say every day, are we talking at some point

8  every day?  Are we talking all day every day?

9  A    When I'm not taking a pill.  I have pain now.

10  Q    As you sit here?

11  A    As I sit here.  I couldn't take my pain medicine this

12  morning.  I couldn't take my pain medicine yesterday.  I have

13  to be here.

14  Q    How does the pain medicine affect you?  Does it?

15  A    It makes -- it's like a drowsiness feeling.

16  Q    Your sleep, has it been affected?

17  A    Yeah.  I sleep about two or three hours.  Then I'm awake.

18  Q    What wakes you up?

19  A    It's uncomfortable, pain.

20  Q    Pain where?

21  A    In my knee.

22  Q    Before you were injured at Wal-Mart did you sleep well?

23  A    Yeah.  I slept good.

24  Q    Have you had a good night's sleep since?

25  A    Not a good night.  If I get four and a half hours, that's

1  a good night.

2  Q    How often does that happen for you?

3  A    Not often.

4  Q    During these days, when you wake up -- well, let me ask it

5  this way:  Each day when is your pain at its best, when it's

6  hurting the least?  And when is your pain at its worst, when

7  it's hurting the most?

8  A    It doesn't have a time, mornings, late at night, in the

9  afternoon, sometimes at night.

10 Q    How long does it take you to get going in the morning when

11 you get out of bed?

12 A    First I have to get out of bed.  May sit on the edge of

13 the bed about 10 or 15 minutes, get down and start moving

14 around.

15 Q    Do you wear the brace every day?

16 A    Yes.

17 Q    Are there any special instructions with the brace?

18 A    Wear it every day except for when you're sleeping and

19 taking a bath.  It has to be worn on the skin, which I said

20 leggings was the only option because they're so thin.  It

21 can't be worn with jeans.

22 Q    Before this happened to you did you used to like to wear

23 jeans?

24 A    Yes.  I love jeans.

25 Q    Can you wear jeans now?

```
1   A    No.

2   Q    Let's talk about your activity a little bit.  Okay?  How

3   has this injury impacted the things that are most important to

4   you, Ms. Corley?

5   A    I'm unable to -- my mobility, moving around, just daily

6   life.

7   Q    Is it getting any better?

8   A    No.

9   Q    Now, Ms. Corley, have you done everything Dr. Dube has

10  told you the best of your ability?

11  A    Yes.

12  Q    There was some talk about you losing some weight.  Did he

13  tell you to lose some weight?

14  A    He said it would help me, and for my own personal life I

15  wanted to get weight off of me.

16  Q    And did you work hard to do that?

17  A    Yes.

18  Q    How much weight did you take off?

19  A    46 pounds.

20  Q    Did that make your knee feel better?

21  A    No.

22  Q    Have you -- are you still down the 46 pounds or have you

23  put any back on?

24  A    I put it back on.

25  Q    All of it?  Some of it?
```

1  A    All of it.

2  Q    Is that because you're just not moving around?

3  A    I'm not moving around, no kind of exercise or anything.

4  Q    Ms. Corley, I want to ask you some questions about the

5  claims in the lawsuit for a couple minutes.  Okay?  At the end

6  of the case the jury will be given some elements to consider

7  of your harms and losses.  I'm going to ask you if you're

8  asking the jury to award those for you.  Okay?  The medical

9  expenses you've incurred -- can we get the light down one

10  second?  This is Exhibit No. 22 for the trial, Ms. Corley.

11  Are you asking the jury to award you the medical expenses

12  you've incurred so far of $129,068.50?

13  A    Yes.

14  Q    The jury heard Dr. Dube talk about the cost of the future

15  knee replacement surgery -- you can turn the lights back up,

16  thank you -- being $60,000.  Are you asking the jury to

17  compensate that?

18  A    Yes.

19  Q    You heard Dr. Dube talk about the fact that you have other

20  gel shots and physical therapy and a, more likely than not, a

21  fourth arthroscopic surgery before the knee replacement.  Are

22  you asking the jury to award those future costs as well?

23  A    Yes.

24  Q    The suffering you've done with this injury since the day

25  of the injury through the day of this trial, are you asking

1   for the pain and suffering compensation?

2   A    Yes.

3   Q    And for the rest of your life for what you're going to

4   have to deal with?

5   A    Yes.

6   Q    Now, there's an element of damage called loss of enjoyment

7   of life.  Are you enjoying your life the way you were before?

8   A    No.

9   Q    And you've described that to us today; right?

10  A    Yes.

11  Q    Are you asking the jury to consider that element of damage

12  and allow compensation?

13  A    Yes.

14  Q    There's a permanent injury line, cause of -- for permanent

15  injury for the fact that you will suffer with this for the

16  rest of your life on permanent injury.  Are you asking the

17  jury to consider that and award those damages?

18  A    (Nods head.)

19  Q    Loss of enjoyment of life has the elements before, from

20  the date of the injury up to today, and then it has from today

21  and the future.  Are you asking them to award both of those?

22  A    Yes.

23  Q    Okay.  Do you have an idea about what you want?

24  A    Whatever you think is fair.

25  Q    What's been the worst part, Ms. Corley?

1    A    Life, my life.  November the 7th, 2011, my life changed.

2    I have no life, just pain.

3              MR. MCELHANEY:  May I have one moment, your Honor?

4              THE COURT:  Yeah.

5              (Brief Pause.)

6              MR. MCELHANEY:  Ms. Corley, thank you.  Mr. Rowlett

7    will have some questions.  Are you okay?  Do you need a break

8    before that?

9              THE WITNESS:  I'm okay.

10             MR. MCELHANEY:  Okay.

11                          CROSS-EXAMINATION

12   BY MR. ROWLETT:

13   Q    Ms. Corley, you just said you're okay to keep testifying.

14   But if that changes at any time, will you tell us?

15   A    Yes.

16   Q    And if you need to stand up or anything, that's still

17   fine.  Okay?

18   A    Okay.

19   Q    All right.  Now, Ms. Corley, you slipped on water; right?

20   A    Yes.

21   Q    And you don't know where that water came from; right?

22   A    Correct.

23   Q    And you don't know how long it was on the floor; correct?

24   A    Correct.

25   Q    And we saw in the video was that a -- did that video

1  appear --

2           Your Honor, I'm going to move back here and work from

3  here if that's okay.

4           Did that video appear to be an accurate video of what

5  you did that day?

6  A    Yes.

7  Q    Did it appear to have been altered in any way?

8  A    No; not to my -- I don't know.

9  Q    Is it consistent with your recollection?

10 A    Yes.

11 Q    And you had a buggy with you that day; is that right?

12 A    Yes.

13 Q    And you were pushing it, and your son was with you?

14 A    Yes.

15 Q    And you'd gone to the store to get Miracle Whip; is that

16 right?

17 A    Yes.

18 Q    And that was the only thing you planned to get there that

19 day?

20 A    At Wal-Mart I never know what I'm going to get, at

21 Wal-Mart.  That's why I went.

22 Q    You went to -- you went why?

23 A    To get the Miracle Whip.

24 Q    All right.  Why did you get a buggy if you were just going

25 to get Miracle Whip?

1  A    Wal-Mart is a one-stop shop.  I don't ever -- you never

2  know what else you're going to get.  I go down different

3  aisles.  Just because I'm going to get Miracle Whip I

4  always -- I go to different aisles, the sale aisle, the

5  clearance aisle.  It's just a habit.

6  Q    So you brought a buggy just in case; is that right?

7  A    Yes.

8  Q    And then you parked the buggy at the beginning of the

9  aisle; right?

10  A    Yes.

11  Q    Why did you stop the buggy there at the beginning of the

12  aisle?

13  A    To go down the aisle to get the Miracle Whip.

14  Q    Why did you take the buggy with you?

15  A    I just -- I just stopped right there.  I was going to pick

16  up Miracle Whip.

17  Q    It wasn't because there was anybody in the aisle in front

18  of you?

19  A    No.  I didn't see anyone in the aisle.

20  Q    Was anybody in the aisle at all while you were in the

21  aisle that day?

22  A    I didn't see anybody visible in the aisle.

23  Q    Do you know whether the water was present on the floor

24  when you walked with your buggy up and parked it?

25  A    I don't know.

1  Q   Might have been there; might not have been there.  All

2  right.

3          Your Honor, I would ask assistance in showing this on

4  the screen, the video already entered into evidence.

5          Now, Ms. Corley, can you see that screen okay or

6  could we dim the lights a little maybe?

7          All right.  Now, Ms. Corley, do you see yourself in

8  that shot?

9  A   Yes.

10 Q   And have you seen this video before?

11 A   Yes.

12 Q   Have you seen it more than once?

13 A   Yes.

14 Q   And that's you with your son.  And I'm going to play a

15 little bit.

16          (Whereupon, a video was played.)

17 BY MR. ROWLETT:

18 Q   You're walking up toward where you slipped; is that right?

19 A   Yes.

20 Q   All right.  And I've paused it at 3:39:20, and it's your

21 testimony that you don't know whether the water was on the

22 floor at that time; right?

23 A   Correct.

24 Q   And you were going to go to the right down there because

25 the Miracle Whip was just down the aisle a ways; right?

1  A    It was down the aisle, yes.

2  Q    Would it be accurate to say it was about halfway down the

3  aisle?

4  A    I don't recall exactly how far, but it was down the aisle.

5  Q    What's your best estimate of how far down the aisle it

6  was?

7  A    Maybe a little under midways.  I'm not accurate because I

8  don't exactly remember exact where the Miracle Whip was.  It

9  was on the aisle.

10  Q    Several feet down there?

11  A    Yes.

12  Q    And does it look like from the video that you were

13  generally right where you were just a minute ago, the same

14  location where you slipped; is that right?

15  A    No.  It looked like I was on the right side when I walked

16  in.

17  Q    Okay.  So you took your buggy up, and you parked it;

18  correct?

19  A    Yes.

20  Q    And then you turned to the right and went down the aisle;

21  correct?

22  A    Yes.

23  Q    And you came back and walked right to your buggy, and

24  that's when you slipped; right?

25  A    Yes.

1  Q   So if the water had been there when you put your buggy in

2  the stopped position, and you would have stepped in the water;

3  right?

4  A   I don't know.  I can't say I would have stepped in the

5  water.  If I'm walking, I don't know where the water exactly

6  was.

7  Q   Well, you saw the water after you slipped; right?

8  A   Yes.

9  Q   You didn't see it before; right?

10  A   Correct.

11  Q   And you described it as being about the size of a plate;

12  right?

13  A   Yes.

14  Q   And you looked down, and you saw that you had stepped in

15  it and slipped; right?

16  A   Yes.

17  Q   And you saw where the water was; right?

18  A   Yes.

19  Q   And it was right next to your buggy where we see on the

20  video; right?

21  A   Right in front of the buggy.

22  Q   Right.  Okay.  I'm going to play a little bit more and

23  because I've got to ask you a follow up question about it.

24  Would you mind watching with us a little bit more here,

25  Ms. Corley?

1          (Whereupon, a video was played.)

2   BY MR. ROWLETT:

3   Q   And this is again at 3:39:20.  And you've just turned to

4   your right to go down the aisle; correct?

5   A   Yes.

6   Q   All right.  Was that your son starting to go down the

7   aisle with you?

8   A   Yes.

9   Q   Okay.  I'm going to back it up just a little bit and play

10  that again, Ms. Corley, because I want to ask you about it.

11  Okay?

12          (Whereupon, a video was played.)

13  BY MR. ROWLETT:

14  Q   Do you know whether your son stepped in any water before

15  you did?

16  A   No, I don't.  He didn't -- if he would have stepped in it,

17  it wasn't my recollection.

18  Q   You don't remember him saying anything to you about it?

19  A   No.

20  Q   All right.  We're at 3:39:22.  I'm going to play a little

21  bit more.  Okay, Ms. Corley?

22          (Whereupon, a video was played.)

23  BY MR. ROWLETT:

24  Q   I'm pausing it at 3:39:34, Ms. Corley.  Do you know what

25  you were doing around that time?

1  A    I went in the aisle to get Miracle Whip.  I could have

2  been -- I don't know what I was doing, looking on the shelf.

3  Q    Do you remember?

4  A    No.

5  Q    I'm going to play a little bit more.

6          (Whereupon, a video was played.)

7  BY MR. ROWLETT:

8  Q    Now I'm going to pause it right here at 3:39:37.  Do you

9  see the lady in the green shirt with the ponytail right near

10 your cart?  I'll play a little bit more, and then you tell me.

11 And I'll pause it and ask you about whether you see the lady

12 in green.

13          (Whereupon, a video was played.)

14 BY MR. ROWLETT:

15 Q    Did you see her flip her hair right there where you can

16 see the ponytail?

17 A    Yes.

18 Q    All right.  So would you agree it appears there's a lady

19 with a green shirt on and a ponytail right near where your

20 cart is?

21 A    Yes.

22 Q    All right.  I'm going to play a little bit more,

23 Ms. Corley.

24          (Whereupon, a video was played.)

25 BY MR. ROWLETT:

1  Q    You can see her ponytail again there right at 3:39:45.

2  She walks just right where you slipped, didn't she?

3  A    I don't know.  She walked right where I slipped, but she's

4  in the aisle.

5  Q    She's right close to it, isn't she?

6  A    I can't tell how far away she is.

7  Q    Okay.  And she goes down your aisle; right?

8  A    Yes.

9  Q    Because we can see it on the video; right?  I'm going to

10 play a little bit more here.

11          (Whereupon, a video was played.)

12 BY MR. ROWLETT:

13 Q    All right.  Now I'm going to pause it at 3:39:47.  You're

14 not back to your cart yet; right?

15 A    Correct.

16 Q    Now, do you remember when you walked in that aisle,

17 whether you stayed in that aisle?

18 A    Yes.

19 Q    You don't remember going outside the aisle?

20 A    No, I do not.

21 Q    Okay.  So would it be fair to say when you said you didn't

22 remember anybody else being on that aisle at the same time,

23 the video shows that that lady with the ponytail was on the

24 aisle at the same time as you were?

25 A    I didn't visually see the woman in the aisle.

1  Q   But wouldn't you agree the video shows that the woman was

2  on the aisle at the same time you were?

3  A   Yes.

4  Q   Okay.  All right.  I'm going to press play again and go a

5  little bit farther here.

6           (Whereupon, a video was played.)

7  BY MR. ROWLETT:

8  Q   All right.  It's 3:40:02.  You're not back yet; right?

9  A   Correct.

10 Q   Okay.  You think you just went to grab the Miracle Whip in

11 the right container and come right back or do you think maybe

12 you were doing some other shopping when you were down that

13 aisle or you just don't remember?

14 A   I don't remember.  I was getting the Miracle Whip.

15 Q   Okay.  We'll play some more here.

16           (Whereupon, a video was played.)

17 BY MR. ROWLETT:

18 Q   All right.  3:40:09 is when you come back; right?

19 A   Yes.

20 Q   And you came right back to your cart where you parked it;

21 right?

22 A   Yes.

23 Q   And your cart hadn't moved when you were away from it;

24 right?

25 A   Correct.

1    Q    And you pushed your cart up with your hands on the handle;
2    right?
3    A    Yes.
4    Q    And then you moved down the aisle and came back to again
5    get in the same position with your cart; right?
6    A    Yes.
7    Q    You normally push a buggy about the same way, kind of
8    grabbing the handlebar, the handle, and pushing it?
9    A    Yes.
10              (Whereupon, a video was played.)
11   BY MR. ROWLETT:
12   Q    Okay.  Now, 3:40:11, that's when you slip; right?
13   A    Yes.
14   Q    So there's definitely water on the floor at that time;
15   right?
16   A    Yes.
17   Q    Did you see where the water came from?
18   A    No.
19   Q    And have you tried to think about that since you got --
20   well, since you filed this lawsuit for sure.  But you've seen
21   the evidence and tried to figure out where the water came
22   from; right?
23   A    I don't know where it came from.
24   Q    Well, you've considered that; right?
25   A    Yes.  I don't know where it came from.

1  Q   Okay.  I mean, you don't think anybody from Wal-Mart put

2  it there on purpose; right?  We're not here about that.

3  A   I don't know where the water came from.

4  Q   You don't have any reason to believe anybody from Wal-Mart

5  put it there on purpose; right?

6  A   I don't know where the water came from.

7  Q   Okay.  I'm going to play some more here, Ms. Corley.

8           (Whereupon, a video was played.)

9  BY MR. ROWLETT:

10 Q   Now, what's your son doing right there, right at 3:40 --

11 right before 3:40:20?

12 A   He's wiping his foot in the water.

13 Q   Kind of kicking it?

14 A   No; like wiping it.

15 Q   Wiping it, okay.  Now, did you watch the video and see

16 where the folks from Wal-Mart were when they cleaned up this

17 water after?

18 A   Yes.

19 Q   And did you see, I believe the lady's name is Kadisha, go

20 down that aisle a little bit as she was cleaning?  Do you

21 remember that or not?

22 A   No.  I don't remember that.

23 Q   I'm going to play it forward.

24           (Whereupon, a video was played.)

25 BY MR. ROWLETT:

1   Q   I'm going to jump forward just a little bit, Ms. Corley.

2   Okay?  Actually, I think I'm going to have to switch shots

3   because this is the before versus the after.

4            (Wherefore, a video was played.)

5   BY MR. ROWLETT:

6   Q   All right, Ms. Corley.  We're up at about 3:41:43.  And do

7   you see Ms. Smith there guarding the spill?

8   A   Yes.

9   Q   Do you see now another, what you understand from the

10  testimony, to be another Wal-Mart employee come up; is that

11  right?

12  A   Yes.

13  Q   All right.  Ms. Corley, at 3:42:57 does it appear to you

14  that one of the Wal-Mart employees is cleaning up the water?

15  A   Yes.

16  Q   Okay.  I'll let you watch that a little bit more.

17           (Wherefore, a video was played.)

18  BY MR. ROWLETT:

19  Q   Can you tell at 3:43:17 that one of the Wal-Mart

20  associates has gotten some paper towels to go wipe some?

21  A   Yes.

22           (Wherefore, a video was played.)

23  BY MR. ROWLETT:

24  Q   All right.  At 3:43:41 do you see how the Wal-Mart

25  employee has gone down into the aisle where you can't really

1  see her while she's cleaning?

2         MR. MCELHANEY:  Your Honor, I object to that

3  speculation, what she's doing, counsel's commentary.

4         THE COURT:  Sustained.

5  BY MR. ROWLETT:

6  Q   Did you see the Wal-Mart associate cleaning right before

7  she went out of view?

8  A   Yes.

9  Q   And did you see her go down the aisle toward the direction

10  where you got the Miracle Whip?

11  A   Yes.

12         (Whereupon, a video was played.)

13  BY MR. ROWLETT:

14  Q   All right.  Ms. Corley, do you see at 3:43:53 the employee

15  has come back out of the aisle cleaning as he came out --

16  where she came out; is that right?

17  A   I see a guy at the end of the endcap.

18  Q   Okay.  Can you tell, based on the earlier testimony, you

19  can see the person doing something to the floor?

20  A   Yes.

21  Q   All right.  So, Ms. Corley, you did see the lady with the

22  ponytail go down the aisle after you went down there; right?

23  A   No.  I didn't visually see her.

24  Q   Pardon me.  On the video?

25  A   Yes.

1  Q   Okay.  And you don't know if perhaps she might have

2  spilled the water; right?

3  A   I don't know how the water got there.

4  Q   Okay.  Which side -- if you're going down the aisle, you

5  took a right, and went down the aisle, which side was the

6  dressing, Miracle Whip on, your right or your left?

7  A   I think the left.

8  Q   I'm sorry?

9  A   On the left.

10  Q   All right.  I may come back to this, your Honor, but I was

11  just going to put that -- reduce that for the moment.

12          So did you know that liquid was water?

13  A   Yes.  It was water.

14  Q   You could tell; right?

15  A   Yes.

16  Q   And you don't recall seeing any dirt or footprints in it;

17  right?

18  A   I don't -- wasn't visualizing trying to look for

19  footprints.  I just looked down where I was, where I slipped.

20  Q   Okay.  Looking at the video earlier, did you see whether

21  anything was in your cart at the time you walked up there?

22  A   I couldn't tell.

23  Q   Do you recall whether anything was in your cart at the

24  time you walked over there?

25  A   I'm not sure if anything was in it.

1  Q    You just don't recall?

2  A    I don't remember what was in it, if anything was in it.

3  Q    Approximately how long had you been in the store before

4  you slipped?

5  A    Maybe about 30 minutes.  I picked my son up at 3:00.

6  Q    Do you think you were doing shopping during that 30

7  minutes?

8  A    We were looking around.

9  Q    Don't remember whether you picked up anything or not?

10  A    I can't remember.

11  Q    So is it possible that there was water in your cart?

12  A    No.

13  Q    How do you know?

14  A    I wouldn't have gotten a cart with water in it, water on

15  it.  I'm in the store.  If they have carts there, I'm not

16  going to get a wet cart.

17  Q    No, ma'am.  Would you have possibly purchased any kind of

18  container with water?

19  A    No.  I didn't have any water.

20  Q    Do you know what else was in the cart?

21  A    No, I don't.  But I know it wasn't water, didn't have any

22  water.

23  Q    And your position is that this accident was Wal-Mart's

24  fault; right?

25  A    Yes.

```
1   Q    And explain why that is to the jury, please.

2   A    I went in a store that I thought was safe, walked in,

3   limped out.

4   Q    Are you done, ma'am?

5   A    Yes.

6   Q    Do you need a break?

7   A    No.

8   Q    Are you sure?

9   A    Yes.

10  Q    Okay.  Did you see Ms. Smith walk by the aisle after you

11  went down it?

12  A    On the video, yes.

13  Q    Okay.  Do you know whether the water was on the floor at

14  the time she walked by?

15  A    I don't know how the water got there or how long it was

16  there.

17  Q    Now, after you hurt your knee, did you purchase the goods?

18  A    Yes.

19  Q    You don't remember what that was?

20  A    No.

21  Q    And then did you have to pick somebody else's kid up from

22  the bus afterwards too?

23  A    Well, my friend had asked me if I would pick her son up,

24  and she was in the hospital.

25  Q    And so you picked up her son on the way home?
```

1   A    Yes.

2   Q    Had you ever had any experience like this with that pop?

3   A    No.

4   Q    Did I hear you correctly earlier say that since then, you

5   had a situation where you were going up the stairs, and you

6   felt your knee pop?

7   A    Yes.

8   Q    When was that, Ms. Corley?

9   A    It was after my -- after my first surgery.  It's been

10  since my injury.

11  Q    It was before your second surgery?

12  A    I can't remember the exact date because my knee pops all

13  the time and --

14  Q    When it -- has it popped all the time since the accident

15  at Wal-Mart?

16  A    Since the injury.

17  Q    Well, you mentioned at one time on your direct testimony

18  about a popping as you were going up the stairs.  Do you

19  remember that?

20  A    Yes.

21  Q    Okay.  And you said that when you were at the Wal-Mart,

22  that it felt like it popped; right?

23  A    Yes.

24  Q    And then I believe you said that it hurt -- was it an

25  eight and a half out of ten after the accident?

1   A    About an eight and a half.

2   Q    So it hurt a lot after the accident?

3   A    Yes.

4          MR. ROWLETT:  Okay.  Your Honor, may I approach for

5   the exhibits, please?

6          THE COURT:  Yes.

7   BY MR. ROWLETT:

8   Q    And, Ms. Corley, do you remember filling out a witness

9   statement after the accident?

10  A    Yes.

11  Q    Was that in your own handwriting?

12  A    Yes.

13  Q    And did they tell you what to say in it?

14  A    No.

15  Q    Did they just ask you to describe what happened?

16  A    Yes.

17  Q    And did they alter it after the accident?

18  A    I don't understand what you're saying.

19  Q    Well, you saw it earlier, I guess, the Exhibit 5 that you

20  all have -- your lawyer has introduced into evidence.

21         May I pass that up, your Honor?

22         THE COURT:  Yeah.

23  BY MR. ROWLETT:

24  Q    This is Plaintiff's Exhibit 5.  Is that the statement that

25  you wrote out, Ms. Corley?

1  A    Yes.

2  Q    What did you write down at the bottom about how your knee

3  felt after the accident?

4  A    It's aching from the pop.

5  Q    Okay.  Has your knee hurt constantly since the accident?

6  A    Yes.  It's always hurting.

7  Q    It's always hurting?

8  A    Take a pill, pain medicine, and it's gotten a little --

9  after surgery, it got better, a little temporary, but I'm

10  always hurting.

11  Q    Okay.  Now, when you've gone to see Dr. Dube, he's -- he

12  and his people have asked you how your knee felt; is that

13  right?

14  A    Yes.

15  Q    And have you seen any of the records that they generated

16  after your visits?

17  A    No.  I only saw what was on the screen.

18  Q    Were there ever times when you went in there that you were

19  not having distress or did you always have distress when you

20  went into Dr. Dube's office?

21  A    No.  I would have -- temporarily it would feel a little

22  better, but the pain never just gone away one hundred percent.

23  Q    So you've always been in pain every time you've gone in to

24  see Dr. Dube?

25  A    Yeah.  It may have been a time I went and I was feeling a

1  little better.

2  Q   All right.  If there are any entries in the records that

3  your lawyers have made an exhibit in this trial that describe

4  you as not being in any significant distress, would that sound

5  accurate to you?

6  A   I don't understand what you're saying.

7  Q   Let me ask a different question.  If a record shows that

8  you denied having any pain while you were in Dr. Dube's

9  office, did that sound right to you?

10 A   Yeah.  If I was feeling a little better -- if I'm feeling

11 a little better, I'm going to say I'm feeling a little better.

12 I won't say I'm hurting if I'm not.

13 Q   Would you have denied having any pain?

14 A   Not if I'm having pain I won't deny it.

15 Q   And you've had pain since the accident, just it's been not

16 as bad sometimes?

17 A   On a -- yeah.  I may have a good day where if I take a

18 pain pill, I'm not going to feel the pain.

19 Q   What kind of pain pills are you taking?

20 A   Right now they have me on Oxycodone and Motrin.

21 Q   How long have you been taking Oxycodone?

22 A   I went to pain management.  I've been there a little over

23 a month.

24 Q   So you only just started that?

25 A   Yes.

1  Q   Did every time you talked to Dr. Dube before you had one

2  of these scopes, you talked about whether to do it or not with

3  him; is that right?

4  A   Yes.

5  Q   And did you discuss the possibility of a total knee

6  replacement?

7  A   We talked about me having to have a knee replacement in a

8  couple of years.

9  Q   But your knee is really hurting you right now?

10 A   Yes.

11 Q   Have you asked him about the possibility of having one

12 maybe after the first surgery instead of having multiple

13 scopes?

14 A   I didn't know I was going to have to have multiple scopes.

15 I'm not a doctor.

16 Q   Have the scopes helped your knee do you think?

17 A   Temporarily.

18 Q   Who's your primary care physician?

19 A   Clarissa Arthur.

20 Q   How long have you seen Dr. Arthur?

21 A   For a couple of years now.

22 Q   Do you remember who your primary care physician was at the

23 time of the accident?

24 A   Hope Family Medical Center.

25 Q   And how long had you been seeing them?

1  A    A couple of years.  I want to say a couple of years, a

2  year.  I can't recall the exact time.

3  Q    Do you remember the office of your primary care physician

4  that you were seeing during the couple of years before the

5  accident?

6  A    No.  I didn't have insurance, so I didn't have a primary

7  care physician.

8  Q    Were you going to any primary care physician during that

9  time?

10 A    No.  I would only go to the doctor if I was hurting real

11 bad and just go to the emergency room.

12 Q    But you saw Dr. Mohyuddin (phonetic); is that right?

13 A    Dr. Mohyuddin.

14 Q    Pardon?

15 A    Dr. Mohyuddin.

16 Q    Mohyuddin.  Okay.  All right.  And you said that your knee

17 popped in this accident; right?

18 A    Yes.

19 Q    And you said it's popped since the accident?

20        MR. MCELHANEY:  Your Honor, it's repetitious, already

21 covered it.  Object.

22        THE COURT:  Overruled.

23 BY MR. ROWLETT:

24 Q    And so have the pops since the accident been -- any of

25 them been similar to the pop during which you injured your

1 knee at Wal-Mart?

2 A   It's popped.  I can't say if it's -- it popped.

3 Q   Have any of them felt the same as the one where your knee

4 hurt at Wal-Mart?

5 A   Yes.

6 Q   Have they hurt after it popped?

7 A   Yeah.  After it popped it hurt bad.

8 Q   So the Wal-Mart slip was not the only time your knee hurt

9 after it popped.  It hurts after the pops since then; is that

10 right?

11 A   If I'm walking and it popped, it hurts.

12 Q   And when you were walking at the Wal-Mart and it popped,

13 it hurt; right?

14 A   After I slipped and twist and pop, yes, it hurt.

15 Q   Right.  So how would you compare those pops that have

16 occurred since then to the pop that occurred at the Wal-Mart?

17 A   All the pops are painful.

18          MR. ROWLETT:  Give me just a moment, your Honor.

19          (Brief Pause.)

20          MR. ROWLETT:  That's all I've got, your Honor.

21          THE COURT:  All right.

22          MR. MCELHANEY:  May we get the exhibit back from the

23 witness so we can have them all back together, please.

24                    REDIRECT EXAMINATION

25 BY MR. MCELHANEY:

1   Q   Ms. Corley, I may have just a few questions.  Okay?  Are

2  you okay?

3   A  (Nods head.)

4   Q   Mr. Rowlett asked you if you had been able to see the

5  video surveillance footage that Wal-Mart provided to us when

6  we asked for it.  Do you remember that question?

7   A   Yes.

8   Q   Have you ever been -- had a chance to see the video

9  footage that existed before the hour before your injury?

10   A   No.

11   Q   Did you or anybody on your behalf get to go to Wal-Mart

12  and look at all of the footage?

13   A   No.

14   Q   So what of the video you've is just what Wal-Mart gave us;

15  right?

16   A   Yes.

17   Q   Now, you were here yesterday when we heard Mr. Hicks talk

18  about the lady with the red shirt; right?

19   A   Yes.

20   Q   And now Mr. Rowlett is asking you about the lady with the

21  ponytail?

22   A   Yes.

23   Q   Okay.  Did -- when you came out of that -- when you were

24  in that aisle, did you ever see or hear anything that led you

25  to think that water had hit the ground from a break or

1  somebody dropping something?

2  A    No.

3  Q    And Joshua, did he cause the water to be on the floor?

4  A    No.

5  Q    Did he have anything with him that would have done that?

6  A    No.

7  Q    Did you cause the water to be on the floor?

8  A    No.

9  Q    Did you have anything in your buggy that had water in it?

10  A    No.

11  Q    What do you shop for that would have water in it besides

12  like a bottle of water or a jug of water?

13  A    That's the only thing that would have water in it that I

14  shop for.

15  Q    Do you remember picking up any Water bottles that day or

16  jugs of water?

17  A    No.

18  Q    During your treatment with Dr. Dube, Mr. Rowlett was

19  asking you about pain medicine.  And you're on Oxycodone now?

20  A    Yes.

21  Q    And you take -- what's the prescription for that?

22  A    Oxycodone 7.5, two a day along with Motrin.

23  Q    When do you take them, two a day?

24  A    I take one in the morning and maybe late evening.

25  Q    From time to time did Dr. Dube also give you pain

1  medicine?

2  A    Yes.

3  Q    So you've been on pain medicine for three years?

4  A    Yes.

5  Q    Mr. Rowlett asked you what Wal-Mart did, what you blame

6  Wal-Mart for.  Should Katrina Smith have cleaned up the water

7  when she walked by?

8  A    Yes.

9  Q    And all those other employees that were in the area,

10 should they have done something?

11 A    Yes.

12 Q    Should Wal-Mart just leave water laying on the floor?

13 A    They shouldn't.

14 Q    Had you had any training on how to look for or clean up

15 water in a retail store?

16 A    No.

17         MR. MCELHANEY:  Thank you, ma'am.

18         THE COURT:  All right.  Thank you, ma'am.  You can

19 step down.  Let's take a 15-minute break.

20         (Whereupon, the jurors exited the courtroom.)

21         THE COURT:  All right.  See y'all in a few minutes.

22         COURTROOM DEPUTY:  All rise, please.

23         (Brief recess.)

24         COURTROOM DEPUTY:  All rise, please.

25         THE COURT:  All right.  Thanks.  Y'all can be seated.

1  Anything we need to talk about?  All right.  Let's bring the

2  jury back.

3          (Whereupon, the jurors entered the courtroom.)

4          THE COURT:  All right.  Thanks.  Y'all can be seated.

5  Are you ready to call your next witness?

6          MS. HAGH:  Yes, your Honor.  Before we call our last

7  and final witness, actually, we'd like to announce to the

8  Court that the parties have stipulated to Ms. Corley's life

9  expectancy of 35 years based on the relevant mortality tables.

10         THE COURT:  Okay.

11         MS. HAGH:  And we'd ask the court to instruct the

12  jury and to accept the stipulation as fact.

13         THE COURT:  Okay.  All right.

14         MS. HAGH:  Our final witness, your Honor, is

15  Ms. Montesha Corley.

16         THE COURT:  Okay.  Ms. Corley, if you'll come forward

17  up here and when you get up to the front, raise your right

18  hand to be sworn in, right here.

19         COURTROOM DEPUTY:  Raise your right hand, please.

20                 MONTESHA LECHEL CORLEY,

21     herein, having been first duly sworn, was examined

22  and testified as follows:

23         COURTROOM DEPUTY:  State your full name for the

24  record, please, and spell your last.

25         THE WITNESS:  Montesha Lechel Corley, C-o-r-l-e-y.

```
1                          DIRECT EXAMINATION

2   BY MS. HAGH:

3   Q    Montesha, you are Ms. Corley's daughter; correct?

4   A    Yes, ma'am.

5   Q    And how old are you?

6   A    23.

7   Q    And are you currently in school anywhere?

8   A    Yes.  I'm at Tennessee Technology center for cosmetology.

9   Q    And when do you expect to graduate?

10  A    I expect to graduate next year around this time, maybe

11  September.

12  Q    And you currently live with your mom; is that correct?

13  A    Yes.

14  Q    And who else lives there with you?

15  A    I have a younger brother, and my daughter lives there as

16  well.

17  Q    And have you lived with your mom most of your life?

18  A    Yes.

19  Q    As well as your older brother?

20  A    Yes, ma'am.

21  Q    And how old is your brother, older brother?

22  A    My older brother?

23  Q    Yes.

24  A    He's 26.

25  Q    Okay.  And your mom was a single parent; correct?
```

1    A    Yes, ma'am.

2    Q    Okay.  And what was your childhood and teenage years like?

3    A    We've always been very, very close, and I was very active.

4    I started dancing when I was seven, and I also started

5    cheerleading when I was nine.  So she was always around, and I

6    cheered for multiple teams, sometimes three different

7    organizations, along with dancing.  And she was like a cheer

8    mom, so she never missed a game, never missed a competition.

9    She made water bottles, T-shirts, designed bags.  She done

10   that -- actually, I stopped cheerleading at 18, and she was

11   there the entire time.

12              And at my games she would come -- and it was this one

13   incident where I guess we got snowed in at the game, and she

14   actually carpooled some of my cheer mates and had another

15   parent follow to my house.  And we all just went to my house,

16   and we slept in her bed too.  And it was like over 14 girls,

17   but she's always been there through everything, competitions,

18   dance, cheerleading, every game, homecomings.  And I was at

19   homecoming like for four years, and she was always there,

20   right there in the front.

21   Q    So she was very involved in your life?

22   A    Yes.

23   Q    And did you go to school here in the Nashville area?

24   A    Yes.

25   Q    Where did you go to school?

1  A    High school?

2  Q    Yes.

3  A    McGavock Comprehensive High School.

4  Q    And what year did you graduate high school?

5  A    2009.

6  Q    Okay.  And how old were you when your mom took in Joshua,

7  your youngest brother?

8  A    I was 13.  Yes, I was 13.

9  Q    What was the dynamic like when he became a sibling and

10  third addition to your family?

11  A    It was -- we loved it.  We hadn't had babies in our family

12  for a while, so he became the baby.  And we loved it.  We

13  couldn't have asked for a baby at a better time.

14  Q    And did your mom raise him by herself as well?

15  A    Yes, ma'am.

16  Q    Did you help her any when you were a teenager?

17  A    Yes, ma'am.

18  Q    Okay.  And you have a daughter yourself now; correct?

19  A    Yes, ma'am.

20  Q    And how old is she?

21  A    She's three.

22  Q    When was she born?

23  A    She was born October 10th, 2011.

24  Q    Okay.  So just weeks before your mother's incident at

25  Wal-Mart your daughter was born?

1  A    Yes.

2  Q    Did your mom help you any in those first three weeks of

3  Carmen's life?

4  A    Yes.  She helped me a lot.  Actually, I had a Cesarean

5  section, so I needed a lot of help.  And she would come get

6  her in the middle of the night.  I mean, I breast fed as well,

7  but she was right there helping me.  She would keep her

8  basically almost the whole night until it's time to be fed,

9  and she would bring her in there.  And she would help with her

10 baths, everything.

11 Q    Changing?

12 A    Changing.

13 Q    Feeding?

14 A    Feeding.  I had trouble with the breastfeeding, but she

15 actually helped me with the breastfeeding as well.  And when I

16 needed rest, even during the day if she had her at night, she

17 would still help me during the day when I needed rest as well.

18 Q    How would you describe your mom prior to this injury?

19 A    She was very active, always on the go, had lots of energy,

20 just exciting, very fun.

21 Q    And you've talked about some of the things she did with

22 you while you were involved in cheer and dance.  What are some

23 things that you did as a family with your two brothers and

24 your mom?

25 A    We would go to amusement parks, Beech Bend in Kentucky,

1  and we always did that like every year, maybe sometimes twice

2  a year.  And we would go to Family Fun Center, Laser Tag.

3  Yeah, she would be there running around too.

4          Me and my mom, we would go get our nails done, toes

5  done.  We would dance by ourselves too, play like WII games or

6  any type of Play Station games.  So we would dance and play

7  rock band.  And with my older brother and my younger brother,

8  we would go to the movies, just everything actually outside

9  the house.

10 Q   And when you guys would go to amusement parks or different

11 places, was your mom able to be on her feet all day?

12 A   Oh, yes.

13 Q   Was she able to ride any of rides?

14 A   Yes.  She would ride the rides with us, and she's mainly

15 the one with the energy.  I would be the one who's tired and

16 ready to go home.  But, yeah, she would.

17 Q   Did she ever have any problems getting around?

18 A   No; not at all.

19 Q   Did she ever complain of knee pain?

20 A   No; not at all.

21 Q   Did she ever complain of right knee pain?

22 A   No.

23 Q   How has that changed since her injury at Wal-Mart?

24 A   She really don't leave the house much.  She kind of just

25 stay in bed a lot or she'll sit on the couch.

1   Q   Take your time.

2   A   I'm sorry.  She kind of just -- we don't really leave the

3   house too much.  She kind of just lay around.  Sometimes she

4   would kind of try to get up and cook, but she doesn't really

5   have the energy anymore.  And she's kind of always just in

6   pain.  It's just a drastic change.

7   Q   And I can see and understand it's difficult for you to

8   talk about.  But how has that affected, you know, your home

9   life and Joshua's home life?

10  A   He wants to start sports, but it's kind of hard getting

11  around now.  So, of course, she wants to be there to take him

12  and to be at every game, but it's kind of hard.  I have to

13  help out with school, taking him to school sometimes, and

14  picking him up along with my daughter.  My mom was usually the

15  one who watches my daughter, but I have to take her to my

16  grandma's now, which is out east Nashville.  We live in

17  Antioch.

18          So sometimes I would wake up and take my brother to

19  school and then take my daughter to my grandma's, then drive

20  back to school -- well, drive to school, then back to my

21  grandma's if she doesn't spend the night, and then go home.

22  But sometimes she's tired, so I would have to miss class,

23  which is -- I understand because some days she needs to take

24  her medicine, like she's in pain.  So I would just kind of

25  take my brother to school and keep my daughter, and I would

```
 1   pick my brother up just so she don't have to leave the house
 2   so she can just rest and get some of the rest that she needs.
 3   Q    Other than helping take Joshua to and from school, what
 4   other things have you done to help your mom these last three
 5   years?
 6   A    I've grocery shopped.  I'm not the best shopper, but I
 7   try.  I grocery shop.  I help around the house, cleaning, help
 8   her with laundry.  She's a very clean person.  Like she likes
 9   things done her way.  But I try my best to clean as good as
10   she wants -- and she's fine with it -- and just anything that
11   she needs.  Because she likes making things, so I would go out
12   and pick up some -- go to Hobby Lobby, pick up some material,
13   shirts, and she would do it if she feels like it.  But she
14   doesn't really have the energy, so I would just go out and get
15   some extra things that she needs for the house.
16   Q    Now, was your mom able to do all the cooking and cleaning
17   prior to her injury?
18   A    Yes.  She did mainly -- well, she did all the cooking and
19   the cleaning.  We cleaned up as well, but she did everything.
20   Q    And would she always be responsible for taking Joshua to
21   and from school?
22   A    Yes.
23   Q    And she'd watch Carmen for you every day?
24   A    Yes.
25   Q    Now, your mom's first surgery was two days before
```

1  Christmas.  Do you remember that?

2  A    I do.

3  Q    Tell me what that Christmas was like for you in your

4  house.

5  A    Okay.  Well, that Christmas I remember she was on the

6  couch.  We had a tree here and right here, and our tree was

7  here and she had her leg -- she was laying on the couch, and

8  she was just kind of propped up.  She had her medicine then

9  but she wasn't -- well, she just wasn't feeling too good, so

10  you couldn't tell the excitement she wanted to be.  But you

11  could just see how much pain she was in.  So I had to help the

12  kids with her gifts in building things like the bikes and put

13  together doll houses because I have a niece as well.

14          So every Christmas she would wake up, and she would

15  make a big breakfast like eggs, bacon, sausage, pancakes,

16  biscuits.  She would make a breakfast every Christmas morning.

17  So she wasn't able to do that, and I put up the Christmas

18  tree.  And on that Christmas day we opened up gifts maybe

19  around 6:00 o'clock, and she is right there usually.  The

20  Christmas prior, before the injury, she would be there to take

21  the trash of the gift wraps, and she would clean as we go.  So

22  that's what I was doing.  I was trying to like keep our house

23  clean because I know how she is.

24          So I was there with the kids passing them their

25  gifts.  She usually does that, but she wasn't feeling well.

1  She basically laid there the whole Christmas because she just
2  didn't feel good at all.  So I was trying to be her actually
3  by cleaning and passing out the kids' gifts and setting up the
4  night before.  So she just wasn't herself at all.
5  Q    And so your mom would usually do all the Christmas
6  shopping --
7  A    Yeah.
8  Q    -- for all the kids, for her grandkids.  She would wake up
9  and cook that day usually?
10 A    Yes.
11 Q    But she wasn't able to that year?
12 A    No.
13 Q    Was she able to the following year?
14 A    Not really; more than she could the previous year.  But
15 the following year I still put up the tree, took down the
16 tree, helped with the gifts.  She wasn't able to shop as well.
17 Q    And before she could put up the Christmas tree by herself?
18 A    Yes; Christmas tree, Christmas lights around the windows,
19 a wreath on the door.
20 Q    She could hang all the ornaments?
21 A    Yes.
22 Q    Take the tree apart.  Did you guys have a real tree or a
23 fake tree?
24 A    We would have a fake free.
25 Q    So she could put it together, take it down, put it in a

1  box?

2  A    Yes.

3  Q    Where do you guys normally store your tree?

4  A    We had a storage room on our balcony.

5  Q    Was your mom able to take the tree and put it up by

6  herself?

7  A    No.  She hasn't been able to do that for the past three

8  years.

9  Q    She could do that before?

10  A    Yes.

11  Q    Okay.  What role have you played in -- and you've talked

12  about this a little, but during the time that your mom, these

13  three years, your mom has had three different surgeries on her

14  knee -- what role have you played in her medical treatment, if

15  anything?

16  A    I took her to her last two surgeries.  I took her to

17  her -- I can't think of what it's called after her --

18  Q    You'd take her to physical therapy?

19  A    Yes.  I would take her to her physical therapy

20  appointments.  It would actually be me and my daughter.  I

21  would bring her along, as I didn't have anyone else to watch

22  her.  But I would take her there every time, go pick up her

23  prescriptions.

24  Q    Would you and your daughter actually go into the doctor's

25  office?

1  A    No.  We would go and run some errands if she needed

2  anything while she was in there, and then we would sometimes

3  wait in the car because I didn't want to bring a baby into the

4  doctor's office with her whining or anything like that.  But

5  we would wait in the car if we wouldn't run errands, and then

6  we would go back and pull up and pick her up.

7  Q    What's the biggest change you've seen in your mom,

8  Montesha, since her injury at Wal-Mart?

9  A    Her lack of energy and just all around.  She's usually a

10 very excited, energetic, outgoing person, like never sits

11 down, never needing anything.  She likes to do for herself.

12 But now she can't really do too much of that, do too much of

13 anything because she's always in pain.  So she's just not

14 herself, not who she used to be.

15 Q    And other than her emotional changes, have you noticed

16 anything different about her physically?  Does she walk

17 different now?

18 A    Yeah.  Sometimes when she's walking, her leg will give

19 out.  Like I notice it, and she does that a lot.  Her leg

20 always gives out, and it can be just walking to the kitchen.

21 Q    Does she have trouble getting up and down steps?

22 A    Yeah.  She walks up the stairs like my daughter, my

23 three-year-old, like step up, step up, step up, step up,

24 right.

25 Q    Did your mom have a problem walking up and down the steps

1 any before this injury?

2 A   No; not at all.

3 Q   Did you ever see your mom walk with a limp before this

4 injury?

5 A   Not at all.

6 Q   Does your mom wear her brace every day?

7 A   Yes.

8 Q   Do you have to help her doing any of her personal care,

9 anything in the shower?  Do you help her with that?

10 A   When she first had her surgeries, like every time, every

11 time she had her surgery I would help her go to the restroom,

12 get her ice packs and all that.  I would help her get dressed,

13 help her wash up and all that.

14 Q   How is your mom doing?  How do you think your mom is doing

15 today?

16 A   Today I would say better than she was a couple of months

17 ago after her surgery.  She's getting better, but she still

18 has her days, her moments in time where she's just not looking

19 too good, and I can tell that she needs to lay down and take a

20 chill.

21 Q   How has this injury -- how do you think this injury has

22 affected her emotionally?

23 A   Because she's just so used to doing everything for

24 herself, and she's not a person to ask for anything.  She's

25 not a person to ask for anything and she just --

1 Q Now she has to ask for help?

2 A Yeah.

3 Q How has her injury affected you?

4 A We don't really get to do -- I don't mind doing anything

5 to help my mom, but we don't really just get to have our

6 quality time outside or do things that we used to do.  Like

7 now we do have a lot of similarities, and we love designing

8 and making things.  And as far as activities, as far as like

9 dancing, we still love to watch little girls dance and cheer.

10   We don't really get to just go outside and do things.

11 If we do go out, she gets tired like really easy because her

12 knee is like always giving out, and she can go out for a

13 little bit.  But she can't really do that.  We don't really

14 shop anymore, and we don't really go out and get our nails and

15 toes done, just different activities that we were able to do

16 before this.  She's not able to do this anymore.

17 Q Is most of the time you spend together now at home?

18 A Yes.

19 Q How is your mom's relationship with your daughter Carmen?

20 A Oh, it's great.  It's amazing because she loves her

21 grandma.  She sleeps with her, and she sleeps wild.  So I will

22 have to let her fall asleep with my mom and then kind of go

23 get her and bring her back to my room.  But sometimes I would

24 still wake up, and she's found her way back into her room.

25 She just loves her grandma.

1  Q    Is your mom able to play with Carmen?  To pick her up?  To

2  hold her?

3  A    She can hold her, but she can't let her crawl on her.  She

4  loves to crawl on my mom.  Like that's her grandma.  That's

5  hers.  So she can't really just do too much with her as far as

6  letting her just crawl all types of ways.

7  Q    And why is that?

8  A    Because sometimes she would hit her knee, and she even

9  knows that her knee is messed up now.  So she'll kind of like

10  move around to the other side and climb more over on her left

11  side.  So if she knows that my mom is not feeling good, she

12  would go and say, Mama -- she calls her mama, and she calls me

13  mommy.  So she would go and she was like -- she'll say, Mommy,

14  does Mama knee hurt?  And I would say, yes.  So she would go

15  and she would kiss her knee and say -- just try to make her

16  feel better.  And she's only three, but she loves her grandma.

17          MS. HAGH:  Thank you, Montesha.

18          THE WITNESS:  You're welcome.

19                          CROSS-EXAMINATION

20  BY MR. ROWLETT:

21  Q    Ms. Corley, I'm Andy Rowlett.  I represent Wal-Mart in

22  this case.  We haven't met before today, have we?

23  A    No; not at all.

24  Q    All right.  And I don't represent your mom.  I

25  representing Wal-Mart, so I'm going to call you Ms. Corley.

1  Is that okay?

2  A   Yes, sir.

3  Q   All right.  Now, Ms. Corley, you talked about some of the

4  things you're doing to help your mom out.  Is there any kind

5  of division or responsibilities between you and anybody else

6  who's helping her out, like certain things you do and other

7  people might do to help her out?

8  A   Yes; more as transportation.  I pick up my brother.

9  Sometimes I grocery shop for her.  If anything -- if she needs

10 anything, I'm mainly the driver, so I would go out and get

11 certain things that she needs.

12 Q   Okay.  How about your grandmother?

13 A   Yeah.  She helps too.  It's between me and my grandmother.

14 Q   Okay.  All right.  And is there kind of a split between

15 how you all help, who does what?

16 A   Just whatever works with our schedules that day.

17         MR. ROWLETT:  Your Honor, I need just a moment.

18         (Brief Pause.)

19         MR. ROWLETT:  That's all I've got, your Honor.

20         THE COURT:  All right.  Okay.  Thank you, ma'am.  You

21 can step down.

22         MR. MCELHANEY:  Your Honor, that's the plaintiff's

23 case in chief.

24         THE COURT:  All right.  We're going to take a

25 15-minute break.  I need to talk to the lawyers for a little

1    bit, and I'll call y'all back in here.

2            (Whereupon, the jurors exited the courtroom.)

3            THE COURT:  All right.  Did you have a motion you

4    wanted to make?

5            MR. ROWLETT:  I do.

6            THE COURT:  Okay.  Go ahead.

7            MR. ROWLETT:  Do it now?

8            THE COURT:  Yeah.

9            MR. ROWLETT:  Your Honor, Wal-Mart moves for judgment

10   at this time based on liability and the lack of proof of

11   liability.  As the Court knows from the proof entered so far,

12   the initial investigation by the folks at the store led to

13   them thinking that was probably a woman with a cup, who was

14   shown on the video.  But additional work on that -- and I can

15   show the video if that would be helpful to the Court.  But

16   additional work in recent days has shown that that was a

17   shopping list very likely.

18           And, also, additional work has indicated and evidence

19   from this trial has indicated that Ms. Corley went down the

20   aisle and was down there for a short period of time.  Another

21   woman went down there not that long after, and it's just not

22   possible to tell with any kind of preponderance of the

23   evidence, without speculating, the source of the water, how

24   long it was there, where it came from, anything like that.

25   Now --

1          THE COURT:  Well, is it really speculation?  We know

2     it was there at least an hour beforehand because we all

3     watched the video, and it never shows up.  So it must have

4     been there.

5          MR. ROWLETT:  Your Honor, that's actually not the

6     case because the video shows multiple people walking over and

7     over and --

8          THE COURT:  But you say -- I'm listening to your

9     testimony when you go okay -- and these were your words

10     somewhere -- we know the water is there now.  And we all see

11     them clean it up.  So there is a point when there's water

12     there; right?  Everybody agrees on that.

13          MR. ROWLETT:  Right.  But you can never see it on the

14     video.

15          THE COURT:  But you're not denying it's there.  You

16     can't see it on the video, but nobody is denying there's not

17     water on the floor.

18          MR. ROWLETT:  That's right.

19          THE COURT:  So then the question becomes when did it

20     get there, and how long had it been there.  But you never see

21     anybody on the video cause the water to be on the floor.

22          MR. ROWLETT:  Your Honor, I think the only thing that

23     makes any sense is for the water to have come from off screen

24     or --

25          THE COURT:  But so what?  Even if it did, so what?

1          MR. ROWLETT:  Well, the so what is that it could have
2    occurred after the woman with the ponytail went down that
3    aisle and while --
4          THE COURT:  That would be a stretch.  I mean, could
5    it have?  It could have, but we all watched the video over and
6    over again.
7          MR. ROWLETT:  Your Honor, we're all in a position of
8    speculating.
9          THE COURT:  That's not speculating.  I'm watching it.
10          MR. ROWLETT:  Right.  And --
11          THE COURT:  I'm not going to argue with you because
12    I'm going to deny your motion.  But I'm trying to tell you
13    here's what the jury is going to be thinking.  There are all
14    kinds of places in there where they can go this water was on
15    the floor, you know, maybe it had been there longer than an
16    hour.  We don't know.  How did it get there?  Don't know.  But
17    it was there.  And then they get to decide, based on watching
18    the video and the testimony, how long it was there.  They
19    don't have to know how it got there, do they?
20          MR. ROWLETT:  Your Honor, they're just going to have
21    to speculate to conclude that it was there beyond a few
22    seconds before, which is --
23          THE COURT:  Why?  They get to watch the video.
24    That's not speculation.  They can watch it and say I don't see
25    it happen, so it's a reasonable conclusion to say that it must

1   have been there because we all watch it and don't see it hit

2   the floor.  The idea that the lady in green had anything to do

3   with it seems pretty farfetched.

4         MR. ROWLETT:  Well, your Honor, if the Court has made

5   the Court's ruling, I won't address it further --

6         THE COURT:  No, no.  I'm just talking with you about

7   it because I'm watching the same stuff.  I don't know what

8   they're going to do, but there's all kinds of evidence.  I'm

9   just wanting to talk to you about your case.  It's an

10  interesting way to try it.  I don't know what else you're

11  going to do, but it's a tough case.

12        MR. ROWLETT:  Okay.  Well, I hear you, but, your

13  Honor, we're just convinced the water was not sitting there an

14  hour.  But be that as it may --

15        THE COURT:  Well, I know you may be convinced of

16  that, but you don't learn that -- you don't get there by

17  watching the video.

18        MR. ROWLETT:  Well, fortunately Mr. Hicks explained

19  what you can see on the video and what you can't, and his

20  experience watching people may --

21        THE COURT:  I agree with you.  I see them.  They

22  don't appear to be stepping over anything.  Nobody appears to

23  be seeing it.  But it's there, and nobody denies that it was

24  there.

25        MR. ROWLETT:  Well, sure.  We denied it was there

1  before -- at any point before she slipped that anybody can

2  conclude without speculating.  There's no evidence.

3        THE COURT:  There's evidence that it was there.

4        MR. ROWLETT:  At the time she slipped.

5        THE COURT:  And there's -- and as you watch it, you

6  see it didn't get there any other time.  Now, you know, maybe

7  if there had been another hour or two of the video, you might

8  see how it got there.  But it's clearly there when she slips,

9  and you don't see it get there beforehand.  I don't know.  I

10 don't know what they're going to do, but there's plenty of

11 evidence that a jury could conclude it was there.  There's

12 also evidence to conclude it wasn't there and it magically

13 appeared a second before she slipped on it.  I don't know.

14 We'll see.  I mean, right?  That's your theory.  It magically

15 appeared.

16        MR. ROWLETT:  There is no magic about it.  We can't,

17 you know, I guess every time -- we've gotten kind of used to

18 videos and being able to tell what happened and figure things

19 out with all this technology and CSI and here's exactly what

20 happened.  We just can't see what happened at this location.

21        THE COURT:  But is it your theory that it occurred a

22 split second sometime before -- immediately before she

23 slipped?

24        MR. ROWLETT:  It may well have, and we don't know.

25 We just don't know.

```
 1              THE COURT:  Okay.
 2              MR. ROWLETT:  And you've got to speculate to say
 3    other than that.
 4              THE COURT:  I don't know.  Not much speculation but
 5    okay.  All right.  Unfortunately it's the jury that will make
 6    the decision.  So it's fortunately for you.  Okay.  Well, then
 7    let's take a few minutes.  Do you know -- you're set for the
 8    rest of the day?
 9              MR. ROWLETT:  I have Gavigan, and I think that will
10    be it.
11              THE COURT:  Okay.  I'd like to get out -- well, we're
12    going to need to get out a little early because it's CMA.  I
13    don't know if we can finish him before 5:00.  We may have to
14    come -- we're going to have to come back tomorrow anyway and
15    have closing and all that, but CMA is going on.  It's going to
16    screw up everybody's parking for them because all of a sudden
17    Central Park is going to jack up the rates after 5:00 o'clock,
18    and everybody is going to want to get out of town.  So, you
19    know, it's 3:20.  About 4:30, 4:45 we can -- I'm not saying
20    rush through it.  I'm saying if we get to 4:30, 4:45, let's
21    just go ahead and stop and finish him the next day so
22    everybody can get out of here.
23              All right.  Let's take ten minutes.
24              COURTROOM DEPUTY:  All rise, please.
25              MR. MCELHANEY:  Your Honor?
```

```
 1              THE COURT:  Yeah.
 2              MR. MCELHANEY:  I'm sorry.  Can we have permission
 3   for Ms. Corley to be excused for the rest of the afternoon?
 4              THE COURT:  Yeah.  That's fine.
 5              MR. MCELHANEY:  Thank you.
 6              THE COURT:  Okay.
 7              (Whereupon, the jurors exited the courtroom and there
 8   was a brief recess.)
 9              COURTROOM DEPUTY:  All rise, please.
10              THE COURT:  Thanks.  All right.  You're ready?
11              MR. MCELHANEY:  Yes, your Honor.
12              THE COURT:  Okay.  Let's bring the jury in.
13              (Whereupon, the jurors entered the courtroom.)
14              THE COURT:  Thanks.  Y'all can be seated.
15   Mr. Rowlett, you're ready?
16              MR. ROWLETT:  Yes, your Honor.  Defendant calls
17   Dr. William Gavigan.
18              THE COURT:  Doctor, if you'll come forward up here,
19   Ms. Brewer is going to swear you in if you'll raise your right
20   hand.
21              COURTROOM DEPUTY:  Raise your right hand, please.
22                        WILLIAM GAVIGAN, M.D.,
23              herein, having been first duly sworn, was examined
24   and testified as follows:
25              COURTROOM DEPUTY:  State your full name for the
```

1  record, please, and spell your last.

2          THE WITNESS:  William Gavigan, G-a-v-i-g-a-n.

3                    DIRECT EXAMINATION

4  BY MR. ROWLETT:

5  Q    Would you state your full name again for the jury, please,

6  sir.

7  A    William M. Gavigan.

8  Q    And, Mr. Gavigan or Dr. Gavigan, are you a medical doctor?

9  A    I am.

10  Q   How long have you been a medical doctor?

11  A    37 years.

12  Q   Where are you licensed to practice medicine?

13  A    In Tennessee.

14  Q   How long have you been licensed in Tennessee to practice

15  medicine?

16  A    That long.

17  Q   Continuously?

18  A    Yes.

19  Q   Where did you go to college?

20  A    Notre Dame, University of Notre Dame.

21  Q   And medical school?

22  A    St. Louis University.

23  Q   Where did you do your residency?

24  A    At Mayo Clinic.

25  Q   Are you board certified?

```
1   A    I am.

2   Q    By what entity or in what area?

3   A    It's orthopedics.  It's the --

4          THE COURT:  You can lead him on this if you want.

5          MR. ROWLETT:  Okay.

6          THE WITNESS:  AAOS I think it is.

7   BY MR. ROWLETT:

8   Q    Is that for orthopedic surgery?

9   A    Yes.

10  Q    And are you currently performing surgery these days?

11  A    No, I'm not.

12  Q    Okay.  And for how long did you perform surgery as an

13  orthopedic surgeon?

14  A    34 years.

15  Q    Was that in Nashville?

16  A    In Nashville.

17  Q    All right.  With what group at the end?

18  A    At the end.  Since about 1993, it was with TOA.

19  Q    And what is TOA?

20  A    Tennessee Orthopedic Associates.

21  Q    All right.  Now, when were you last treating patients as a

22  medical doctor?

23  A    In April of 2011.

24  Q    And why are you not doing that anymore?

25  A    Well, around that time I started slowing down.  And I
```

1  decided I'd done it for 34 years, and it was time to stop.

2  Q   As part of your work as an orthopedic surgeon, had you

3  ever evaluated cases where patients of yours were injured?

4  A   Yes.

5  Q   Approximately how often over the years?

6  A   It's what orthopedics do, I mean, many, many times.

7  Q   Was it a weekly occurrence?  Monthly?

8  A   I think -- was your question injury?

9  Q   Well, how often were you evaluating persons with injuries?

10 A   Probably every day.

11 Q   And then have you been involved in the legal system in

12 terms of giving depositions or testimony for people who have

13 been injured?

14 A   I have.

15 Q   And you did that while you were at TOA?

16 A   Yes, I did.

17 Q   So currently are you assessing claims made by persons who

18 are injured or claiming injury?

19 A   Yes, I am.

20 Q   Now, are you doing that in cases like this one where

21 somebody is injured say not at work?

22 A   Yes.

23 Q   Are you also doing it as part of workers' compensation

24 matters?

25 A   I am, yes.

1    Q    So do you do work for defendants or plaintiffs or both?

2    A    The majority is for defendants.  Probably it's 80/20 now,

3    80 percent defendants and 20 percent plaintiffs.

4    Q    Have you ever been retained by Wal-Mart that you recall

5    before this matter?

6    A    I don't recall.

7    Q    And my law firm is Howell & Fisher.  Do you remember ever

8    working with me or anybody over there?

9    A    I do not remember.

10   Q    When you were practicing as a treating physician, did you

11   always know who the lawyers were who came in and did a

12   deposition with you?

13   A    I'm sorry.  Say that again.

14   Q    When you were practicing as a treating physician and one

15   of your patients was injured, would sometimes their lawyer

16   take your deposition?

17   A    Yes.

18   Q    Was that done regularly throughout your career?

19   A    Yes.

20   Q    Now, please describe for the jury what the focus of your

21   practice was as an orthopedic surgeon.

22   A    I was a general orthopedist.  I would treat hands, knees,

23   hips, do back surgery.  I did the full gamut.  As time went

24   on, I stopped doing back surgery.

25   Q    And have you reviewed medical records related to

1    Ms. Corley in this matter?

2    A    I have.

3    Q    Okay.  Do you remember?  Was it quite a few or --

4    A    Yes; about like this.

5    Q    Do you remember whether it was both before and after her

6    accident at Wal-Mart?

7    A    It was after her accident at Wal-Mart.

8    Q    Okay.  And what issue or issues were you assessing as part

9    of your review?

10   A    Causation.

11   Q    Now, are you qualified to assess that issue?

12   A    As an orthopedic surgeon, yes.

13   Q    Have you seen patients with knee issues such as Ms. Corley

14   had?

15   A    Yes.

16   Q    Was that common over your career or occasional?

17   A    Very common.

18   Q    Have you ever performed knee surgeries involving a scope?

19   A    Yes.

20   Q    Can you describe for the jury kind of how often or how

21   much of that you did.

22   A    Well, I knew you'd ask, so I tried to have a conservative

23   number.  It's at least a thousand if I did 30 a year.

24   Q    Was it a regular part of your work?

25   A    But it was a regular part of what I did.

1  Q    How often were you in surgery over the years?  Twice a

2  week or --

3  A    Two to three times a week.

4  Q    And as part of that work, did you read x-rays of knees?

5  A    Yes.

6  Q    MRI's?

7  A    Yes.

8  Q    And have you treated patients with a torn meniscus?

9  A    I have.

10 Q    Have you ever treated patients who needed a total knee

11 replacement?

12 A    I have.

13 Q    Have you ever treated patients with arthritis in their

14 knees?

15 A    Yes.

16 Q    Please explain to the jury generally how medical records

17 are maintained and why or generated, rather, at least in your

18 experience.

19 A    Well, the patient would come in.  We would take a history,

20 do an exam, do tests, render treatment, and that would all be

21 documented in medical records.

22 Q    And what's the point of documenting all that in a medical

23 record?

24 A    Well, it's important to know -- all of us want to know the

25 history of what's happened to us, especially medical issues.

1  Q    And when you had a patient come in, would you ever look at

2  their records from before --

3  A    Always.

4  Q    -- they came to see you?

5  A    Always.

6  Q    Why?

7  A    Because to know what's going on now with somebody you

8  would have to know their past history.  I would first take a

9  history of what the present illness is, what happened, and

10 then I would ask what happened before.

11 Q    And in terms of assessing causation in this case with

12 Ms. Corley, what role did medical records play in that

13 assessment?

14 A    A lot.

15 Q    And did you actually examine Ms. Corley?

16 A    No, I did not.

17 Q    Was that necessary to your evaluation of causation?

18 A    Not three years out.  Maybe initially if I saw her, that

19 would have been helpful for causation, but three years out it

20 wouldn't be helpful for what happened.

21 Q    Initially you mean right after the accident?

22 A    Yes.

23 Q    Okay.  And you understand that -- did Ms. Corley have knee

24 surgery?

25 A    Yes.

1  Q   Now, Doctor, today I'm just going to ask you about the

2  first and second one.  Okay?

3  A   All right.

4  Q   All right.  Now, did you review records related to

5  Dr. Dube's treatment of Ms. Corley?

6  A   I did.

7  Q   And did he document his care and treatment of Ms. Corley?

8  A   Yes.

9  Q   Based on your expertise and history as an orthopedic

10 surgeon, were you qualified and able to assess it and

11 understand it?

12 A   Yes.

13 Q   And given her presentation when she first came in to

14 Dr. Dube, have you seen patients similar to Ms. Corley?

15 A   Yes.

16 Q   Many times?

17 A   Many times.

18 Q   All right.  And, Doctor, did you prepare a report for us?

19 A   I did.

20 Q   Well, feel free to refer to that if you need to refresh

21 your recollection.  Do you remember every single detail in the

22 stack of records that you reviewed?

23 A   No.  I tried to clean out salient parts to put in my

24 report.

25 Q   All right, Doctor.  Well, referring to when Ms. Corley

1   first came in to see Dr. Dube, do you have a record of what

2   kind of issues she was having at that time?

3   A    Well, she had had a twist injury at Wal-Mart and had knee

4   pain and came in, and he diagnosed a torn cartilage.

5   Q    And then did he perform surgery on her?

6   A    He did.

7   Q    And at that time for that surgery, based on her

8   presentation, is that the same thing you would have done at

9   that time?

10  A    Yes.

11  Q    Why?

12  A    She had a twist injury.  She came in and had an MRI, and

13  if I'm not mistaken, it showed a small degenerative and a

14  small tear of the meniscus, medial meniscus.  And therefore --

15  Q    She couldn't quite hear you.

16  A    Okay.  Let me speak into the mike.  I apologize.  An MRI

17  was done -- that's much better -- and it showed a tear of the

18  medial meniscus.

19  Q    All right.  And then did Dr. Dube perform surgery?  Did

20  you read what he saw when he performed the surgery?

21  A    I did.

22  Q    All right.  Compare what you can tell about somebody's

23  knee with an MRI versus what you can tell once you're

24  performing surgery on a knee.

25  A    Well, you're looking directly at the knee through the

1    arthroscope, so it's like you're having your hands right on

2    it.  You're seeing it.  So those are the real findings.

3              MR. ROWLETT:  Your Honor, may I take the exhibits,

4    please, sir?

5              THE COURT:  Yeah.

6    BY MR. ROWLETT:

7    Q    Dr. Gavigan, do you have a record in front of you of what

8    Dr. Dube recorded as what he observed during that first

9    surgery on Ms. Corley's knee?

10   A    I do.

11   Q    Would you please tell the jury what items he observed?

12   A    I'm referring to my note here.  His op note stated --

13   postop diagnosis was right knee medial meniscal tear, right

14   knee Grade II to III chondromalacia of a large area of the

15   medial femoral condyle, loose bodies throughout the right knee

16   with apparent donor site from the medial femoral condyle,

17   extensive synovitis, Grade I and II chondromalacia of the

18   patella.  Now, I didn't answer your question.  I wrote the --

19   I gave the diagnosis, but he did have comments in the body of

20   his report of what he saw.

21   Q    Well, were those diagnoses done after the surgery?

22   A    Yes.

23   Q    Was that based on what Dr. Dube observed?

24   A    Yes.

25   Q    All right.  So please tell the jury about the second

1  finding about Grade 2 to 3 chondromalacia.  What is

2  chondromalacia?

3  A    Chondromalacia is arthritis Grade 1 to 4.  Grade 4 would

4  be bone on bone, and grade 2 to 3 is moderate to moderate

5  severe.  And it means the surface of the shiny cartilage is

6  breaking down and thinning out.

7           MR. ROWLETT:  Your Honor, may I pass Plaintiff's

8  Exhibit 10 up to Dr. Gavigan?

9           THE COURT:  Yeah.

10 BY MR. ROWLETT:

11 Q    Dr. Gavigan, could you hold that up so the jury can see it

12 and please explain to them where Dr. Dube recorded

13 chondromalacia?

14 A    The thigh bone on the inside, you call that the femur, and

15 right on the weight bearing part of it that's what he stated

16 as a large area of Grade II to III chondromalacia right here.

17 He saw many -- just stop at that point.

18 Q    Well, what else did he see there, Doctor?

19 A    Throughout the knee he saw loose bodies floating around in

20 the knee.  Throughout the knee he saw synovitis, which means

21 if you look in there, the tissue is kind of inflamed and

22 reddened.  And then up under the kneecap he saw lesser

23 findings, but he saw Grade I to Grade II chondromalacia or

24 thinning and break down of the cartilage under the kneecap.

25 Q    Can you tell, based on your review of the records, how

1  long that medial meniscal tear had been there?

2  A    No.

3  Q    And do people sometimes have tears such as this one

4  without feeling it or without having problems related to the

5  tear?

6  A    Yes.

7  Q    And did the MRI before the accident make any indication or

8  reference to degenerative changes?

9  A    In the meniscus.

10  Q    And what are degenerative changes?  What does that mean?

11  A    It means it's breaking down.  The meniscus is gristle.

12  It's fibrocartilage.  It's usually very stout.  It's a shock

13  absorber, gives a little when you walk on it.  And with

14  degenerative changes it's having fissure lines breaking on the

15  inside of it and then on the outside of it.

16  Q    Why does this happen?

17  A    It's degenerative wear and tear.

18  Q    Does it happen as people age?

19  A    It can happen as people age.

20  Q    How long does it take chondromalacia to form?

21  A    Years, at least several months.  It's a slow ongoing

22  process.

23  Q    And so do you have a record then of approximately how long

24  after the accident at Wal-Mart this first surgery took place?

25  A    The accident was 9-18-14 -- I'm sorry.  Wrong page.  The

1  accident was November 7th, 2011, and the surgery was

2  December 3rd, 2011.

3  Q   Doctor, I'm going to ask you to state all your opinions,

4  only if you have them, to a reasonable degree of medical

5  certainty.  Is that okay?

6  A   Yes, sir.

7  Q   Now, do you have an opinion about whether Ms. Corley had

8  chondromalacia before the accident at Wal-Mart?

9  A   I do have an opinion.

10 Q   And what is that?

11 A   That she did.

12 Q   And why do you say that?

13 A   Because there couldn't -- all of those findings that we

14 just related to you couldn't have happened in a month.  It

15 would have taken, as I said a minute ago, at least several

16 months.  And with all that loose -- the loose bodies floating

17 and the extensive surface of the medial femoral condyle, that

18 probably would take years.

19 Q   Dr. Gavigan, what is synovitis?

20 A   Synovitis is inflammation.

21 Q   Is it related to arthritis?

22 A   Yes.

23 Q   And can you reach an opinion or formulate an opinion about

24 whether Ms. Corley had the meniscus tear before the accident

25 at Wal-Mart?

```
1   A    I initially said it was aging determinant.  When I see the
2   findings of the surgery with the extensive arthritis changes,
3   I would say that more than likely it's pre-existing.  It came
4   with the arthritis.  The arthritis is the main problem, and
5   with that arthritis there's a little tear of the meniscus.
6   Q    And did Dr. Dube document arthritis?
7   A    He did.
8   Q    Did Ms. Corley have a second knee surgery?
9   A    She did.
10  Q    And do you recall or does your report reflect why she had
11  a second knee surgery?
12  A    She was having pain.
13  Q    So what is your assessment of the role of arthritis in the
14  knee for the second surgery?
15  A    She had an MR -- what led to the second surgery was this
16  MRI on 7-23-2013.  It showed a linear band of presignal in the
17  posterial horn of the medial meniscus with a tiny component
18  extending into the articular surface.  To translate that, it
19  means there might be a new small meniscus tear.
20        The actual report stated this may represent the
21  sequelae of a tear or post surgical changes.  So in our
22  business we don't know if that's a new tear or it's just the
23  changes that are resulting because there's been surgery.  And
24  we go in and we shave and burr the meniscus so it remains
25  rough.
```

1  Q    Doctor, how do you -- what's a weight bearing x-ray?

2  A    Weight bearing x-ray is when you're standing, when the

3  patient is standing.

4  Q    What's the point of it?

5  A    Well, to assess arthritis it's the definitive means to do

6  so.

7  Q    How does it do that?

8  A    Because a regular x-ray, non weight bearing, the space, it

9  could be open, and it doesn't represent the anatomic situation

10 when you're walking around.  So you get a weight bearing x-ray

11 standing, and that let's you know what the dynamic status of

12 the knee is.  So if you have arthritis, very often they're

13 different.  The standing film will show you really how much

14 arthritis there is.  It usually is more -- if you have

15 arthritis, it's more narrow than the non weight bearing film,

16 and it will let you quantitate it all the way up to is it bone

17 on bone.

18 Q    And is a weight bearing x-ray used to assess whether a

19 total knee replacement is appropriate?

20       MR. MCELHANEY:  I'm sorry to interrupt, but I think

21 discussion of weight bearing x-rays is outside the scope of

22 the Rule 26 disclosure.  We object to the topic.

23       THE COURT:  Overruled.

24 BY MR. ROWLETT:

25 Q    Dr. Dube -- pardon me.  Dr. Gavigan, did you see any

1  records in -- do you need a hand there?

2          THE WITNESS:  Yeah.  Can you excuse me, your Honor?

3  Can I get some water?

4  BY MR. ROWLETT:

5  Q   Yeah, sure.  It gets a little dry after working in this

6  courtroom for a while.

7  A   Yes.

8  Q   After Ms. Corley returned after the first knee surgery

9  continuing to have problems, would you have done a weight

10  bearing x-ray?

11  A   Yes.  I would have been concerned that she's not getting

12  better.  I knew on the first surgery you had a lot of

13  arthritis, and I would try to figure out why she's not getting

14  better.

15  Q   Would a weight bearing x-ray have helped you?

16  A   Weight bearing x-ray would let us know.

17  Q   Did you see any indication in Dr. Dube's records that you

18  reviewed that he ever performed a weight bearing x-ray?

19  A   I didn't see it.

20  Q   And depending on the results of a weight bearing x-ray

21  after the first surgery, depending on the findings, might it

22  have been appropriate for Ms. Corley to have had a total knee

23  replacement at that time?

24  A   Depending on the findings, yes.

25  Q   What findings would you look for or assess in determining

1  whether somebody would need a total knee replacement?

2  A   Either a bone or bone narrowing or very significant

3  narrowing to explain her pain.

4  Q   What's your assessment of whether the second surgery was

5  indicated?

6  A   Well, my opinion was that it wasn't because we already

7  knew how much arthritis she had, and even if there was a tiny

8  little meniscal recurrent tear, it wouldn't have changed

9  anything to take care of that.

10 Q   What's your assessment of the role of arthritis and her

11 problems around the time she had the second surgery?  That is,

12 did it play any causal role or not?

13 A   Well, no.  Even the op note -- go to the second op note of

14 the second surgery -- stated the same findings, Grade II and

15 Grade II chondromalacia.  So to answer your question, the

16 second surgery wouldn't have been --

17 Q   What's the role of arthritis, if any, and the problems she

18 was having right before the second knee surgery?

19 A   Sorry.  I got off the question.  I think the -- that was

20 her problem at the time of the second surgery.  It was

21 arthritis.

22 Q   And what's your opinion about whether the accident at

23 Wal-Mart caused her to have arthritis?

24 A   It didn't.  She already had it.

25 Q   Have you watched the video?

1    A    I have.

2    Q    And did it show Ms. Corley appear to slip?

3    A    Yes.

4    Q    Could you see whether she twisted her leg or not?

5    A    I made a note of it.  Let's see what I -- I'll refer to

6    that.

7    Q    Your report on the last page.

8    A    Yes.  I have it.  I commented that I did watch the video

9    and -- I'm sorry.  That's Dr. Dube's.  Let me go -- I stated I

10   did watch the video, and I stated that when she came out of

11   the aisle and grabbed the cart, she twisted her right knee and

12   paused, then continued walking but with a right-sided limp.

13   Q    How did you describe the incident there in the next part

14   of your assessment?

15   A    I stated this was a very minor twist.  She did not fall.

16   She held onto the cart.  She paused for a moment and then

17   started walking around the store.

18   Q    And what was your assessment of whether the twist was

19   related to the underlying arthritis in her knee?

20   A    I believed it was.

21   Q    And then what was your assessment about whether Ms. Corley

22   had a problem with her knee such that she was susceptible to

23   having problems with it for any kind of minor twisting

24   episode?

25   A    I believe without much arthritis that was documented in

1    the surgery, that she would have those problems.

2    Q    What was your assessment of whether, based on what

3    Dr. Dube saw on the first surgery, Ms. Corley was likely to go

4    the rest of her life without knee problems?

5    A    She was not going to go for the rest of her life without

6    knee problems.  She had significant arthritis.

7    Q    And have you seen other patients who've had problems with

8    their knees after some kind of event?

9    A    Yes.

10   Q    And in terms of patients, is there any kind of similar

11   incident that puts strain on a knee, such as going up and down

12   the stairs, getting out of a chair?

13   A    With that much arthritis, getting up from a sitting

14   position, walking up and down the stairs, trying to squat,

15   trying to kneel, planting the foot and pivoting, could all at

16   times cause pain.

17   Q    And maybe cause problems with the knee?

18   A    Yes.

19   Q    Does that much arthritis make somebody susceptible to

20   problems?

21   A    Yes.

22         MR. ROWLETT:  All right.  One moment, your Honor,

23   please.

24         (Brief Pause.)

25         MR. ROWLETT:  That's all I've got, your Honor.

```
 1              THE COURT:  All right.
 2                          CROSS-EXAMINATION
 3    BY MR. MCELHANEY:
 4    Q    Dr. Gavigan, do you have any exhibits up there with you?
 5    A    Is this an exhibit?
 6    Q    You can pass it to the marshal, please.  Good afternoon,
 7    Doctor.  We met a few weeks ago; right?
 8    A    Yes.
 9    Q    Came out to your office and asked you some questions about
10    this case?
11    A    Yes.
12    Q    Have you had a chance to read the deposition transcript
13    that was generated as a result of the questions and answers
14    that you and I had that day?
15    A    No.
16    Q    Doctor, will you agree with me that for 30 years you've
17    been a professional witness?
18    A    Can I ask, does that mean doing depositions?
19    Q    Well, do you remember when I asked you that question in
20    your deposition the other day?
21    A    No.
22    Q    I asked you if you are a professional witness.  You don't
23    recall that?
24    A    I think, yes, I recall that question.
25    Q    Do you recall your answer to the question?
```

1  A   I do not.

2          MR. MCELHANEY:  Mr. Rice, can we see page 38, lines 8

3  through 10.  Can we get the lights for a second, sir?

4          And, Dr. Gavigan, I want to be fair with you, so if I

5  can get the help of the marshal, I'll pass you a copy of the

6  deposition transcript.  Okay?  That way if you want to look at

7  something to make sure, when I ask you questions today, that

8  it's in context, you can do that.  Okay?

9          THE WITNESS:  Fine.

10 BY MR. MCELHANEY:

11 Q   Is that fair?

12 A   That's fair.

13 Q   Okay.  So I'm showing you page 38, lines 9 through 10, on

14 the screen.  Can you see that?

15 A   Yes.

16 Q   When I asked you the question a couple of weeks ago,

17 you're a professional witness, are you not, what was your

18 answer?

19 A   Yes.

20 Q   That's true, isn't it?

21 A   Well, if I may ask, two weeks ago there were a lot of

22 things I didn't understand, and so I'm asking that question

23 now.  If being -- if doing depositions means I'm a

24 professional witness, then that's -- then I am.  But that's --

25 but I haven't done anything else so I really don't, now that

1  I've seen it again, don't know what the definition of a

2  professional witness is.

3  Q   You've been a witness that's been hired -- you can take it

4  down, Mr. Rice.  You've been a witness that's been hired by

5  insurance attorneys for 30 years, have you not?

6  A   I have been hired by insurance companies for 30 years,

7  yes.

8  Q   To be a witness in cases like these; right?

9  A   Again, I wish someone would help me.  I have to say that I

10 don't know these legal terms.  What does professional witness

11 mean?  I've asked does that mean I've done depositions.  I

12 have.  Have I done anything else?  Not that I know of.

13 Q   Do you remember when I asked you that question in your

14 deposition?

15 A   Well, I do, but I'm telling you now that I'm being asked

16 it again, we had quite an exchange that day.  I was answering

17 these questions that I'd never been asked and I -- that was my

18 answer.  But now I'm saying --

19 Q   I appreciate that.  I'm asking you a different question.

20 A   Sure.

21 Q   Have you been a witness for defense attorneys for 30

22 years?

23 A   Again, I don't know what witness means.  If it means that

24 I've done depositions, yes.

25 Q   Did you give me a different answer during your deposition?

1    A    Yes.

2    Q    Okay.  In your deposition you agreed with me, did you not,

3    that you had been a professional witness for defense attorneys

4    for 30 years?

5    A    Yes.

6    Q    Well, this is a different question.  That last question

7    was just had you been a professional witness.  Now we're

8    telling who you were a witness for and for how long.  You

9    understand?

10   A    Well, may I -- this is all new to me, but can I assume

11   that what you mean by witness is I've done depositions?

12   Q    That you've been hired to participate in cases.

13   A    Yes.  I understand that terminology.

14   Q    For defense attorneys for 30 years?

15   A    Yes.

16   Q    Okay.

17   A    Thank you.

18   Q    And, in fact, 95 percent of the work you have done in

19   litigation cases like this one has been for defense attorneys;

20   true?

21   A    Yes.

22   Q    And that is what you are in this case, a professional

23   witness for a defense attorney; correct?

24   A    Yes.

25            MR. MCELHANEY:  We can go with the lights if you

1  want.
2        Doctor, you are not a member of the American Medical
3  Association, are you?
4        THE WITNESS:  No.
5  BY MR. MCELHANEY:
6  Q   You're a retired surgeon at this point; correct?
7  A   Correct.
8  Q   And you quit practicing medicine in April of 2011?
9  A   Yes.
10 Q   You quit taking care of patients in April of 2011?
11 A   I did.
12 Q   And at that point you opened an office on White Bridge
13 Road where you help lawyers with cases?
14 A   Yes.
15 Q   And that's what you've been doing ever since?
16 A   Yes.
17 Q   Your office is not connected to a hospital, is it?
18 A   No.
19 Q   Okay.  Now, since you opened your office and started doing
20 this work for lawyers, 80 percent of that time has been for
21 defense attorneys; right?
22 A   Yes.
23 Q   And over that period of time, since May of 2011, you've
24 earned almost $400,000 doing this work, haven't you?
25 A   Yes.

1    Q    Are you marketing yourself, Doctor, in this new role?

2    A    No.

3    Q    Are you advertising anywhere?

4    A    No.

5    Q    That's not right, is it, Doctor?  That's not correct, is

6    it?

7    A    Can you ask that question again?  My answer was I'm not

8    advertising; I'm not marketing, no.

9    Q    Marketing your services as an evaluator and record

10   reviewer anywhere?

11   A    No.  You asked me that last time, a few weeks ago.

12           MR. MCELHANEY:  All right.  Can we get the lights,

13   please, sir?  Thank you.

14           Dr. Gavigan, what is this we have on the screen?

15           THE WITNESS:  That's my website.

16   BY MR. MCELHANEY:

17   Q    Okay.  And that's advertising your services as performing

18   independent medical examinations and case reviews, is it not?

19   A    It is.

20   Q    And you set this up yourself after you left the TOA

21   practice, didn't you?

22   A    Yes.

23   Q    And you are the administrator of this website, are you

24   not?

25   A    Yes.

1    Q    You're responsible for the content of this website?

2    A    I am.

3    Q    You last updated this website in May of this year, did you

4    not?

5    A    I don't know when I did.

6    Q    What's -- Dr. Gavigan, what's this say right here?  Please

7    contact the office.  That's advertising your services, is it

8    not, Doctor?

9    A    It is, yes.

10   Q    So when you told us in your deposition and just now told

11   the ladies of the jury that you're not advertising your

12   services, that wasn't right, was it?

13   A    Well, the reason I said that was I haven't looked at this

14   in so long, and I forgot about it.  My son set it up for me,

15   who's an internet guy, and I haven't read it maybe in three

16   years.  And so I'm wrong.  Based on that, I do have a

17   marketing piece, but I hadn't thought about it as a marketing

18   piece --

19   Q    And when --

20   A    -- so I was incorrect.

21   Q    When the website data says it was updated in May --

22   A    I don't know what that means.  I haven't read it.  I don't

23   know what that means.  I haven't looked at it.

24   Q    Do you see right here where it says professional

25   organization membership?

1  A    Yes.

2  Q    This is what you hold out to the public to be your

3  credentials to do this work; right, Doctor?

4  A    Yes.

5  Q    And you see right here where it says you're a member of

6  the American Medical Association?  Do you see that?

7  A    I haven't updated it.  I just pulled out that a couple

8  years ago.

9  Q    That's not true, is it?

10  A    It's not true.

11  Q    Dr. Gavigan, before you ever wrote your report for the

12  Wal-Mart defense team, you knew what Dr. Dube's opinions were,

13  didn't you?

14  A    Because I'd just read the report.  I mean, I'd just read

15  his records so after reading his records.  Before I wrote my

16  report I did know.

17  Q    And his deposition?

18  A    Yes; and his deposition.

19  Q    So before you thought about what you wanted to say to the

20  people at -- Wal-Mart did hire you; right?

21  A    Yes.

22  Q    Before you thought about what you wanted to say to

23  Wal-Mart that would be your opinions in the case, they made

24  sure you had to review Dr. Dube's records and his deposition;

25  right?

1  A    Yes.

2  Q    So you first got involved in this case after Wal-Mart knew

3  Dr. Dube's position; right?

4  A    Yes.

5  Q    And you know that Dr. Dube relates all of her problems to

6  the slip and twist; right?

7  A    Yes.

8  Q    And you know he says that the arthritis developed as a

9  result of the slip and twist; right?

10  A    Yes.

11  Q    And you know he says that those loose bodies broke off

12  either during the slip and twist or as a result of it;

13  correct?

14  A    Yes.

15  Q    And when you started to sit down and think of what

16  Dr. Gavigan was going to bring to this case after being hired

17  by Wal-Mart, you already knew all that; correct?

18  A    Yes.

19  Q    Instead of just sending you the raw records for you to

20  review and reach an independent decision, Wal-Mart made sure

21  you had Dr. Dube's deposition to read, didn't it?

22  A    Yes.

23  Q    And, in fact, the only reason that you're sitting here now

24  giving testimony is because you disagree with Dr. Dube.  Will

25  you agree with that?

1  A    Yes.

2  Q    And you're sitting here today giving this testimony after

3  disagreeing with Dr. Dube, and you're being paid $5,000 for a

4  half day to do it; right?

5  A    Yes.

6  Q    And, in fact, at the time we took your deposition,

7  including the time to come here today, you're going to make

8  over $10,000 on this case, aren't you?

9  A    I know you added all that up.  I haven't done that.

10  Whatever the numbers are, if that's what you had.  I don't

11  know.

12  Q    We added it up during your deposition, did we not, sir?

13  A    I'm sure we did.

14        MR. MCELHANEY:  Can we get page 36, lines 20 and 21.

15        THE WITNESS:  I have numbers here on my worksheet

16  here.  So, yes, I would agree.  These numbers match what --

17        MR. MCELHANEY:  Okay.

18        THE WITNESS:  So I'll say yes.

19  BY MR. MCELHANEY:

20  Q    At the time we took your deposition, we knew when you'd

21  come to court that you were going to earn $10,000 to be

22  involved in this case?

23  A    Yes.

24  Q    What we didn't know at that time was whether you were

25  going to be called upon to do any other work, like reviewing

1  and prep for coming to court; right?

2  A    Yes.

3  Q    Have you done some more work, some review and some prep

4  and reviewing other records, since we left?

5  A    Yes.

6  Q    Okay.  So how much other money are you charging now,

7  Doctor, that's above $10,000?

8  A    I don't have it in front of me.  I didn't bring that with

9  me.

10  Q    You charge $500 an hour just to look at records; right?

11  A    Yeah.

12  Q    And Wal-Mart happily paid you that; right?

13  A    Yes.

14  Q    How many more hours do you have in the case, since I left

15  your office, reviewing records, talking to Wal-Mart?

16  A    Two, two and a half.

17  Q    Okay.  Two, two and half, so that's another $1500?

18  A    Yes.

19  Q    So we're at 11, at least $11,500, you've earned because

20  you gave opinions that were different than Dr. Dube; right?

21  A    Yes.

22  Q    The most common cause of meniscus tears in knees is a

23  twisting injury; right?

24  A    Yes.

25  Q    And you agree that Ms. Corley had a twisting injury?

1  A    Yes.

2  Q    You agree she walked into Wal-Mart fine, didn't she?

3  A    Yes.

4  Q    Normal gate; right?

5  A    Yes.

6  Q    And she walked out limping; correct?

7  A    Correct.

8  Q    You agree that the tear in her knee could have occurred

9  with the twist at the Wal-Mart store; right?

10 A    Yes.  I did say that, yes.

11 Q    And that's your opinion to a reasonable degree of medical

12 certainty, isn't it?

13 A    Yes.

14 Q    But despite the fact that you agree that the twist at

15 Wal-Mart could have caused the meniscus tear, you've come up

16 with an idea that she had pre-existing arthritis; right?

17 A    Correct.

18 Q    And it's your opinion that this pre-existing arthritis set

19 her up to have a tear; right?

20 A    Yes.

21 Q    In all of the medical records -- and you showed the

22 jury -- would you say that many records you reviewed?

23 A    Yes.

24 Q    Am I accurate with this little spacing between my fingers?

25 A    Maybe a little more.

1    Q    Maybe a little more.  Okay.  In all the records that

2    Wal-Mart gave you to review, Dr. Gavigan, no other doctor, no

3    other doctor made a diagnosis of pre-existing arthritis, did

4    they?

5    A    No.

6    Q    You agree that Dr. Dube is her treating orthopedic

7    surgeon?

8    A    I do.

9    Q    He has a three-year history with her; right?

10   A    Yes.

11   Q    Certainly Dr. Dube never diagnosed pre-existing arthritis,

12   did he?

13   A    He did not.

14   Q    You are the only doctor to have ever diagnosed

15   pre-existing arthritis; correct?

16   A    In this case.

17   Q    Related to Ms. Corley?

18   A    Yes.

19   Q    Let me ask you a better question.  Regarding Sabrina

20   Corley and her right knee, you were the only doctor to have

21   ever diagnosed pre-existing arthritis?

22   A    Yes.

23   Q    And you're the doctor hired by Wal-Mart?

24   A    Yes.

25   Q    Now, when we got into the nuts and bolts of what happened

1  at Wal-Mart that day during your deposition, you admitted to

2  me that the twist in the water at Wal-Mart would have caused

3  and did cause whatever arthritis was there in your opinion to

4  be worsened; correct?

5  A   Yes.

6  Q   So even if your opinion that you came up with in June of

7  this year were to be correct that she had arthritis, the slip

8  and twist made all that worse, didn't it?

9  A   Yes.

10 Q   And that worsening of that arthritis that you say was

11 there pre-existing, that's what led to the first surgery,

12 isn't it?

13 A   Yes.

14 Q   So regardless of whether you disagree with Dr. Dube, that

15 first surgery was caused by that event at Wal-Mart; right?

16 A   Yes.

17 Q   And that's your opinion to a reasonable degree of medical

18 certainty?

19 A   Yes.

20 Q   And you say that the second surgery was also related to

21 that arthritis; right?

22 A   Yes.

23 Q   The same arthritis that was made worse in the slip and

24 twist; right?

25 A   Yes.

1  Q   Okay.  So it all goes back to the slip and twist; correct?

2  The need for the surgeries?

3  A   The need for the second surgery was arthritis.

4  Q   Which was made worse by the slip and twist; correct?

5  A   Yes.

6  Q   And so, also, I think you agree with me that the entire

7  surgical process of the first surgery, when you cut out some

8  of that meniscus, that's cutting out some of the shock

9  absorber; correct?

10  A   Yes.

11  Q   And it's gone forever.  It's not going to come back, is

12  it?

13  A   No.

14  Q   And that affects the way the knee responds to weight

15  bearing, doesn't it?

16  A   It can.

17  Q   And as you're up on your feet and you're moving around,

18  what can happen is additional parts of that meniscus start to

19  wear away or flake off and get some fraying and tearing;

20  right?

21  A   That may happen, yes.

22  Q   And if that happens, you can go back in and clean that up

23  arthroscopically, can't you?

24  A   You can, yes.

25  Q   And that's what Dr. Dube did in this case; correct?

1  A    Yes.

2  Q    Now, he is using his -- you're not here to question his

3  medical judgment, are you?

4  A    No.  I might have a different opinion, but I'm not going

5  to question it.

6  Q    He's the man who's treating her in real time and real

7  space; right?

8  A    Yes.

9  Q    And he's the one who's interacting with her in his office

10 time and time and time again; correct?

11 A    Yes.

12 Q    And I think you agree with me that there's a lot more to

13 the patient-doctor relationship than is ever contained in the

14 medical record; right?

15 A    Correct.

16 Q    The medical record -- the words in the medical record that

17 the doctor dictates after he leaves the office, doesn't fully

18 contain the exchange between a doctor and his patient, does

19 it?

20 A    No.

21 Q    And Dr. Dube, he had that exchange with Ms. Corley, didn't

22 he?

23 A    Yes.

24 Q    Time and time again; right?

25 A    Yes.

1   Q    By consequence you've never had an exchange with her?

2   A    I did not.

3   Q    You didn't take a history from her?

4   A    I did not.

5   Q    You didn't examine her; correct?

6   A    Correct.

7   Q    Doctor, when physicians like yourself -- when physicians

8   like yourself are faced with two options, one of which is more

9   thorough and provides more information and one of which is

10  less thorough and provides less information, which should the

11  professional doctor choose?

12  A    The more information.

13  Q    Seeing Ms. Corley in this case would have provided you

14  with more information; correct?

15  A    Correct.

16  Q    Taking a history from her would have provided you with

17  more information; correct?

18  A    If she would have given me a different history.

19  Q    Or if you'd asked her different questions than had been

20  contained in the record?

21  A    Correct.

22  Q    So you agree with me that if you had interviewed her and

23  took a history, it would have given Dr. Gavigan more

24  information?

25  A    Yes.

1  Q    Performing a physical examination yourself would have

2  given you more information?

3  A    Yes.

4  Q    You didn't do any of that, did you?

5  A    No.

6  Q    Instead you chose the method that provided less

7  information and was less thorough, didn't you?

8  A    Yes.

9  Q    That's because that's what Wal-Mart wanted you to do,

10 isn't it?

11 A    They asked me to do a medical records review, so I guess

12 if I translate your question, that's what they wanted me to

13 do, yes, a medical records review.

14 Q    So Wal-Mart didn't want you to see her?

15 A    I don't know what they wanted other than they asked me to

16 do a medical record review.

17 Q    And you never asked to see Ms. Corley, did you?

18 A    I did not.

19 Q    Now I want to ask you about x-rays.  X-rays are a good

20 tool to show the joint spacing; correct?

21 A    Yes.

22 Q    And when you look at an x-ray, if there's like -- of a

23 knee or a back and you look at the film of an x-ray -- are you

24 with me so far?

25 A    Yes.

1  Q   -- if there is wide space between bony items, that

2  indicates the absence of arthritis; correct?

3  A   Correct.

4  Q   That's what's called the joint space?

5  A   Yes.

6  Q   And if you have a normal joint space, that indicates the

7  absence of arthritis; correct?

8  A   Yes.

9  Q   Okay.  And that would be the same with the clavicle area

10 of the shoulder you could have as a joint, isn't it?

11 A   Yes.

12 Q   And you would be looking for joint space in that area of

13 the body; right?

14 A   Yes.

15 Q   And in the vertebral bodies, the spine, you'd be looking

16 for joint spacing there; correct?

17 A   Right.

18 Q   And in the hips; right?  That's a joint, isn't it?

19 A   Yes.

20 Q   And in the knees; right?

21 A   Yes.

22 Q   And ankles?

23 A   Yes.

24 Q   So in all those areas if you have normal joint space,

25 that's the absence of arthritis.  You've agreed with me on

1  that; correct?

2  A    Yes.

3          MR. MCELHANEY:  Okay.  Your Honor, I'd like to move

4  in for identification purposes Exhibit No. 25.  It's an x-ray

5  report.

6          MR. ROWLETT:  No objection.

7          THE COURT:  Admitted.

8          (Whereupon, Plaintiff's Exhibit 25 was marked for

9  purposes of identification and admitted into evidence.)

10  BY MR. MCELHANEY:

11  Q    Dr. Gavigan, I'm going to show you this Exhibit No. 25 to

12  trial.  Mr. Rice will pull it.  Go to the top, Mr. Rice.

13          You see this is Premier Radiology in Hermitage?

14  A    Yes.

15  Q    Okay.  And the date of the -- it's an x-ray report;

16  correct?

17  A    Yes.

18  Q    Okay.  Right knee x-ray?

19  A    Yes.

20  Q    On what date, sir?

21  A    11-8-2011.

22  Q    How many days after Ms. Corley fell at Wal-Mart was this

23  x-ray taken?

24  A    Within a few days.  You want me to --

25  Q    Do you remember the date she fell -- well, not fell

1    but slipped and twisted.

2    A    November 7.

3    Q    How many days after was this taken?

4    A    One day.

5    Q    What's the finding on the joint space in the right knee

6    the day after the injury, Doctor?

7    A    Normal.

8    Q    Normal means the absence of arthritis; correct?

9    A    Yes.

10              MR. MCELHANEY:  Thank you.

11                           REDIRECT EXAMINATION

12   BY MR. ROWLETT:

13   Q    Do you have that x-ray in front of you, Doctor, the report

14   you were just asked about?

15   A    No.

16              MR. ROWLETT:  Your Honor, may I have Exhibit 25

17   passed to the witness, please?

18              THE COURT:  Yeah.

19   BY MR. ROWLETT:

20   Q    Would you please read that to yourself, Doctor, and tell

21   us when you're done.

22   A    I have.

23   Q    Does that impact the opinions you've given so far in the

24   case?

25   A    No.

1    Q    Why not?

2    A    This is not a weight bearing film, and my opinion was

3    based on the operative findings.

4    Q    When you were practicing medicine as a treating physician,

5    how often were you hired by lawyers representing injured

6    patients of yours for deposition?

7    A    On the defense side or the plaintiff's side or --

8    Q    Well, did you ever have patients who were patients of

9    yours who had injuries?

10   A    Yes.

11   Q    Need to hear you.

12   A    I'm sorry.  Yes.

13   Q    Did any of your patients -- did any of the patients that

14   you treated as their doctor ever have claims?

15   A    I can't think of any right now.

16   Q    Were all the depositions you gave as a result of being

17   hired to evaluate a claim?

18   A    Can you maybe explain that better?  What does that mean,

19   evaluate a claim?  If it's already out there?

20   Q    Well, Dr. Dube was the treating physician for Ms. Corley?

21   A    Yes.

22   Q    Have you ever been a treating physician like Dr. Dube was

23   in this case?

24   A    Yes.

25   Q    Have you ever provided testimony in a case for a

```
1   patient --

2   A    Of mine, yes.

3   Q    Your patient.

4   A    A lot, yes, all the time, yes.

5   Q    Okay.  And was that when those patients were injured and

6   making a claim?

7   A    Yes.

8   Q    Would you consider them plaintiffs then under that

9   scenario like Ms. Corley is in this case?

10  A    There's a legalese, but ask me one more time.

11  Q    Let me try to do it without using legal terms.  Okay?

12  A    Yeah.

13  Q    So were any of the patients you treated as your own

14  patient, did they ever have claims?

15  A    It's way -- I must have.  I'd say yes, but I can't prove

16  it now that I'm in court here.  But I would think I did.

17  Q    Did you -- were you available and your colleagues at TOA

18  to give depositions like Dr. Dube in this case?

19  A    Yes.

20  Q    Okay.  And do you give opinions that are true and honest?

21  A    Yes.

22  Q    Are they based on how much you're paid?

23  A    No.

24  Q    Are you ever giving opinions to try to get more work from

25  a particular entity?  Are you telling it like you see it?
```

1   A   I tell it like I see it, and sometimes I tell it like it's

2   not wanted to be heard.

3   Q   Do most physicians like doing evaluations like you do?

4   A   No.

5   Q   Are there -- do they have the right to refuse to do that?

6   Can anybody make them do that?

7   A   Nobody can make them do it unless it's their own patient.

8   They have to testify for their own patient.

9   Q   Did some of your colleagues refuse to do it unless it was

10   for their own patient?

11   A   I think so. Most doctors don't like to do that. I've

12   done it a few years. I started off young doing it.

13   Q   When you were asked to assess causation in this case, was

14   it helpful to have Dr. Dube's deposition?

15   A   Well, it's helpful to know whatever he might say about the

16   case, the clinical findings, his thoughts of surgery. So,

17   yes, I think it's always helpful to see the deposition of the

18   doctor to know more about what he's thinking.

19   Q   And if you had agreed with everything Dr. Dube had said,

20   would you have told us?

21   A   Yes.

22   Q   Even if you thought that might not be considered good for

23   Wal-Mart?

24   A   Right.

25   Q   Talked about the charges that you have charged in this

1  case.  How did you come up with that rate of $500 an hour?

2  A   It's the rate that we used at TOA for the last many years.

3  It's the standard rate that orthopedic surgeons charge.

4  Q   And did you ever tell me or anybody with Wal-Mart that you

5  needed to see Ms. Corley to assess causation fully?

6  A   I didn't.

7  Q   Why not?

8  A   Because I think the causation is -- was dependent on the

9  history given of the accident and what past history there was,

10  and there wasn't any that we could find, and the initial

11  findings, the initial exam, the initial MRI, the x-rays, and

12  the initial surgery findings, the initial findings in the

13  first few months.

14  Q   Did that appear to be good documentation of Ms. Corley's

15  situation after the accident?

16  A   Yes.

17          MR. ROWLETT:  That's all, your Honor.

18          THE COURT:  All right.  Thank you, sir.  You can step

19  down.

20          Mr. Rowlett, do you have any additional witnesses?

21          MR. ROWLETT:  Your Honor, I need just a moment.

22          (Brief Pause.)

23          MR. ROWLETT:  Your Honor, defense rests.

24          THE COURT:  Okay.  Any rebuttal?

25          MR. MCELHANEY:  No, your Honor.

1          THE COURT:  All right.  Both the plaintiff and

2    defendant have rested their cases.  I'm going to cut y'all out

3    of here early.  The CMA's are going on.  You're going to want

4    to get out of town.  But then I will see y'all back here for

5    closing at -- I've got some things to do with the lawyers.

6    Let's get started at 9:30.  All right.  See y'all in the

7    morning.  Thanks.

8          (Whereupon, the jurors exited the courtroom.)

9          THE COURT:  Okay.  Let's do this:  I've got some

10   tinkering to do with the jury instructions.  Let's have a

11   charge conference at 8:30 in the morning, and then that will

12   give us time, an hour for you to see what the instructions

13   are.  They're substantially similar to what you've submitted.

14   And then we'll go right into closing.

15         MR. ROWLETT:  Five minutes on closing, your Honor?

16         THE COURT:  An hour.

17         MR. ROWLETT:  Each?

18         THE COURT:  Uh-huh, yeah.

19         MR. MCELHANEY:  Your Honor, will we be allowed to,

20   now that they're in evidence, to play the clips of testimony?

21         THE COURT:  Yeah.  Anything that's in evidence you

22   can use.  Don't use the jury instructions.  We're not going to

23   put those on the evidence presenter or anything else, but you

24   can talk about them.

25         MR. MCELHANEY:  Can we put the words of the jury

1  instruction in a slide?

2          THE COURT:  No.

3          MR. MCELHANEY:  Okay.

4          THE COURT:  You can talk about the jury instructions,

5  but I don't want the words up there.

6          MR. MCELHANEY:  Okay.  And I'm sorry to keep your

7  Honor.

8          THE COURT:  That's all right.

9          MR. MCELHANEY:  Do you know now whether we're going

10 to have -- the verdict form will be the plaintiff's requested

11 or defendant's so we can think about how the closing will

12 look?

13         THE COURT:  What I'm not going to do -- I can't

14 remember which one was which, but I know you had broken them

15 out.  It will be is there liability, yes, no, how much.  Yes,

16 no, and then the question about allocation of fault.  But it's

17 not going to break them down, pain and suffering is this, all

18 the different elements.  You can talk about those, obviously,

19 but they're not going to be asked to allocate for each one.

20 They're going to give a lump sum if they have -- find damages

21 for her.

22         MR. MCELHANEY:  Just general damages verdict?

23         THE COURT:  Yeah.  And anything else y'all think of

24 tonight, we can talk about it in the morning.

25         MS. HAGH:  Thank you, your Honor.

```
1              THE COURT:  All right.  Thanks.

2              COURTROOM DEPUTY:  All rise.

3              (Whereupon, the proceedings were adjourned at 4:42

4    p.m.)

5                              -  -  -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                      REPORTERS CERTIFICATE

2

3

4            I, Wynette C. Blathers, Official Court Reporter for

5    the United States District Court for the Middle District of

6    Tennessee, with offices at Nashville, do hereby certify:

7            That I reported on the Stenograph machine the

8    proceedings held in open court on November 5, 2014, in the

9    matter of SABRINA RECHELLE CORLEY V. WAL-MART, Case No.

10   3:12-CV-01250; that said proceedings in connection with the

11   hearing were reduced to typewritten form by me; and that the

12   foregoing transcript (Volume II of IV, Pages 1 through 151) is

13   a true and accurate record of the proceedings.

14           This the 2nd day of January, 2015.

15

16

17

18                            _____

                              /s/ Wynette C. Blathers, RMR, CRR
19                                Official Court Reporter

20

21

22

23

24

25