```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                      NASHVILLE DIVISION

 3   SABRINA RECHELLE CORLEY,        )
                                     )
 4                Plaintiff,         )
                v.                   )  No. 3:12-CV-01250
 5                                   )
     WAL-MART,                       )
 6                                   )  JURY TRIAL
                  Defendant.         )
 7   _____)  VOLUME III OF IV

 8

 9
     ------------------------------------------------------------
10
                BEFORE THE HONORABLE KEVIN H. SHARP
11                  TRANSCRIPT OF PROCEEDINGS
                        NOVEMBER 6, 2014
12
     ------------------------------------------------------------
13
     APPEARANCES:
14

15   For the Plaintiff:        ROCKY MCELHANEY, ESQ.
                               AFSOON HAGH, ESQ.
16                             Rocky McElhaney Law Firm, P.C.
                               1311 Sixth Avenue North
17                             Nashville, Tennessee  37208

18   For the Defendant:        GEORGE ANDREW ROWLETT, ESQ.
                               Howell & Fisher
19                             300 James Robertson Parkway
                               Court Square Building
20                             Nashville, Tennessee  37201-1107

21

22
     PREPARED BY:    WYNETTE C. BLATHERS, RMR, CRR
23                   Official Court Reporter
                     801 Broadway - Room A-837
24                   Nashville, TN  37203
                     (615) 401-7221
25
```

**I N D E X**

| | PAGE |
|---|---|
| PLAINTIFF'S CLOSING ARGUMENT | 13 |
| DEFENDANT'S CLOSING ARGUMENT | 44 |

1          The above-styled cause came on to be heard on

2    November 6, 2014, at 8:55 a.m., before the Honorable Kevin H.

3    Sharp, when the following proceedings were had, to-wit:.

4          COURTROOM DEPUTY:  All rise, please.

5          The United States District Court for the Middle

6    District of Tennessee is now in session, the Honorable Kevin

7    H. Sharp presiding.

8          THE COURT:  Thanks.  Y'all can be seated.  Okay.

9    Let's talk about jury charge and start with plaintiff, if

10   you'll just tell me what page you're on and what your issue

11   is.

12         MR. MCELHANEY:  Yes, your Honor.  I apologize, your

13   Honor.  I wasn't there.  Your Honor, please, on page 28, your

14   Honor, there are -- this is the compensatory damages charge,

15   mostly the Pattern Instruction 14.01.  Under medical expenses

16   we stopped without having the future medical expenses there,

17   and the charge was reading the present cash value of similar

18   services likely to be required in the future.  The testimony

19   from Dr. Dube about the knee replacement cost is $60,000.  We

20   would ask for that to be included.

21         THE COURT:  Okay.

22         MR. MCELHANEY:  We also have under physical pain and

23   mental suffering kind of the same phrase in the present cash

24   value for pain and suffering likely to be experienced in the

25   future, which would come after the term discomfort suffered by

1　the plaintiff.  The standard charge says, comma, and the

2　present cash value for pain and suffering likely to be

3　experienced in the future.

4　　　　　THE COURT:  All right.  Either one of these, do you

5　disagree with those?  I mean, there was evidence of it, and

6　they've asked for it.  Any reason it shouldn't be there?

7　　　　　MR. ROWLETT:  Your Honor, I just can't remember if

8　present cash value would do that with pain and suffering

9　because you don't have to convert with inflation and all that.

10　　　　　THE COURT:  Well, that's true.

11　　　　　MR. MCELHANEY:  There's another charge on the present

12　cash value, pain and suffering, on how to do it.

13　　　　　THE COURT:  That's fine.  You know that works in your

14　favor not to have it, though?

15　　　　　MR. MCELHANEY:  Right, right.

16　　　　　THE COURT:  You want it?

17　　　　　MR. MCELHANEY:  Want what?

18　　　　　THE COURT:  Cash value.  Present cash value works in

19　your favor if it doesn't say present cash value, and

20　Mr. Rowlett seems to be saying you don't put it for pain and

21　suffering.

22　　　　　MR. MCELHANEY:  I'm okay not to put it.  I just want

23　the future pain and suffering language to be there.  I'm okay

24　if we omit the term "present cash value".  I just said we'd

25　like to have for pain and suffering likely to be experienced

1  in the future there, though.

2        THE COURT:  Right.  Okay.  I get that, and I know you

3  don't have the present cash value.  But why wouldn't it be

4  included for pain and suffering as well?  Seems like it would.

5        MR. ROWLETT:  I hadn't thought about it because I

6  didn't know if you'd do inflation and reduce it the same way.

7  I don't know.  I don't have a position on it really.

8        THE COURT:  Okay.  Then what was the next one?  So

9  there's medical expenses, pain and suffering.

10        MR. MCELHANEY:  Under 14.01 the definition for

11  permanent injury has been omitted in the proposed by the

12  Court.  We'd like to include the standard definition of

13  permanent injury from the TPI.

14        MR. ROWLETT:  Which number TPI, please, sir?

15        MR. MCELHANEY:  14.01, standard definition for

16  permanent injury.

17        THE COURT:  Got a problem with that?

18        MR. ROWLETT:  No, your Honor.

19        THE COURT:  Okay.

20        MR. MCELHANEY:  Those are all our issues, your Honor.

21        THE COURT:  Okay.  Mr. Rowlett, what have you got?

22        MR. ROWLETT:  Your Honor, do you care where I stand?

23        THE COURT:  No.  It doesn't matter.

24        MR. ROWLETT:  Your Honor, page 24, the third full

25  paragraph.

1          THE COURT:  Let me catch up with you.  The one that

2   starts and owner?

3          MR. ROWLETT:  Yes, your Honor.

4          THE COURT:  Okay.

5          MR. ROWLETT:  So the third line refers to pattern of

6   conduct, recurring incident generally, continuing condition.

7   And that was not in the included proposed agreed instructions.

8   There's a specific line of cases that goes back a while, *Hale*

9   *v. Blue Boar* and *Red Foods*, and a number of cases we've dealt

10  with over the years.  And then the Tennessee Supreme Court had

11  *Blair v. West Town Mall*, and they kind of clarified it.  And

12  the typical fact pattern that that one deals with is one that

13  was from the *Opryland Beske* case where people kept putting

14  trash in this trash can as they were going to one ride, and it

15  kept overflowing and spilling.  And Opryland said, well, we

16  didn't actually know it was there; there's no proof of how

17  long it was there.

18          And so this method of operation approach is to deal

19  with recurring incidents that are arising out of the method of

20  operation by which the entity operates and potentially either

21  creates or doesn't.  It's a recurring hazard they're not

22  addressing appropriately, and it's created in part by how they

23  choose to operate.  So, for example, I don't know if the Court

24  would remember the cafeteria over at the First American

25  Center --

1          THE COURT:  Uh-huh.

2          MR. ROWLETT:  -- where they had the ice machine.

3   And, you know, if ice is always coming out and getting on the

4   floor and people are falling and the bank cafeteria says,

5   well, we didn't have actual notice of it, there's no proof

6   about how long it was there, you're out of luck.

7          The plaintiffs would try to develop proof and say,

8   well, this thing was recurring.

9          THE COURT:  I agree with you.  That third sentence

10  should go.  The constructive notice as it applies in this case

11  is covered by the sentence above it.  So the third sentence is

12  out.  All right.

13         MR. ROWLETT:  Your Honor, then this one other thing.

14         THE COURT:  All right.

15         MR. ROWLETT:  Page 26, the second paragraph --

16         THE COURT:  Uh-huh.

17         MR. ROWLETT:  -- was not in the agreed proposed.

18  It's not in TPI 9.05 where the parties got it from for the

19  proposed.  I did not see it in the plaintiff's proposed.  I'm

20  not familiar with it.  It's not consistent with anything I've

21  ever seen in 20 years of premises liability law, and it may be

22  in a premises appellate opinion that I haven't seen.  But,

23  also, it just seems -- while I don't know the facts of the

24  case, I assume it's in some appellate opinion.  I don't know

25  the facts of that case.  But 9.05, I think, has been around a

1 long time.  As the Court mentioned, this is a slip and fall

2 case, and one thing that's nice about it, typically the law is

3 pretty straightforward on it, and it's an application to the

4 facts of the law.  And this is just kind of black letter

5 Tennessee common law.

6         THE COURT:  You know, I think we gave this

7 instruction in your last case in here on a slip and fall.

8         MR. ROWLETT:  I do not remember it, your Honor, if

9 you -- I'm sure you're going to now pull it up --

10         THE COURT:  Because we don't start over from scratch.

11 We pull up old jury charges, and so one of the places we'll

12 look is -- I think this is your third trial over here.  It

13 comes from old -- so I don't have the case cite that it came

14 from, but I think it's consistent with the law.

15         MR. ROWLETT:  I flat out do not remember it.  And

16 so --

17         THE COURT:  Well, what's your position on this,

18 Mr. McElhaney?

19         MR. MCELHANEY:  I think it fits the facts, and it's

20 important because of the argument of Wal-Mart that their

21 corporate representative made, is that Ms. Corley should have

22 seen the water.  They chose a white floor.  They trained their

23 people.  If she had no reason to apprehend that and she has a

24 right to rely upon them when there's no notice -- and there

25 was no notice of that -- so I think it is an accurate

1 statement of the law.

2          THE COURT:  Well, here's what I'm going to do.  I'm

3 going to go back and see where it came from.  Were you about

4 to say something?

5          MR. ROWLETT:  Could I add one thing, your Honor?

6          THE COURT:  Yeah.

7          MR. ROWLETT:  It's odd in this case that the

8 plaintiffs are alleging that these spills occur over and over

9 in stores.  And this accident occurred to an adult person not

10 a kid, and so I think people can take reasonable notice or

11 based on common experience it is possible spills occur.  This

12 is not an accident where there was something out of the blue

13 where you'd say there was some pit in the middle of the floor

14 at a Wal-Mart.  Who would expect that?  That wouldn't make any

15 sense.  You wouldn't have any reason to be thinking about that

16 possibility.

17          But certainly any reasonable person should consider

18 the possibility that there might be something spilled in a

19 grocery store in a grocery section where there are families

20 with kids.  This is not an out-of-the-blue unexpected thing,

21 and Wal-Mart is not the only entity or person that should know

22 that it's a possibility to have water on the floor.

23          THE COURT:  Okay.  Well, let me look at that and see

24 where it came from, and then I'll let you know because we've

25 got to get you another draft anyway with all those changes.

1   That's the only one that's left up in the air.  So you know

2   what it's going to look like except for that one.

3         Let's just plan on 9:30 starting.  We'll get these

4   back to you, but starting with closings y'all have 20, 25

5   minutes to get your thoughts together now that you know

6   what -- yeah.

7         MR. MCELHANEY:  I don't want to get in the teeth of

8   any of the Court's rulings.  I just want to clarify one thing.

9   It's okay for us to read this, just not show it to them;

10   right?

11         THE COURT:  Right.  I expect that the Court is going

12   to instruct you that, you know, party claiming damages is

13   entitled to damages, you know, the usual way to do it.  But

14   what I don't want you to do is show it to them, hold it up,

15   put it on the evidence presenter, any of that.  But you can

16   talk about it and argue the instructions.  I'm always

17   surprised that people don't do that.

18         MR. MCELHANEY:  Thank you.  One other question I had

19   was I've researched this to make -- but I couldn't find

20   anything from your court.  Per diem arguments are okay on the

21   value of the cases?

22         THE COURT:  Well, how do you plan on doing that?

23   What are you talking about?

24         MR. MCELHANEY:  Asking for such amount of money per

25   week, per hour, per day that equals another number in the end.

1          THE COURT:  You've got a problem with it, so it's a
2    way of coming up with damages --
3          MR. MCELHANEY:  It's typically done.  That's the way
4    I've always done it for 15 years.  I just want to make sure
5    this Court --
6          THE COURT:  I don't see where -- there's no reason to
7    not be able to do that.
8          MR. ROWLETT:  I don't have a cite, your Honor.
9          THE COURT:  Okay.  You were about to say something
10   else, though, before we he went to that topic.
11         MR. ROWLETT:  Your Honor, what was the issue we
12   were --
13         THE COURT:  We were talking about jury instructions
14   and how you use them as part of your closing.
15         MR. ROWLETT:  Yeah.  I guess the concern is if
16   they're summarized and summarized inaccurately or --
17         THE COURT:  Well, but that happens all the time.  It
18   happens in opening.  It happens in closing.  Everybody gets up
19   and they start talking about the law, and that's just not the
20   law.  So they get an instruction, though, that says if what I
21   say is different from anything they said, go with me.
22         MR. ROWLETT:  I think that -- yeah.  I think the
23   reason maybe more people aren't doing it is you've got to be
24   careful about hitting it right.  And then if it's a two-way
25   street.

1          THE COURT:  Well, right.  But not to get into the

2   theory of how you close.  But the juries have come back, and

3   all they've got are the jury instructions.  They get them and

4   their memories.  And so then they go, what do we do?  And they

5   pay attention to the jury instructions.  And so, you know,

6   when I used to file a case, I always started with the jury

7   instructions.  All right.  I've got a slip and fall case.  Let

8   me pull the jury instructions and start crafting my complaint

9   and everything else I'm doing because at the end of the day

10  it's all they've got so -- and your exhibits and the evidence

11  you put on but it's all -- right?  You've put on your whole

12  case to fit within the instructions, so there's no reason not

13  to then argue.

14          I don't know.  I throw it out there.  You've tried

15  more cases than I have so -- all right.  I'll get these back

16  to you.

17          COURTROOM DEPUTY:  All rise, please.

18          (Brief recess.)

19          COURTROOM DEPUTY:  All rise, please.

20          THE COURT:  Thanks.  Y'all can be seated.  *Woods* is

21  where that came from, *Wood v. Wal-Mart*.  It was -- I think it

22  was an agreed instruction, but it made sense in *Wood* because

23  you had that curb issue.  And it's not the same as we've got

24  here.  So, anyway, I agreed with Mr. Rowlett on that, took

25  that paragraph out.  The others, I don't know why I missed

1  those.  Those came out of the pattern instructions, but

2  they're there.  And the pattern instructions have present

3  value, which makes sense to me.  I don't know why you wouldn't

4  present value it.

5        All right.  The last thing.  If you're talking about

6  instructions during this, during your closing, don't tell them

7  that they get the instructions because then they won't listen.

8  They'll go, oh, we'll just read it later.  And it's 40 pages.

9  They won't read it later.  So they pay attention much better.

10  They actively listen if you don't let them know they're taking

11  it back.

12        So we're ready?

13        MR. MCELHANEY:  One question.  Is there a way we can

14  work the lights in the courtroom so we don't have to turn them

15  on and off?  Can we cut the one behind the screen off to begin

16  with?  That glare comes across there.

17        THE COURT:  You've got that.  I mean, we can leave

18  that.  Kind of leaves me in the dark, but I'm fine.

19        MR. MCELHANEY:  It's up to you, your Honor.  I'm just

20  asking.  That's fine with us if that's okay with the Court.

21        THE COURT:  Mr. Rowlett, do you care?  There's not a

22  separate one that takes care of this along the back?

23        MR. MCELHANEY:  I don't think so.

24        THE COURT:  I don't think so either.  I'll tell you

25  what, during their closing we'll leave it like that.  Then for

1  charging the jury we'll just turn them all back on so I can

2  read.

3        All right.  Let's bring them back.  Mr. Rowlett, if

4  you want all the lights back on for yours, just let us know.

5        MR. ROWLETT:  Thank you, your Honor.

6        (Whereupon, the jurors entered the courtroom.)

7        THE COURT:  All right.  Thanks.  Y'all can be seated.

8  All right.  Everyone followed my instructions?  No one talked

9  about the case, didn't allow anyone to talk to you about it?

10 No one did any research?  Okay.

11       All right.  You'll recall from yesterday both parties

12 have closed their proof and you will get -- you'll hear their

13 closing arguments this morning.  And then I will give you the

14 jury charge, and you'll go back and deliberate.

15       All right.  So, Mr. McElhaney, you're up.

16       MR. MCELHANEY:  Thank you, your Honor.

17                  PLAINTIFF'S CLOSING ARGUMENT

18       MR. MCELHANEY:  Good morning.  Let me remind you who

19 we are suing and why.  We're suing a Wal-Mart corporation

20 called Wal-Mart Stores East, which owned and operated the

21 Wal-Mart out in Antioch on Hamilton Church Road where

22 Ms. Corley was injured.  We're suing that Wal-Mart corporation

23 for two primary reasons.  First, Wal-Mart violated the public

24 safety rule by allowing a dangerous condition to exist on the

25 premises when it had an opportunity to do something about it.

1          The second reason that we're suing Wal-Mart is
2    because it violated the customer safety rules by failing to
3    follow its own policies and procedures to always be on the
4    lookout for dangerous conditions, including spills, and to
5    clean them up.
6          The foundation of the American civil justice system
7    is juries like you.  Juries exist to protect members of the
8    community like Ms. Corley.  Courthouses like this one are
9    built for that purpose.  Courthouses are public, and public
10   courthouses are always open to the community.  These benches
11   in the back, they're for the public to come in and take notice
12   of what's happening in cases like these.  The documents that
13   are stored in the courthouse in the clerk's office are open to
14   public inspection.  That's because in every case that's tried
15   in front of juries like you and every decision that's made by
16   jurors like you impact in some way, small or great, the safety
17   of our community.  It's up to you.
18          It's up to you to decide how far a big chain store
19   can go in violating the public safety rules and the customer
20   safety rules before a jury of our community is going to stand
21   up and say enough, enough.  Now you must meet your full
22   responsibility.
23          If you think it's okay that Wal-Mart violated the
24   rules the judge will give you, the public safety rules, and
25   you think it's okay that Wal-Mart violated their own customer

1 safety rules, then tell us. Tell Ms. Corley. Tell us by

2 returning a verdict that gives Ms. Corley zero compensation or

3 returns a verdict that's less than full compensation.

4 But if you don't think it was okay, if you don't

5 think it's okay that Wal-Mart violated these rules and denied

6 responsibility for three years, then tell them. Tell them by

7 returning a full verdict that compensates Ms. Corley for all

8 of her harms and losses. Return a full verdict in her favor.

9 If you give Wal-Mart a pass on this, then it's going

10 to be business as usual at Wal-Mart just like it's been since

11 3:46 p.m. on November 7, 2011, when they cleaned up the spill,

12 and everybody there went back to doing their normal stuff.

13 If you return less than a full verdict in this case,

14 then Wal-Mart is going to benefit from three years of denying

15 responsibility, for three years of delaying justice. Don't

16 let Wal-Mart profit from not doing the right thing.

17 I want to talk to you a couple of minutes about

18 preponderance of the evidence. That's the standard that the

19 judge will instruct you that you are to govern this case by.

20 And what the judge is expected to instruct you about is that

21 Ms. Corley has the burden to show you that our side of the

22 case is more likely so than not so, more likely so than not

23 so, more likely right than wrong, more probably true than not

24 true.

25 Now, the judge will use the term "more likely so than

1  not so."  A way of thinking about that is what's more probably

2  right.  When you think of preponderance of the evidence -- and

3  the judge talked about a scale in the initial instructions and

4  tilting the scale -- I want you to think about a scale.  For

5  Ms. Corley to win this case under the standards that govern

6  your decision, we have to tilt the scale ever so slightly,

7  ever so slightly.  There has to be beyond a reasonable doubt.

8  I submit to you we've done something like this, and we'll talk

9  about all that proof in a minute and the change in Wal-Mart

10  theories as the trial unfolds.  We'll talk about that, but

11  we'll have to do this, ladies of the jury, ever so slightly.

12  If you find that our side of the case is more likely right

13  than wrong, more probably so than not so, you have to find for

14  Ms. Corley.

15       So what are the rules that Wal-Mart had?  These are

16  in the exhibits of the trial.  You'll be able to see them.

17  Wal-Mart knew that 40 percent of all the injuries in the store

18  accounted -- part of that was from customers who slipped and

19  fell.  That's a huge number.  Of all the Wal-Marts in the

20  country, all of them, the thousands, 40 percent of all

21  injuries include customers like Ms. Corley who slip or trip.

22       When a company knows that huge of a number, it has a

23  great responsibility to make it safe.  The greater the likely

24  risk of harm from a particular type of injury, the greater the

25  responsibility to meet that danger.  40 percent include

1  customers who slip, trip or fall.  They knew this.  That's why
2  they had some safety rules.
3          One of the safety rules is called good housekeeping.
4  If you pay close attention, close attention, you'll be able to
5  identify.  You'll be able.  If you pay attention, you'll be
6  able to identify.  Now, you had asked yourself the question
7  when you see Katrina Smith, one of the many workers in the
8  area walking by, was she paying close attention?  You saw
9  that.  Was she paying close attention?  We know what the
10  potential hazard was.  Everyone was trained about the danger
11  of spills.
12          Another safety rule, never walk past a spill on the
13  floor, never leave a liquid spill unattended.  These are rules
14  that were violated in this case.  Pay attention to what is in
15  your -- pay attention to what is in your path.
16          Remember Mr. Hicks tried to say, well, we've got to
17  watch for all this stuff.  And that's true, but there's no
18  proof that falling merchandise accounts for 40 percent of the
19  injuries.  You've got to pay attention to what is most likely
20  to hurt somebody.  We all want to have good customer service.
21  We expect it.  We want people to engage if we have a question.
22  We understand that.  They're talking to people that prevent
23  injuries.  Paying attention to what -- where you're walking if
24  you're an employee with training.  This is the training,
25  ladies of the jury.

1          Is there way we can get rid of that buzzing?  Is it

2    too loud?

3          COURTROOM DEPUTY:  We can try.  We've got to unplug

4    something.

5          (Brief Pause.)

6          MR. MCELHANEY:  You remember Mr. Tunstill, who was in

7    the courtroom yesterday, been here all week.  We asked him

8    some questions in his deposition that we played for you, as

9    part of our case, about safety and injuries, and I want to

10   remind you of some of that testimony.

11         (Whereupon, a video was played.)

12         MR. MCELHANEY:  Now, what we know is, from the video,

13   that Wal-Mart employees that had been trained in these

14   customer safety rules were in and around this spill for about

15   20 minutes before.  We watched in the courtroom 20 minutes

16   before the incident when Ms. Corley was injured, so we know

17   from just watching that that there are numerous employees with

18   this training.  There was one gentleman that walked right

19   past.  There was another gentleman, and there's Ms. Smith.

20   And so you saw that, and we identified all those workers who

21   were in and around the area.  They had an opportunity.  They

22   had the training, the opportunity to see and clean up this

23   spill.

24         Now, remember this.  Wal-Mart agrees that there was

25   water on the floor.  We saw the incident report filled out by

1   Ms. Smith that's an exhibit -- and you'll have that -- where

2   she typed in the computer.  Was surface dry?  No.

3   Description, water.  You have that.  We also have the clean up

4   that you saw happening where they were cleaning up in the

5   aisle, and they were taking the paper towels, and they were

6   wiping it up with their foot.  You saw all that.  There was

7   water there.  Ms. Corley saw it.  She told you that.

8         We don't have to prove to you where the water came

9   from.  That's not in the instructions the judge will give you.

10  That's not our obligation.  That's not our duty.  What we have

11  to show you is that there was a hazard there.  We've done

12  that.  Wal-Mart admits it's a hazard.  We've done that.

13        The next thing we have to show you is that it's more

14  likely so than not so that it had been there long enough for

15  them to have known about it and done something about it.  Once

16  we do those two things, we prove to you there's a hazard,

17  which we've done, we prove to you that it's more likely so

18  than not so that it's been there long enough for Wal-Mart to

19  have done something about it, either put up a warning sign,

20  stand over it like Katrina Smith did for a while, clean it up.

21  Once they've had an opportunity to do something to protect the

22  customer, that they didn't do, we win.  We win the case at

23  that point, when you find those two facts.

24        But we don't have to prove to you where it came from.

25  It's not in the instructions.  And Mr. Rowlett, when he gets

1  up here next, will not tell you that's our obligation.  That's

2  not the law.

3      Now, what -- but we tried to find out where it came

4  from.  We wanted to know, and so we asked Wal-Mart -- Katrina

5  Smith.  Thank you.  We know that she walked right past it,

6  right past where the fall occurred, 20 something seconds

7  before it happened.  Now, before then on the video she walks

8  up the aisle, and she turns behind the end cap.  And then

9  she's in the middle cap.  She's kind of in the middle.  But

10 then right before Ms. Corley is injured she comes out, and she

11 walks back this way and the spill is to her left.  And she

12 goes up the aisle a minute or so before, it's to her right.

13 She comes back, it's to her left.  And we asked her about her

14 job, and this is what she -- we'll remind you what she told

15 us.

16      (Whereupon, a video was played.)

17      MR. MCELHANEY:  Now, included in the opening

18 statement I thought the way she answered that question was

19 very telling.  Even Ms. Smith knows the seriousness of the

20 answers she's giving and that's why it's correct.

21      (Whereupon, a video was played.)

22      MR. MCELHANEY:  So we know -- and we'll talk about

23 this in just a couple of minutes that through Mr. Hicks'

24 testimony there was some very, very critical facts from the

25 man that came to the trial.  But we know from him that the

1  water, because it was there, was there when she walked by, and

2  she just told you she didn't see it.  She wasn't doing her

3  job.  She had the opportunity.  Other people had the

4  opportunity too, but we've proven to you more likely so than

5  not so that this assistant manager had the opportunity to fix

6  this.

7  　　　　Now, based on her training could she and should she

8  have seen that water on the floor?  Luckily for us Wal-Mart's

9  lawyer asked the question.  Let's remember that testimony.

10  　　　　(Whereupon, a video was played.)

11  　　　　MR. MCELHANEY:  From where I was standing if I look,

12  I can see it.  She didn't look.  From where I was standing I

13  can see it.  Now, if this lady had anything else to offer to

14  you, any other testimony whatsoever, Wal-Mart would have

15  brought her in here.  She still works there.  You heard

16  Mr. Rowlett tell you that in opening statement.  Remember when

17  he told you that Mr. Tunstill started at push carts and then

18  became a manager, and he told you Ms. Smith still works at

19  Wal-Mart.  She's under their control.  She's a manager.  If

20  she had anything else to tell you, she would have been here.

21  She doesn't because that's the truth right there.

22  　　　　But now let's get to what Wal-Mart's position has

23  been.  We call this Wal-Mart's blame game.  We asked them back

24  in 2013 how did the water get on the floor.  We needed to know

25  that.  We want to know.  If you know how the water got there,

1  tell us how the water got there because they investigated.

2  What they told us under oath in the interrogatory, 2013, was

3  that another customer walking past the area where plaintiff

4  slipped holding a tilted cup at 3:38 slipped it (sic), in

5  plaintiff's exhibit.  And let me tell you why that's important

6  and why that was Wal-Mart's position.

7          Wal-Mart took this position in 2013 because it's a

8  very short amount of time for Wal-Mart to have had an

9  opportunity to clean it up if the lady in the red had spilled

10 it.  Now, that's about a minute and 40, 50 seconds that the

11 water would have been on the floor if the lady in red did it;

12 right?  You with me?  So Wal-Mart wanted to come into court

13 having chopped the video up the way they wanted to chop it up

14 and say the lady in red, we had a minute 40, there's no way we

15 could have had an opportunity to fix it.  Because if they

16 don't have an opportunity to fix it, they win.

17          Now, we know that in between time Katrina Smith

18 walked by, so we were prepared to counter that argument if we

19 had to here in court with you ladies.  But we discovered from

20 watching the video very, very closely preparing for trial that

21 that might not have been the case.  But Wal-Mart didn't know

22 that in 2014 when we took Mr. Tunstill's deposition.  He was

23 there on behalf of the company, and he reiterated this red

24 shirt lady.

25          (Whereupon, a video was played.)

1          MR. MCELHANEY:  Now, 2013 lady in red.  2014 lady in

2    red.  We get to trial.  We've all figured it out.  It's not

3    the lady in red.  And we've told them that.  And the guy takes

4    the stand, the safety man -- the protection manager, asset

5    protection manager, and he says, I found out yesterday that I

6    was wrong.  So then what did he tell you then when he's on the

7    stand?  Oh, it could have been somebody in the aisle.  They

8    changed the theory.  You know why?  Because if the lady in red

9    didn't do it, it had to have been there longer because the

10   video doesn't show anybody else putting it there.  That's

11   what's more likely so than not so.

12          So once we get to trial this is the theory.  It's the

13   lady with the green ponytail who come by after miss -- who

14   went down the aisle after Ms. Smith had walked by.  And then

15   if it's not the lady with the green ponytail, well, then it's

16   a shopping cart, it's water from Ms. Corley's shopping cart.

17   You remember that?  Okay.  We're changing our theories.  It's

18   not the lady in red.  We've proven that.  So now it's the lady

19   with the green ponytail.  And, ladies, if you don't buy that,

20   then it's the shopping cart, and Ms. Corley drug the water

21   herself up there.  Reaching.

22          Let me tell you why that was the only alternatives

23   that their lawyer could come up with and why it's critical for

24   you to understand this.  If they try to pick anything else,

25   then Wal-Mart would have had the opportunity to clean the

1  water up.  Both things they try to hone in at trial when
2  they're changing their theories, when they're a moving target,
3  is things that happen after Ms. Smith comes back.  They have
4  to have you try to believe that since they were wrong about
5  the lady in red, they're right about the lady in green.  Well,
6  there's nothing on the video to show the lady in green did
7  anything, and there's nothing on the video to show -- and
8  Ms. Corley told you she didn't have any water in her cart.
9  She didn't drag that water up there.

10         So the only other theory they've got is that it
11  magically appeared in the micro seconds before Ms. Corley
12  walked out of that aisle.  If it's not the lady in green, it's
13  not the shopping cart, it magically appeared.  We don't know
14  how it got there.  We don't know how it got there.  We don't
15  have to prove how it got there.  Did it magically appear?  I
16  suggest to you, ladies on this jury, that the only way
17  Wal-Mart can be found not at fault is if you find the water
18  magically appeared.

19         And that brings me to Mr. Brian Hicks' testimony in
20  support of the statement I just made to you.  Remember this
21  gentleman came to trial live.  We called him.  We wanted you
22  to hear what he had to say.  Wal-Mart didn't call any
23  employees to talk about this case.  The reason they didn't is
24  they're trying to rely upon you to help them perpetuate the
25  denial of this claim.  They have nothing -- their employees

have nothing to say that we didn't determine.  We called all
their employees.  They called nobody.

So what did Brian Hicks say?  And we have this nice
lady here, Ms. Wynette, the court reporter.  We asked her to
transcribe out for us what Mr. Hicks said from this witness
stand during this trial.  These are his actual questions and
words.  First of all, before November 7th Wal-Mart knew that
water and other spills were a recurring event in the stores.
Yes, we've proved that.  We know that it happens frequently.
We asked him.  It happens frequently that there are spills.
Whether it's water or liquid, it happens?  Yes, sir.  It's a
safety concern.  This is back to the fact that Wal-Mart knew
water was a danger.  That's why safety rules are important.
That's why it's important for employees to follow the safety
rules.  And, finally, Wal-Mart knew that customers could be
seriously injured if they didn't follow the safety rules.

Now let's get to some more critical stuff.  This is
why the shifting theories and the moving target and the blame
game doesn't work in this case.  I asked him, I take it then
that in the hour of the video you watched before you saw the
lady in red, that you did not see anything else that would
have put the liquid on the floor?  No, sir.  No, sir.  Okay.
So when they watched it and when you watched it, the only
theory was the lady in red.  Nothing before the lady in red
did they see who put the water there.

Then we go and we ask him, you're agreeing with me that the lady in red, she didn't do it? We're talking about the lady in red. You agree with me that she didn't do it? I didn't see any indication she did. Then we asked him, you agree with me she had a piece of paper? And he said, yes. You've heard that testimony.

So then we said to him, if the lady in red didn't put the water on the floor, would you agree with me that the water was there a longer period of time than you indicated originally? Originally he said 3:38, lady in red. I said, if she didn't do it, which they admitted she didn't, it had to have been there longer than you originally said? The answer, if she wasn't the source of it, I didn't see any other source, potential sources, after her.

So the Wal-Mart witness, not the lawyer who's pointing fingers at other customers, but the Wal-Mart witness didn't see anything put the water on the floor after the lady in red. Remember? They need you to believe the water got there after the lady in red for them to win. If you don't believe that, we win. So he agreed with me. I said, I think you are agreeing with me; correct? And can you see the yes? The gentleman's head is in the way. Can you lean? Yes.

He's agreeing with me the water has been there longer than they wanted to argue at trial because we busted them. It's a denial for a denial's sake, ladies. It's a denial for

```
 1  denial's sake.  This water had been there before 3:38, a
 2  longer period of time.  And I submit to you that it's more
 3  likely so than not so that the culprit of the water, whatever
 4  it was and wherever it came from, was in that video clip we
 5  didn't ever get to see, otherwise you're going to have to find
 6  it magically appeared.
 7           We know it was there.  Where did it come from?  We
 8  submit it was there long enough, perhaps longer than an hour;
 9  right?  That's what their own witness said.  Nothing else in
10  that first hour showed me anything credible of how it got
11  there.  Then we debunked the red shirt lady.  Then we had him
12  admit that nobody after the red shirt lady did it.  I think
13  you've got that.
14           So when you get the verdict form from the judge,
15  you're going to be asked the question was Wal-Mart at fault.
16  And we sincerely ask you to return a verdict on that form at
17  that point of yes, yes.
18           Now I want to talk about this thing called
19  comparative fault.  The judge will tell you about this.
20  Comparative fault is dealing with Wal-Mart blaming Ms. Corley,
21  okay, because they do.  Part of the blame game is to blame
22  Ms. Corley.  And you're going to have to decide whether
23  Ms. Corley has any fault in this.  Now, the judge will tell
24  you when -- some about the law.  He will explain this to you
25  in the instructions, that the owner of the property has the
```

1  duty to make it safe.  It says the duty arises from the

2  position of control which the person in possession occupies.

3  That's Wal-Mart.  He, and it goes on to say, has superior --

4  he generally has superior knowledge of a perilous condition

5  and is the person normally best able to prevent any harm to

6  others.  That's the rule.  Okay.

7         So what do we know Wal-Mart knew?  Well, they knew

8  about the 40 percent of spills.  They knew about the customer

9  safety rules.  They knew the harm that could come to others.

10  Ms. Corley is there to buy Miracle Whip to make lunch

11  sandwiches for her son that she took in because the mother

12  didn't want her -- didn't want him.  She's there as a

13  customer.  She has never had any training on how to look for

14  stuff.  She's there shopping.

15         Now, you have to decide whether Ms. Corley pushing a

16  buggy, checking after her then eight-year-old son, trying to

17  get through the aisle, whether she should have done something

18  differently.  Wal-Mart -- who has the greater knowledge?  Who

19  has the greater responsibility to protect?  Wal-Mart.  You

20  weigh it.  You talk about it.  You're the judges of the facts.

21  The judge will tell you that.  We submit when you're given the

22  question is Sabrina Corley at fault, you say no.  If you

23  say -- to answer that question in the negative is to say under

24  the circumstances existing, under the circumstances existing a

25  reasonable person wouldn't have done anything differently than

1  Ms. Corley did or to say what else could Ms. Corley have done,

2  we submit you say no.

3       Now, if you for some reason in your collective wisdom

4  discussing this case think that Ms. Corley should have done

5  something differently and perhaps she should have seen the

6  water without training being there as a shopper, without the

7  superior knowledge of the years of frequent spills -- I mean,

8  she told you she chose this place because she thought it was

9  clean, safe, and good prices.  If you think she should have

10  done anything different, then we submit it's a very small

11  number, 10 percent at the most.  We ask you to put no.

12       Let me tell you the effect of this.  The law allows

13  us to explain this, and the judge will tell you as well.

14  Whatever compensation you allow for Ms. Corley is reduced by

15  whatever percentage of fault you put on her.  So if you say

16  she's 10 percent at fault, the judge will take away 10 percent

17  of the award.  If you say she's 20 percent at fault, the judge

18  will take away 20 percent.  You won't be asked to do that

19  calculation, and the verdict form will tell you not to do

20  that.  But please understand the impact of what you would be

21  doing there.

22       If you were to find Ms. Corley to be greater than

23  50 percent at fault, she would be awarded zero.  That's the

24  law of comparative fault.  She has to be 49 percent at fault

25  or less to receive anything in this case.  If you find her to

1  be 40 percent at fault, then the judge takes away 40 percent

2  of the award.  You find her to be 50 percent at fault, he

3  takes all of it away.  I just tell you that so you understand

4  the rules, not because we think you should put anything on

5  that line.  We submit to you under the facts a prudent person

6  being a shopper without knowledge wouldn't have done anything

7  differently.  We ask you to put no.

8         Now, after you get to this portion of the verdict

9  form, the last part you have is about harms and losses.  Now,

10  I'm going to submit to you at this point it's one of the more

11  important questions in the case.  For you to determine what

12  are the harms and losses and to allow compensation that fully

13  equates to the harm caused, the greater the harm caused, the

14  greater the compensation required.

15         Now, to compensate means to balance, to make even, to

16  balance out, to make even, to compensate.  Think back about

17  our scale.  I want to try to give you maybe a real life

18  example that you can understand about compensation.  And when

19  you're doing this, this compensation allowing on the verdict

20  form, the judge will tell you -- and Mr. Rowlett agrees.  I

21  highlighted it -- it is your duty to determine the facts, and

22  in doing so you must consider only the evidence I have

23  admitted.

24         We talked about that either in voir dire, the jury

25  selection process, or during opening statement.  We talked

1  about only considering what's been proven in the courtroom,

2  not considering what I call outside reasons.  We asked you

3  during the voir dire process -- and I think if the judge told

4  you not to consider outside reasons -- would anybody think

5  that they should.  Everybody said they shouldn't.  But let's

6  go back to the example.  We'll talk about compensation and

7  outside reasons.

8          We have a scale.  Let's say we have a worker at a

9  factory in Gallatin where I live, and he's making 10 bucks an

10 hour.  And I choose 10 bucks an hour not because that's what

11 he's worth but because that's easy for my calculations.  Say

12 he works a 40-hour week.  Okay.  On this scale here we put the

13 worker's hours at his hourly rate.  He's owed $400.  Okay.

14 Right?  He's worked it.  That's his -- that's what he's owed,

15 $10 for 40, $400.  Now, to compensate him for that the

16 employer should do what?  Put $400 on this scale, balance it

17 out.  The work done, $400, balances it out.  Okay.  If he had

18 been making 15 bucks an hour, we need $600 over here to

19 compensate.

20          Now, what if you at the end of the week had shifted

21 like this because he's done his work and he's owed 400 bucks.

22 Instead of putting 400 bucks over here the supervisor would

23 say, you know what, I just don't like you anymore.  I don't

24 think you're worth that.  I'm going to give you $300.  See,

25 that would be an outside reason.  To not pay him what he's

1  owed for some outside reason would not be right.

2        What if the -- he'd worked his hours and then the

3  boss said, you know what, I don't think paying you $400 is

4  fair to the owner of the company; it's not fair to him to pay

5  you this much.  That's another outside reason, and outside

6  reasons should not come into play in your calculation of

7  compensation.  What I mean by that is if some juror were to

8  say, you know, I understand we have to compensate Ms. Corley

9  for everything she's been through and for the next 35 years of

10  her life.  I know that's what we have to do.  This number

11  seems high.  It just seems high.  Then one of you ladies needs

12  to say, hey, that's an outside reason.

13        And what if we start calculating numbers and we get

14  somewhere and then someone says, gosh, that's not fair to

15  Wal-Mart.  Then one of you ladies needs to say, hey, that's an

16  outside reason.  Let's stick to the proof in the case.  Let's

17  stick to the proof in the case.  And so we're going to ask you

18  to do some of that with me, this analysis of what our harms

19  and losses are.

20        Before we get there we've got to talk about the

21  causation.  We have to prove to you that it's more likely so

22  than not so that Sabrina Corley was injured in the slip and

23  twist.  And Dr. Dube, you heard from him.  And you also heard

24  the only witness they called being Dr. Gavigan, who they

25  brought to the stand to talk about some things.  And I'm going

1  to highlight some of his testimony for you as well but also

2  Dr. Dube.  So on causation did the slip and twist cause the

3  knee injury?  Is it more likely so than not so?  Dr. Dube told

4  us these things.

5        (Whereupon, a video was played.)

6        MR. MCELHANEY:  That's what Dr. Dube told us, and

7  he's been her doctor for three years.  We submit you should

8  listen to him and determine that this is the cause.

9        Now, they called Dr. Gavigan, and we'll talk about

10 some of his testimony because under the law you'll be given --

11 Dr. Gavigan does the same thing.  I want to talk to you about

12 this aggravation of pre-existing condition charge that the

13 judge will give you.  The judge is expected to charge you that

14 if you find that defendant's fault aggravated plaintiff's

15 pre-existing condition and you find that plaintiff's

16 pre-existing condition had caused plaintiff no harm, pain or

17 suffering before the incident, then defendant is responsible

18 for all the harm.  The judge will tell you that.

19        So what did Dr. Gavigan tell us when I was asking the

20 questions?  Quickly.  We get the nuts and bolts of what

21 happened -- and this is his testimony too.  We transcribed it

22 as well for you.  These are his words from trial.  You

23 admitted to me that the twist in the water would have caused

24 and did cause whatever arthritis was there in your opinion to

25 be worsened?  Yes.  So even if your opinion you came up with

1  in June is correct, the slip and twist made all that worse?

2  Yes.  And the worsening of the arthritis that you say was

3  pre-existing, that's what led to the first surgery?  Yes.

4  Causation.  Bam.  Under this rule the judge will give you and

5  Dr. Dube.

6          Next, so regardless of whether you disagree with

7  Dr. Dube, that first surgery was caused by the event at

8  Wal-Mart?  Yes.  Okay.  We have more.  You can look at it

9  quickly.  The second surgery was related to the arthritis?

10  Yes.  And then down there, which was made worse -- he said the

11  second surgery was arthritis.  I asked him, which was made

12  worse by the slip and fall?  Correct.  That's his testimony.

13          So I want to move then to harms and -- let's move

14  past this.  That's the normal x-ray taken a day after.

15  Remember that's in evidence, and Dr. Gavigan said that normal

16  joint spacing area is absence of evidence -- harms and losses,

17  here's where we are.  In this case the judge will tell you

18  several things to consider in compensation.  He will explain

19  to you that past medical expenses that have been incurred as a

20  result of the injury are one of the things that you should

21  allow as compensation.

22          In this case we ask you to allow on the verdict

23  form -- the verdict form, ladies and gentlemen, will have one

24  line for you to tell all of the harms and losses.  You don't

25  need to break it down the way I'm going to break it down for

1   you, but we're going to go through each of the harms and

2   losses for you and what we expect you should allow.

3       $129,068.50, past medical expenses. And it's okay if

4   you write these numbers down. 129 -- flip back one second,

5   129068.50. Then we go forward. Now, in opening statement I

6   told you you'll have an opportunity to fix what can be fixed,

7   help what can be helped, and make up for the things that

8   cannot be fixed or helped. Allowing the past medicals, that's

9   how you fix what can be fixed. That's money that has been

10  incurred to treat this. That's how you fix what can be fixed.

11  But how do you help what can be helped? You help what can be

12  helped by allowing the future medical bills. Now, in the

13  future medical Dr. Dube tells us what she's going to need.

14          (Whereupon, a video was played.)

15      MR. MCELHANEY: So when you're talking about future

16  medicals -- and that's in the medical expenses -- here's what

17  we ask you to do: We ask you to give the cost of the fourth

18  surgery that Dr. Dube says is more likely not to occur.

19  Here's how you determine from the records you have the cost of

20  the fourth surgery. Exhibit to trial from Dr. Dube was the

21  cost of the third surgery in present dollars. This is what

22  was just charged. We took his deposition in April. Then she

23  had the third surgery in June, and we went back and took his

24  deposition in October. And what we talked about was this

25  third surgery, and these are the medicals related to that

third surgery.  So Dr. Dube has to be involved.  And that

11,000 includes physical therapy at his office and the office

visits leading up to the surgery and after the follow-ups.

Summit Surgery Center was involved for the operating

room and the anesthesia.  So the fourth surgery will cost the

same or similar, and we just have to prove similar services.

That's what the judge will instruct you, similar services.

The fourth surgery will be a similar surgery than the third,

and we ask you to allow 43,145 for that fourth surgery.

Then we want you to allow the cost of the knee

replacement, and Dr. Dube told you it's $60,000.  He explained

it to you.  His cost is ten, hospital is thirty, physical

therapy, anesthesia, and related services, he said the number

$60,000.  There's no contrary proof.  Even Dr. Gavigan

indicated that perhaps she already needed the knee

replacement.  He said he might have opted for it already.  So

we ask you to allow that.

And then there's one other element on future

medicals, the cost of other medical care.  We know that she's

in pain management.  She goes and gets pain medication.  She's

going to need injections, Dr. Dube said, physical therapy, and

so you look at the cost of those items that are in the medical

bills that we have given to you for similar services.  There's

medicine from Walgreens in there, injection costs, physical

therapy costs, and doctors appointments.  We ask you to give

1  forty-one eight fifty-five for those other future medicals,

2  and this is for the next 35 years.  It's about a thousand

3  dollars a year.  It's not like we're asking for a large

4  number, although collectively 41,000 seems like 41,000, but

5  it's for 35 years.

6         The next thing we've got to do is talk about past

7  pain and suffering, loss of enjoyment of life.  We're going to

8  ask you to consider allowing for the last three years having

9  undergone three surgeries and the shape she's in and what

10 you've heard from the witnesses, $100,000.  That's $33,000 a

11 year.  It's $2500 a month, a little more than a hundred

12 dollars a day -- a little less than a hundred dollars a day.

13 So for last three years, three surgeries, pain and suffering

14 we're talking about here, loss of enjoyment of life.  It also

15 includes mental anguish and emotional difficulty that the

16 judge will instruct you to award -- to allow.  We ask a

17 hundred thousand dollars.

18        And now I want to talk about the future medicals --

19 not medicals but the future harms.  And to do that we need to

20 talk about the stipulation that she has a 35-year life

21 expectancy.  So, ladies, when we talk about what's going to be

22 allowed for future harm, we're talking about over a 35-year

23 period of time, 12,775 days that she's expected to live with

24 this permanent injury, 12,775 days of life left.

25        Now, this is one of the parts of our system that I

1  think is unfair to a jury.  If I can make a tweak to the

2  system, which we can't do, today is the only day of justice.

3  That's what our system has.  But it would be easier for you to

4  allow harms in the future if we could come back.  What if we

5  could come back in five years and say, well, she had the knee

6  replacement; she's had that pain and suffering.  She's

7  incurred those costs.  She's lost that enjoyment.  She's

8  missed out on those activities.  And then come back five years

9  again and bring you ladies back and give you an update, allow

10 you to give some more compensation.  But the law doesn't allow

11 us to do that.

12      You are the only jury who ever gets to set

13 compensation in this case, and you have to do it for what has

14 happened and what we've proven is more likely so than not so

15 to happen in the next 35 years.  And so it's hard to ask you

16 to project that.  But we have to do it, and that's your job.

17      The second thing I think is kind of unfair is that

18 jurors like you don't get to know what juries like you are

19 doing in other cases like these.  If we could tell you, if

20 Mr. Rowlett could tell you or I could tell you what other

21 juries have allowed in cases very similar to this, it would

22 make your job easier.  You'll have some frame of reference.

23 But we can't.  It's under the rules.  So you don't get to have

24 a framework, guide post.  So I'll try to give you numbers that

25 I think is appropriate to compensate Ms. Corley for an injury

1  like this in cases like these.

2         So here's what we ask in the future:  We're going to

3  talk about permanent injury first, and this is what Dr. Dube

4  told us.

5         (Whereupon, a video was played.)

6         MR. MCELHANEY:  The judge will tell you what a

7  permanent injury is.  He'll define it for you.  And he's going

8  to tell you that you award that, that permanent injury may

9  cause fatigue, lack of vigor, but it's not necessarily

10 required that we show those things.  I think we've shown them

11 in this case, and you'll hear that definition of permanent

12 injury.  The judge will tell you.

13        So in our society in trying to come up with how to

14 price permanent injury, it's difficult to price, like pain and

15 discomfort and displeasure.  In our society we price things

16 that are pleasurable and make us have a good time.  For

17 instance, if you're going to go to a movie now, tickets are

18 about 15 bucks; right?  Two and a half hours -- because movies

19 are longer than they used to be when I was a kid, two and a

20 half hours of enjoyment, $15.  That's the price of pleasure.

21 A nice meal at Carrabba's, O'Charley's, Applebee's, 20 bucks

22 for two people is on the menus or most places.  20 bucks for

23 an hour to sit down with a companion and enjoy a meal, that's

24 a cost of pleasure.

25        But society doesn't price pain.  We don't have a

1 guide for pain.  What does pain cost?  So what we suggest to

2 you is you consider, in allowing permanent injury, $15.65 per

3 day for permanent injury.  That's the price of a movie ticket.

4 We're asking you to allow for permanent injury what it would

5 cost to have two and a half hours of enjoyment for a 24-hour

6 period to deal with a permanent injury.  15.65, now, you might

7 not like that number.  You might think it's too low.  You

8 might think it's too high.  Mr. Rowlett may have a different

9 number to suggest, but we suggest, in looking at her permanent

10 injury, 15.65 a day is fair and would adequately compensate

11 for permanent injury.

12         Future pain and suffering.  This is to compensate her

13 for two elements.  We've combined two into one here.  The

14 judge will tell you these are each distinct elements of

15 damage.  And the judge will tell you that each element should

16 be compensated.  We're going to combine them into one, and

17 we're going to ask you for the pain and suffering she's going

18 go through for the rest of her life and the inability to do

19 the things that she enjoyed in her life the way she enjoyed

20 them.  Christmases aren't the same, taking a bath differently,

21 the things in her life that change.  She can't wear blue

22 jeans.

23         The little things deserve to be compensated.  There's

24 big things.  She wears that hunk of brace every day, and she

25 walks with a limp.  And she's slow as molasses getting up and

1  down.  That is real life stuff that was not a part of her life

2  before she was injured.  But there are small things.  She used

3  to step over in the bathtub.  I mean, that's a small thing.

4  Now every day she has to sit down.  She says she can't go and

5  take a fast shower.  The humiliation of going to the bathroom

6  on yourself because you can't move as quick, these are real

7  life changes that deserve compensation.

8       We're going to ask you for a dollar and 15 cents an

9  hour for both elements, a dollar 15 her hour for both

10  elements.  That's 62 and a half cents, I think, maybe 67 and a

11  half cents an hour for each element.

12       You might think what you've heard in this courtroom

13  deserves a dollar 50 an hour or $2 an hour.  That's up to you.

14  You may think it deserves 75 cents an hour.  That's up to you.

15  I'm giving you what I -- and this is one of the hardest parts

16  of my job, is to try to come up with this because Ms. Corley

17  has a serious life-long changing thing here, and we've got to

18  adequately -- I don't want to ask for too much and make you

19  mad.  It's hard to do this part of my job, so I'm not trying

20  to double it hoping you'll give us half of it.  I'm just

21  trying to shoot to you what we think as lawyers for

22  Ms. Corley, based on the proof that's out there, you should

23  consider allowing.

24       You are the judges of the facts.  You can decide

25  whether it's less or it's more.  You're not bound either way.

1  There's a famous named Robert Frost.  You may have heard of

2  him.  He wrote, I can summarize all that I know about life in

3  three words:  It goes on.  It goes on.  In this case after you

4  return your verdict, your life will go on.  After this case,

5  Mr. Rowlett's life will go on.  My life will go on.

6  Mr. Tunstill will go back to Springfield and be the manager at

7  the Wal-Mart store.  We'll go back to our husbands and our

8  wives and our children and our jobs, our schools, and we'll

9  eat spaghetti and we'll watch Nickelodeon with our kids and

10 we'll go to ballgames and church.  And life will go on.

11         And, ladies of the jury, it's going to go on for

12 Sabrina Corley too.  It's going to go on for Sabrina Corley in

13 a far different and more troublesome and more "agonous" way

14 than it did before she went to Wal-Mart on November 7, 2011.

15 She walked in, and she limped out.  And she's been limping

16 every day since.  She don't sleep.  She don't go out.  She

17 can't play with her granddaughter.  She can't wear jeans.  She

18 puts that brace on every day, sets in church in a different

19 way, has to get to the movies early so she can sit on a

20 special handicap bench, a handicap bench.

21         Life goes on, and that's why it's important for you

22 to return a full verdict for Ms. Corley for 35 years of what's

23 coming down the line as life goes on.  We ask you on that line

24 that you get, that one line on the verdict form that has a

25 dollar sign in front of it, that you put in this number,

1    $924,000.  These numbers on the right-hand side are the

2    numbers I told you as we went through these elements of

3    damage.  Past medicals, 129; pain and suffering in the past,

4    100; future medicals, the three elements we asked for, the

5    fourth surgery, the knee replacement, and those miscellaneous

6    treatments combined to be 145.

7         Now, on the future medicals, if you don't think she

8    should have that miscellaneous treatment, those shots, the

9    pain medication Dr. Dube has put her in pain management, if

10   you don't think she should have that, leave that element out.

11   You have the ability to leave it out.  If you don't think she

12   should have the fourth knee surgery or that Wal-Mart should be

13   responsible to pay for it, leave it out.  But if you find they

14   are responsible for this harm and they are the cause of this

15   treatment, then allow it on the verdict form.

16        Permanent injury, when you do 1565 a day for her

17   life, it's $200,000.  And pain and suffering for the rest of

18   her life, if you do a dollar 15 an hour, a dollar 15 an hour

19   is $350,000.  You've got the ability to set whatever

20   compensation you think is right.  I wish you could know what

21   other juries are doing.

22        Now I'm about finished.  Mr. Rowlett is going to come

23   up, and he's going to do what defense attorneys do and what

24   he's done in this case so far, confuse the issue, question

25   everything, prove nothing; confuse the issues, question

1   everything, and prove nothing.

2   One of my favorite quotes is, "Consider it pure joy

3   to face trials of many kind because the testing of your faith

4   develops perseverance." Ms. Corley has been tested. She's

5   been tried. She's been blamed. It's taken three years to get

6   here. Tomorrow will be three years since she went to Wal-Mart

7   on November 7, 2011. Her faith has been tested, and she's

8   come through. She has faith in our system. She has faith in

9   you. Thank you.

10   MR. ROWLETT: Are we taking a break first, your

11   Honor, or not?

12   THE COURT: How long do you think you're going to be?

13   That was a little over an hour.

14   MR. ROWLETT: 20 minutes.

15   THE COURT: Then let's just go.

16   DEFENDANT'S CLOSING ARGUMENT

17   MR. ROWLETT: Good morning again. Wal-Mart requests

18   a verdict in favor of Wal-Mart on liability, a finding of no

19   negligence by Wal-Mart's associates, Katrina Smith and others

20   in the area and their manager, Greg Tunstill.

21   If you find that the people in the area were

22   negligent, Wal-Mart requests that you find that Ms. Corley's

23   fault, if any, was 50 percent or more. Now, as I said before,

24   Wal-Mart is not here blaming Ms. Corley but if this -- if

25   there was water there and if it were visible, then it was

1  definitely visible to Ms. Corley and in her path of travel.

2          Now, as I said in opening, I would be remiss if I did

3  not address damages. There's been a lot addressed here by

4  damages, a lot of proof, a lot of argument, so I'm going to go

5  ahead and address that and then liability issues.

6          Dr. William Gavigan testified here in person and came

7  here in person. He practiced medicine as an orthopedic

8  surgeon in Nashville for over 30 years and is board certified.

9  He's treated lots of patients like Ms. Corley. His

10 qualifications really are not in question. The questions

11 generally raised by plaintiff's counsel was about consulting

12 and charging a fee for it. Well, he is an orthopedic surgeon.

13 He's practiced for many years. He's got a lot of expertise.

14 He is charged the rate that they were charging at Tennessee

15 Orthopedic Alliance for this type of work when he left. And

16 as you can see from the medical bills that have been

17 presented, Dr. Dube has some significant charges himself, and

18 they've added up to numbers quite a lot bigger than numbers

19 related to Dr. Gavigan.

20         Now, as Dr. Gavigan testified, lots of physicians

21 don't like testifying, and they don't do it. It's not their

22 favorite thing. If you want to argue in the courtroom, go to

23 law school, but if you want to help people and treat people as

24 a patient, medical school is a better way to do it. But as he

25 said, they get pulled into this type of claim because people

1  get injured, and they have to be assessed.  And they need

2  people who are qualified to assess those injuries, and those

3  are medical doctors and in this type of case orthopedists.

4          Now, there's no evidence that Dr. Gavigan is giving

5  any inconsistent opinions or doing anything in any other case

6  that he shouldn't have done.  He's been a doctor for over 30

7  years and given depositions and testified in that case, and

8  there's been nothing presented to indicate any kind of issues

9  with him giving the opinion that he thinks whoever hired him

10 wanted to hear.  So that's just really not fair to make any

11 kind of issue about that when there's no evidence of him ever

12 having done that.

13         Now, his key testimony was to explain about arthritis

14 and how it's a degenerative condition.  It was extensive when

15 Dr. Dube performed the first surgery on Ms. Corley and looked

16 in her knee and could see it as he was performing the surgery.

17 It was there.  He could see it.  And Dr. Gavigan's testimony

18 is that it's progressive.  Arthritis is a degenerative

19 condition, and it occurs over a long period of time.  And that

20 makes sense, and it also is consistent with Ms. Corley's slip

21 being a relatively minor impact or incident compared to some

22 of the other things that happen to people in accidents.

23         This wasn't a car wreck.  This wasn't a truck wreck.

24 This wasn't something huge falling on somebody.  It didn't

25 break the thigh bone or the shin bone.  This was a different

1  kind of accident, the kind of accident where it makes sense to

2  say we're going to look at what was in there beforehand.

3  Doesn't matter if you have arthritis or not if your knee is

4  broken or your leg is broken, but in this type of situation if

5  you've had arthritis before, then that helps explain why

6  somebody would have problems after a little twist, a little

7  twist.  And it doesn't really make sense that you would have

8  those problems if your knee were healthy.

9       And, unfortunately, life gives people different kind

10 of health patterns, and we don't pick them.  And so sometimes

11 people have a knee that has some problems, and they don't know

12 about it until they twist.  And then it hurts.  But it doesn't

13 make sense that the incident that was shown to this jury would

14 cause damage to a healthy knee, which is what Dr. Dube's

15 position seemed to be.

16       Now, another key element in assessing the damages and

17 whether it was caused by what was pre-existing or caused by

18 this incident, again look at it in comparison to a car wreck.

19 Now, thankfully we don't all have car wrecks every day or

20 every week or every month or we don't have something heavy

21 fall on us, but we sure do go out in the rain.  And we sure do

22 in the winter months have to go out in weather that's not that

23 good, and we all usually have to take the stairs and do other

24 things like the things Dr. Gavigan talked about that can put

25 some strain and stress on a knee.

     1          These are everyday common occurrences, and this was
     2   pretty similar to a lot of the everyday common occurrences
     3   that we all experience just living in a world where there are
     4   surfaces that are uneven or steps or water outside, curbs.  So
     5   to say that this accident was the only thing going on is not
     6   consistent with what makes sense, and to say that somebody
     7   where this type of event caused problems would have been fine
     8   if not for this event, would have been perfectly normal,
     9   everything great for the next 35, 38 years, it doesn't make
    10   sense.
    11          It doesn't make sense if this little thing caused or
    12   began all these problems, to say that her knee would have been
    13   just fine going forward, especially when her treating
    14   physician documented extensive arthritis right during that
    15   first surgery.
    16          Now, plaintiffs put up an x-ray taken very soon after
    17   the accident.  It wasn't weigh bearing.  It wasn't weight
    18   bearing.  It needs to be weight bearing to show whether
    19   there's arthritis.  Dr. Dube thought he had done weight
    20   bearing x-ray.  And his records have been entered into
    21   evidence, and they'll come back to the jury room with you.
    22   Dr. Gavigan didn't find any evidence of a weight bearing
    23   x-ray.  The plaintiffs haven't discussed it among all the
    24   other proof that's been discussed and put up on the board.
    25   Dr. Dube thought he had done a weight bearing x-ray but didn't

1  point to one, and we still haven't seen one.  And the one that

2  they've pulled out and gave to Dr. Gavigan, as if it showed

3  her knee was fine, was not a weight bearing x-ray.  It was

4  not.

5          And so putting all the issues in context, ladies and

6  gentlemen, the slip too -- and the video has been put into

7  evidence.  The slip too was a minor one, and let me show it

8  again.  I know the jury has seen it before.  With the Court's

9  permission I'm going to flip a switch here over to the

10  defendant's side, and I guess it's taking a little time or

11  else I hit the wrong button -- here we go.

12          Now, as the jury heard, there were three clips saved

13  by Brian Hicks:  One, the hour before; one, the hour after;

14  and one of the incident itself.  I don't know that we've

15  played the one of the incident itself since it's overlapping

16  of the others.  I'm going to -- it's 3:40:07.  You can see

17  Ms. Corley's cart right there, and I'm going to play it for

18  the jury.

19          (Whereupon, a video was played.)

20          MR. ROWLETT:  All right.  I'm going to play it one

21  more time and then talk about it a little bit.

22          (Whereupon, a video was played.)

23          MR. ROWLETT:  You can see in that clip -- and I'll

24  play it again now that I'm explaining what was there.  You can

25  see that she's carrying something.  It looks like probably the

1  Miracle Whip she talked about in her right hand, and you can
2  see that she put it in the cart.  And as her foot moves, she
3  looked down.  She didn't go down.  She looked down, but she
4  didn't go down.  There wasn't anything where she seemed to
5  need the cart where she just about fell, and it did look like
6  her right foot moved a little bit.
7          I'm going to show it to the jury again.
8          (Whereupon, a video was played.)
9          MR. ROWLETT:  This is important.  This is important
10 because it shows how commonplace this type of thing was, and
11 that's very relevant to assessing damages and the role of
12 pre-existing arthritis in the knee problems that Ms. Corley
13 has had.
14         It was just a little slip.  She didn't fall.  She did
15 not fall.  She did not go down.  It didn't knock her much.  It
16 was as small a slip as it seems like you could have on a wet
17 surface.  And, again, that all ties back to Dr. Gavigan's
18 explanation about arthritis playing a role in the problems
19 that she's had.
20         Now, Ms. Corley has had multiple knee surgeries, and
21 it appears she has not benefited much from them and has
22 continued to have pain and such pain that she's needed to take
23 prescription pain medications.  She talked about that a little
24 bit.  I asked her about it, and then Mr. McElhaney asked her
25 about it.  And she made clear that she'd been taking it longer

1    than I initially understood from what she had said.  And these

2    additional surgeries were for pain, were for pain.  That's the

3    reason she's had them.

4          Now, this is why it's so important that Dr. Dube did

5    not do a weight bearing x-ray and did not evaluate the

6    possibility of a need for a total knee replacement if, in

7    fact, she needed that, if there came to be bone on bone.  Or

8    maybe if the fist arthroscopic surgery didn't work and help

9    that much, maybe it didn't make sense to do a second and a

10   third and be talking about doing a fourth when there is the

11   possibility of doing a total knee replacement, a total knee

12   replacement.

13         Now, plaintiff's counsel has talked a lot about

14   permanent injury, and, in fact, Dr. Dube testified that

15   Ms. Corley had a permanent injury.  And there is no disputing

16   that if something is taken out of your leg, it's not growing

17   back.  That is indeed permanent.  And arthritis, nobody

18   testified about a cure for it.  Nobody testified about the

19   knee going back, except the total knee replacement has been

20   testified about.  But we can't -- nobody said we could make

21   the knee like it was.  We're not arguing that the knee can be

22   put back, so there's no dispute about whether Ms. Corley's

23   knee has changed over time.  It has.  And Dr. Dube testified

24   about the need for yet another scope, even after three do not

25   seem to have done much good.

1          Does that make sense, ladies and gentlemen?  Now, I
2    don't recall -- I don't think any of us are physicians here,
3    but we have to assess these things.  And the jury is being
4    called upon to assess what physicians do.  That's what we do
5    in this country.  We have people who are not physicians and
6    not engineers assess these kinds of things all the time, every
7    day.  That's part of our being a democracy.  But it also
8    assumes people are able to do that, and they are.  And one
9    reason they are is because everybody can use common sense and
10   analysis and logic and assess what somebody says based on your
11   own life experience and what makes sense to you.

12          And it does not make sense to continue to have very
13   expensive knee scopes that I think Dr. Dube said maybe take 15
14   or 20 minutes that don't seem to be doing any good and not
15   really addressing the problem.  Now, there may be -- total
16   knee replacements are not perfect, as you've heard I think it
17   was Dr. Dube say.  You can need another one after a certain
18   number of years, and that's why people often wait to do it.
19   But people also do it, and if they're having a lot of pain, a
20   huge amount of pain where they have to take prescription pain
21   medications and they can't do this and they can't do that and
22   they can't do this, maybe it doesn't make sense to go have
23   another scope in your knee when the three first ones didn't
24   help so much.

25          So, ladies, I would ask you to bring your life

1  experience and your analysis and your common sense and your

2  experience into evaluating what's gone on so far and what's

3  led to all these really high medical bills and Ms. Corley

4  continuing to have problems with her knee.

5          Now, another thing, so Dr. Dube said permanent

6  injury.  We all heard that.  Dr. Gavigan did not say her knee

7  would be back to normal any time soon.  But Dr. Dube never did

8  testify about what a total knee replacement would do and how

9  functional Ms. Corley would feel and how she would be doing

10 once she had that.  He never testified she has -- is condemned

11 to a lifetime of pain and suffering.  Plaintiff's counsel

12 seems to think that should be an inference for this jury, that

13 one can only assume or understand that she must be condemned

14 or she must -- her future must be as it has been.  Well, who's

15 qualified to say that?  I'm not.  We need a medical doctor to

16 assess the likelihood of that.

17         Dr. Dube did say in his opinion she would need

18 another scope and a total knee.  Dr. Gavigan thought a total

19 knee was a definite possibility, although there has never been

20 a weight bearing x-ray to make that clear.  But nobody has

21 said that because she has a permanent injury she has permanent

22 extensive pain and suffering, that if you have a total knee

23 replacement, even if you have a total knee replacement, you're

24 going to be in pain every day, you're not going to be able to

25 do anything.  Nobody said that.  And I'll bet you that's

1  contrary to this jury's common knowledge and experience given

2  the amount of people who we have experience with in our daily

3  lives getting around well at elderly ages.

4  So in terms of the request for damages, it does not

5  appear that the additional scopes made any sense.  There's not

6  proof that Ms. Corley is destined to not be able to do things

7  and to continue to have pain and to have to continue to take

8  prescription pain medications.  Nobody has said anything about

9  the efficacy of that.  Is it a good thing?  Is she going to

10 have to be taking prescription pain medication permanently?

11 Is that a helpful thing?  There's been no testimony on that.

12 There's been no testimony on that.

13 As to liability, I want to address first what we know

14 and what we don't know in terms of the facts.  There's been

15 discussion about preponderance of the evidence, and that will

16 be discussed in the -- when the judge reads the jury

17 instructions to you.  The key word in that phrase is

18 "evidence."  This is not about all of us or the jury trying to

19 figure out what was most likely.  The phrase is the

20 "preponderance of the evidence," not what's your best guess.

21 So there has to be evidence.  And there's also a phrase

22 "burden of proof," proof, evidence, same thing.  So there has

23 to be proof, and there has to be evidence.  And Ms. Corley has

24 the burden of proving that.

25 So one key issue is where did the water come from?

```
 1   Now, certainly the jury instructions will not say you must
 2   find where the water came from.  They will not say that.  But
 3   certainly where the water came from is relevant to figuring
 4   out how long it was there.  So I'm going to start with where
 5   it came from and what the evidence is and what facts we know
 6   and don't know about where it came from because that's
 7   relevant to how long it was there.
 8          So Ms. Corley's foot slipped.  She testified the
 9   water was about the size of a plate, and the video shows some
10   Wal-Mart associates cleaning the floor.  There was water
11   there.  It's in the report.  There's no dispute about it.  So
12   where did it come from?  Mr. Hicks' initial assessment, which
13   has been our assessment until fairly recently, as
14   Mr. McElhaney has explained, was that a woman had a cup and
15   that that was the most likely spot because nobody has seen or
16   said they've seen anything in that hour before about where the
17   water came from.  Nobody has pointed anything out.
18          So when you look at the video, you can see the lady
19   looked like she had a red cup, and I'll agree it wasn't
20   noticed until a few days ago that it was brought to our
21   attention that, in fact, that was a list.  These videos are
22   interesting.  You can watch them 20 times or 30 times, and the
23   next time you watch it you see something new.  That's just how
24   they are.  That's how they are.  They're in evidence.  You'll
25   have an opportunity to look at it if you need to and probably
```

1  if you want hit the play button or pause button and see what
2  you need to see instead of having somebody else do it when you
3  may have wanted to see it again or paused or been looking for
4  something in particular.

5       And as you may have -- this is consistent too with
6  Mr. Hicks looking at one particular spot, and he was asked a
7  question about another. He didn't even see the guy walking
8  down on that part of the screen. I did because I happened to
9  be looking at him, but when he was asked about it, he said,
10 oh, I was looking over to the right. That can happen. You
11 can only look at one part of the screen and not see another
12 part.

13      So plaintiffs had this video before the depositions
14 of the Wal-Mart people because they were asking about it in
15 detail. They didn't say anything about the red cup back in
16 February 2014, and as Mr. McElhaney said, they figured out
17 about the cup a few days ago. They figured out about it.
18 This case has been going on a while, so we're not the only
19 ones to only have seen something recent. They saw it, as he
20 said, in trial prep and told us.

21      Mr. Hicks then looked at it and explained his
22 assessment of it. He did this in the military. He does this
23 at the store, and he explained it. I cannot explain it any
24 better. Mr. Tunstill cannot explain it any better. This is
25 what Mr. Hicks does. He does it a lot, and everything he said

1   explained what the video shows and doesn't show.

2          So where did the water come from so we can figure out
3   how long it was there?  The plaintiff has indicated at times
4   that it been must have been there over an hour.  Why?  Because
5   you can't see an obvious source of it.  You can't see an
6   obvious source of it.  Where did it come from?  We can't see.
7   We can't see where it came from, so the problem with saying it
8   must have been there over an hour is that that assumes that a
9   video would certainly show where water came from.  And the
10  video is on.  If only Wal-Mart had a different policy of
11  saving more than an hour before, somewhere in that two hours,
12  maybe hour one to hour two or hour two to hour three it must
13  have shown somehow somebody putting the water there.

14         Well, sometimes if we watch a show on TV and it's
15  always figured out at the end, that's pretty cool, and that's
16  part of the fun thing about watching a TV show.  CSI, they're
17  always figuring it out because all the evidence helps them
18  piece it together, and that's a fun part of the show.  But
19  life isn't like TV.

20         We can't always figure out what happened, and if this
21  jury watches this video -- well, look, if there was evidence
22  that the plaintiffs had found sometime during that hour before
23  showing somebody put the water on the floor, you surely would
24  have seen it.  So there is likely -- I cannot see there being
25  any dispute.

1    And let me shift gears for just a second to say

2 something I meant to say earlier.  As I mentioned before in

3 opening, I only get to go one time now.  So I'm hopeful that

4 Mr. McElhaney will only use the second part of his closing to

5 rebut what I say and not add anything new because I don't get

6 a chance to address it.  And that really just wouldn't be

7 fair.

8    So there is an assumption, an assumption which is not

9 based in fact, that if there was a spill during the hour

10 before, the video would show it, the video would show it.

11 That assumption does not make sense.  When Ms. Corley slips,

12 we can't see water on the floor.  When they're cleaning it up,

13 we can't see it.  We can never see ever on the video water on

14 there.  So why must it be that if the water -- if we don't see

15 an obvious source of the spill during that hour, it must have

16 been before?  Isn't it possible it leaked from somewhere and

17 flowed and we couldn't see it?  It's definitely possible.

18 That's what water does.  It leaks, and it moves on its own

19 accord if it's not contained.

20    And so it is not founded in law or evidence to say

21 that it must have been there over an hour.  That is pure

22 assumption and pure speculation and contrary to the evidence.

23 So the two assumptions that are fundamentally part of that

24 belief or assertion that the water, if it had been there

25 during that hour would have seen it, is that the source of the

water would have been on the screen, and it was right next to
the edge of that aisle, right next to the edge of the aisle.
And the other is that we would be able to see the source of
the water.  Well, again, it was right next to the other aisle.

Initially, I mean, that's what would be most -- make
the most sense is if somebody did that or somebody gives their
kid a sippy cup.  Anybody here who's had kids in the grocery
store with a sippy cup -- and it's been a while for me -- but
it's kind of hard to keep that liquid off the floor; right?
So if we had a kid with a sippy cup in a cart, that would be
likely culprit number one; right?  But we didn't see that.  We
didn't see that.

Now, Wal-Mart has done its best to assess this video.
It got its key person here to testify live.  Now, let me do
one other side here.  Mr. McElhaney noted that Wal-Mart hadn't
really called anybody.  Well, he put on all our proof.  I
mean, they put on all our policies and procedures.  They put
in our incident report.  They had our people testifying, and
they played it.  And they called them.  That's our proof.  We
didn't want to repeat the same stuff just to show you we
could.  You've heard it enough and seen it.

So, anyway, as you heard Mr. Hicks, oh, try to figure
out, well, where did it come from.  We don't know.  We don't
know.  We haven't stipulated that it came from somewhere.  We
were asked where -- Wal-Mart was asked where it thought the

1   water came from, and based on what was seen, Mr. Hicks and

2   Mr. Tunstill signed interrogatory responses it was thought to

3   be from the red cup at the time. Well, after that was pointed

4   out that was wrong, where did it come from?

5           Well, the cleaning person for Wal-Mart went down the

6   aisle, and as was pointed out, we could not see exactly what

7   that person was doing. True. There wasn't a camera on the

8   aisle, but as they went toward the aisle, they were doing

9   something with their foot. They disappear from view, go back

10  out in the camera view still doing this. So it doesn't make

11  sense to conclude that that person was doing anything other

12  than cleaning into the aisle. Did the water come from there?

13  We don't know. We don't know. We don't know where it came

14  from.

15          Could it have come from the cart of the lady with the

16  ponytail? Well, obviously that was not Mr. Hicks' first

17  impression because he thought it was the lady with the list

18  that he thought was a cup. Did it come from the lady with the

19  ponytail? We don't know. Did it come from Ms. Corley's own

20  cart? You'll recall she pushed her cart up, walked down the

21  aisle. And it was not micro seconds before she came back. It

22  was not immediately, but a moderate amount of time passed.

23  That was played. She came back, walked right to where she

24  was, and slipped.

25          Was the water there when she walked up? She doesn't

1  know.  She testified she doesn't know how long it was there,

2  just as we don't know how long it was there.  Was it there

3  when she walked back?  When she was here?  When she was here?

4  When she was here?  It was there when she was here and

5  slipped, but when it was there before, we just don't know.

6         And this goes back to the point about evidence and

7  speculation.  This is not about what would be the most likely

8  guess if you had to guess.  This is about what does the

9  evidence show and what does the evidence indicate.

10        Now, beyond it just being an assumption and based on

11 speculation and not analysis of the evidence, there was also

12 all the additional evidence that Mr. Hicks testified to that

13 shows why it wasn't there for a long time.  You didn't see

14 anybody walking around it.  We didn't see any customer

15 reports.  We didn't see anybody slipping.  Ms. Corley did not

16 slip when she walked up and stood there nor did her son.  So

17 we don't know where the water came from, and that is tied to

18 us not knowing how long it was there because since we don't

19 know how long it was there and since any of us would have to

20 speculate to make an assertion about where it came from, we

21 would also have to speculate to make a determination about how

22 long it was there.  We just don't know.  We just don't know.

23        The burden of proof under the law is on Ms. Corley,

24 and the jury instructions that the Court will read to you are

25 that Wal-Mart must have created a hazardous condition --

1  there's been no proof of that, nobody is arguing that -- that
2  Wal-Mart actually knew that it was there.  There's been no
3  prof of that.  And the third thing is that Wal-Mart should
4  have known it was there, and that's really what this case is
5  all about, should Wal-Mart's employees have known it was
6  there.  And if it wasn't there when Ms. Smith walked by, then
7  how could anybody fairly say they should have known it was
8  there?
9        So I want to talk a little bit about Ms. Corley's
10 fault.  Now, we've heard the phrase "blame game."  Wal-Mart
11 has been sued, and the claim has been made that Katrina Smith
12 should have seen that water when she walked by.  If she should
13 have seen it walking by in this direction, as what's over to
14 the left, that assumes it was visible.  If it was visible,
15 then it was visible to Ms. Corley, at least when she walked
16 back.  And if it was there over an hour, which doesn't make
17 any sense, then it was there not only when she walked up and
18 parked her buggy to go get a can of Miracle Whip, it was there
19 when she walked up, and it was there when she walked back,
20 right in her path of travel.
21        You'll see in the Wal-Mart policies and procedures
22 that they've put up on the screen path of travel.  Did you see
23 any Wal-Mart people checking every aisle as they walked down
24 the main aisle?  They did not.  And it wouldn't make sense for
25 any retail store's employees to be checking side aisles as

1 they're walking.  They are to look out for their path of

2 travel.  They want to see anything they can that's there.

3       So Wal-Mart is only addressing Ms. Corley's actions

4 because the allegation has been made that Ms. Smith should

5 have seen the water.  And the Court is going to instruct you

6 about that.  Now, she was not a Wal-Mart associate, not a

7 former Wal-Mart associate.  But she's an adult, and she's been

8 in retail establishments.  And we've all been in retail stores

9 and shopped, and we know that sometimes things get on the

10 floor.  They're not perfectly even carpeted places, any retail

11 store, any retail store.

12       And so the judge is going to instruct you that the

13 plaintiff, Ms. Corley, had a duty to use reasonable care for

14 her own safety, to make responsible use of her senses, and to

15 see or be aware of an unsafe condition that is obvious or

16 should be discovered through the use of reasonable care.  If

17 Katrina Smith should have seen it through the use of

18 reasonable care as an associate for Wal-Mart, Ms. Corley

19 should have seen it.  She had the last opportunity to prevent

20 the accident.

21       I use the word "accident" very purposefully.  We

22 talked about it a little bit in voir dire.  Just because

23 somebody is injured or something occurs that's accidental or

24 unintended doesn't mean somebody was negligent or careless.

25 So for Wal-Mart to be liable in this case under the law, this

jury has got to find that its associates were negligent, they were careless, they were not exercising reasonable and ordinary care. And accidents can happen even without that happening. I think we agreed on that in the jury selection. Sometimes bad things happen to good people. In fact, they happen to good people way too often, way too often. And it doesn't mean it's somebody else's fault or somebody's fault. Things happen.

This case is not about Wal-Mart company. Wal-Mart the company is the defendant. It's not about Wal-Mart the company. This jury has heard ample evidence of Wal-Mart's policies and procedures and practices and all the extensive things that they train their associates to do to try to prevent accidents. There's not been one piece of evidence critical of Wal-Mart the company. There's been no evidence of a pattern of a bunch of accidents at this store, Mr. Tunstill going out and having all sorts of other accidents at other stores and getting terminated. He's at a bigger store now.

Katrina Smith is still an assistant manager there, and you can bet that if this were an unsafe store and that Wal-Mart was running an unsafe store, after all the digging the plaintiffs have done, you'd be hearing about that. You'd be hearing about that. This is not about Wal-Mart running an unsafe operation. And this jury is entitled to use its common sense and everyday experience here. And we wouldn't have had

1  all these folks shopping at this store or at Wal-Mart stores

2  if it were an unsafe company, and we wouldn't have these

3  policies and procedures and the extensive training if it ran

4  an unsafe operation.

5          What this case boils down to is two people primarily,

6  Katrina Smith and Greg Tunstill.  Now, he's a store manager.

7  These are big operations.  Y'all have shopped at them.  You've

8  seen them here.  There are lots of people going through there.

9  It's a big responsibility.  It's quite a responsibility and

10  quite a job to be a manager of Wal-Mart.  It's not a fruit

11  stand on the side of the road.  It's a big deal.  There's a

12  lot going on there, and what the plaintiffs want you to

13  conclude is that Mr. Tunstill ran a shoddy operation, not

14  Wal-Mart.  This isn't about Wal-Mart.  This is about him.

15  This is about him and his store and Katrina Smith.  He was in

16  charge.  This was his store.

17          Did he implement Wal-Mart's policies and procedures

18  correctly?  Did he train his people?  There were other people

19  in the area.  I'm focused on Ms. Smith because she was the one

20  there closest in time, but you saw the red arrows with all the

21  Wal-Mart associates.  There's no allegation Wal-Mart didn't

22  provide enough people to staff this area.  Nobody said, gosh,

23  if that Wal-Mart home office would just give them enough

24  people to adequately police the area.  They were all over the

25  place for the 20 minutes before.  Ms. Smith was right there

1  within a minute or two before.

2          This is not about Wal-Mart in Arkansas doing

3  something wrong.  This is about Greg Tunstill and Katrina

4  Smith.  Did he run a crummy operation?  Is he competent to

5  operate a store and make it safe?  Is Katrina Smith uncaring?

6  Is she careless?  That's what the whole case rings on.

7  Katrina Smith, I mean, if she's careless and doesn't look out

8  for water, she shouldn't -- why would she be assistant

9  manager?  Please don't find that Katrina Smith was careless.

10  Please don't find that she was not exercising reasonable

11  ordinary care.  It's not fair.  It's not fair when we don't

12  know where the water came from, and we don't know how long it

13  was there.  And she was walking right past to the right doing

14  her job, and the accident occurred to the left.

15          There's been talk about taking responsibility.

16  Wal-Mart takes responsibility when its employees do something

17  wrong, as it should.  It wouldn't be fair for Wal-Mart to come

18  in here and say, well, I guess they were at fault, but it's

19  not our responsibility.  And that's not the law, and there

20  will probably be a jury instruction on that.  And that's been

21  the law a long time, and that's how it should be.  That is how

22  it should be.

23          So, folks, I would ask you to find -- to not find

24  that Ms. Smith was being careless because that's what the

25  whole case depends on, Ms. Smith being careless and not caring

1 and not paying attention and not doing her job and not being

2 effective. Wal-Mart asks you for a verdict in favor of

3 Wal-Mart and a finding that this was an unfortunate accident.

4 Thank you.

5          THE COURT: Mr. McElhaney.

6          MR. MCELHANEY: Ladies, this is not a court of fair.

7 This is a court of law. Is it fair to Ms. Corley that she's

8 in the shape she's in? Is it fair to Ms. Corley they spent

9 $11,000 on a retired doctor who doesn't do anything now, that

10 looks at litigation cases 95 percent of the time for defense

11 attorneys? Is that fair? This is not a court of fair. It's

12 a court of law.

13          And I told you what Mr. Rowlett was getting ready to

14 do, confuse the issue, question everything, and prove nothing.

15 How many questions did he ask you? We're talking about

16 automobile wrecks now? We're blaming kids with sippy cups?

17 So now we've debunked every single theory they've come up

18 with. They get up in closing argument and for the first time

19 ever in the case talking about sippy cups.

20          Mr. Rowlett says it's been a long time for him. I've

21 got an 18-month-old little boy named Tate. He uses sippy cups

22 all the time, and they don't leak. That's why it's a sippy

23 cup. I mean, kids can turn those sippy cups in the air, and

24 what might happen is that little white thing that sticks up in

25 the lid, it may drop down in there. Now, if it drops down in

1  there and you've turned it up, then you've got a problem.  But
2  if you walk around with a sippy cup doing this all day long,
3  there ain't nothing going to happen.  Confuse the issue.
4          He admitted to you, Mr. Rowlett, that we don't have
5  to prove where the water came from because that's the law.
6  Then he spends the next ten minutes trying to tell you that we
7  can't prove where the water came from.  He wants you to go
8  down these rabbit holes, these red herrings, and we don't have
9  to prove where the water came from.  We have to prove it was
10  there, which he admitted.  Point one, plaintiff wins.  You
11  have to prove it was there long enough to have the opportunity
12  to do something about it.
13          Now, we have lawyer argument from Mr. Rowlett against
14  what Mr. Brian Hicks told you from this witness stand, and
15  that was we've eliminated everything in the hour before except
16  the lady in the red.  Now we've eliminated her, and he told
17  you we've eliminated everything after her.  Then I asked him
18  and we showed it to you, the lady in the red -- not the red
19  cup.  There was a white cup or a piece of paper.  And we're
20  going to get the facts right when arguing because we're just
21  arguing.
22          There's an old saying, if a lawyer has got the facts
23  on his side but not the law, you argue the facts.  If the
24  lawyer has got the law on his side but not the facts, you
25  argue the law.  If you've got neither the facts or the law,

1  you just get up and argue, which is what we've got here,

2  ladies.  We're talking about could it have been a leak.  For

3  the first time ever you get this.  This is dodge and weave and

4  move and hope they trick you.  We talk about could have been a

5  leak.  From where?  This is the mayonnaise aisle.  It's not

6  the freezer section.  There's no eggs, milk.  There's no

7  refrigerant.  This is the middle of the store.  We've all been

8  to Wal-Mart.  What's leaking water out there?  He wants you to

9  think now in closing argument that there's a leak.

10       Why would he try to trick you?  Because he's hoping

11  it will work.  We've proved with evidence from Mr. Hicks that

12  if the lady in red did not cause it, it had to have been there

13  before 3:38, longer than 3:38.  In that period of time we

14  watched for 20 minutes all sorts of people milling around

15  working, nobody looking for water.

16       The judge will tell you about circumstantial evidence

17  because Mr. Rowlett wants you to think evidence has to be

18  somebody dropping a cup.  The judge, he told you when you

19  first got seated as jurors about if you go outside in the

20  rain, you know it's raining.  That's direct evidence.  If you

21  see somebody come in with an umbrella, that's circumstantial

22  evidence that it's raining.  Circumstantial evidence is simply

23  a chain of circumstances that indirectly proves a fact.  The

24  judge will tell you that.

25       There's circumstantial evidence here that the water

was there for longer than an hour because their expert with

the training from the Marine Corps has reviewed it and

eliminated everything on the video for the first hour.  I

would like to have watched the other hour for 20 or 30 times.

I would like to see the pictures they took, both digitally and

hard copies.  The hard copies are supposed to be put in the

file.  Amazingly the digital copy and the photographic copy

are gone.

They want to talk about Mr. Tunstill, is he running a

good shop?  I'm not trying to attack this man.  This man is

here because he was a man that they chose to be here.  The

case is against Wal-Mart, and it's not about an unsafe

operation.  It's about an unsafe condition on November 7,

2011.  The rest of that is just confusing the issue.  We're

here about November 7, 2011, where there was an unsafe

condition on the floor, which they have admitted there was.

Now we're talking about was it there long enough for

them to know about it and do something about it, and we know

it was because Mr. Hicks told us it had been there for a

longer period than they ever thought the first time around.

Don't be confused.

I don't know what walking out in the rain has do with

this case in what Mr. Rowlett was talking about.  I don't know

what car wrecks have to do with it.  But when he started out,

all he talked about was Dr. Gavigan, and Dr. Gavigan admitted

1  to you that the most likely cause or the most common cause of

2  a meniscus tear is a twisted knee.  And we showed you his

3  testimony about -- showed you an x-ray that said -- it's taken

4  the day after.  Normal.  Now, even if Gavigan is right, which

5  we submit he's not, Dube testified that arthritis was caused

6  by default once you start that process of trimming out

7  meniscus.  But Gavigan's testimony is that it caused that

8  aggravation and worsened.

9          Then we talk about, well, the arthritis was there

10  before she ever walked into Wal-Mart, which made it more

11  likely she would get hurt.  There's a jury instruction on

12  that, and it's in favor of Ms. Corley.  Did Mr. Rowlett tell

13  you about it?  No.  Confuse the issue.  The judge will tell

14  you recovery is allowed even if the pre-existing condition,

15  Dr. Gavigan's testimony, made plaintiff more likely to be

16  injured and even if a normal healthy person would not have

17  suffered substantial injury.  That's the law.  I bet

18  Mr. Rowlett thinks that's not fair either, but that's the law.

19          What did Dr. Dube, the treating physician, what did

20  he say about substantial, about this video?

21          THE COURT:  Let's start thinking about wrapping up.

22          MR. MCELHANEY:  Yes, your Honor.  I'm there.

23          (Whereupon, a video was played.)

24          MR. MCELHANEY:  Pretty substantial.  It sounded like

25  Mr. Rowlett was questioning Dr. Dube's medical judgment, but I

1  asked Dr. Gavigan, the witness, if he was questioning

2  Dr. Dube's medical judgment, and he said no.  He told you no

3  because he was the man treating her in realtime.  So are you

4  going to choose the guy they hired or are you going to choose

5  Dr. Dube?  Even the guy they hired supports a finding of

6  causation.

7          Sabrina Corley, based on what you've heard, is a good

8  woman.  She is worthy of your verdict.  I asked and challenged

9  Mr. Rowlett if he thought the numbers we put up were not fair

10 or were too much to give you another idea of what would be

11 more reasonable.  I challenged him in my first opening if he

12 didn't like the numbers, to tell you what would be a better

13 number.  He did not do that.  That indicates to you because

14 the numbers are fair.

15         About 155 years ago an author named Albert Pine

16 wrote, that which we do for ourselves dies with us; that which

17 we do for others lives on and is immortal.  Your verdict is

18 going to live on.  It's to be for public inspection in this

19 courthouse.  If anybody wants to know was judgment done in

20 November of 2014 in this courthouse for this lady, y'all come

21 look at it.  Please be proud of it.  Let that verdict be

22 immortal.  Thank you.

23         THE COURT:  All right.  Thanks.  You've now heard and

24 seen all the evidence.  You've heard the closing arguments.

25 I'm going to take a short break, let y'all take a little

1  break, and we're going to come back, and I'll give you the

2  jury instructions and then send you off to deliberate and

3  lunch.  So let's just take about ten minutes.

4          (Whereupon, the jurors exited the courtroom.)

5          THE COURT:  All right.  See y'all back here at 10:00.

6          COURTROOM DEPUTY:  All rise, please.

7          (Brief recess.)

8          COURTROOM DEPUTY:  All rise, please.

9          THE COURT:  Thanks.  Y'all can be seated.  All right.

10 Let's bring the jury back.

11         (Whereupon, the jurors entered the courtroom.)

12         THE COURT:  Thanks.  Y'all can be seated.  Okay.

13 Early on y'all figured out how to come in without having to

14 climb over each other.  I'm guessing too that you figured out

15 at some point just because I say ten minutes doesn't mean it's

16 ten minutes.  You have a little longer than that.  Time just

17 runs more slowly up here, I think.

18         Okay.  Now that you've heard all of the evidence in

19 the case as well as the final arguments of the lawyers for the

20 parties, it becomes my duty, therefore, to instruct you on the

21 rules of law that you must follow and apply in arriving at

22 your decision in this case.

23         In any trial there are, in effect, two judges.  I'm

24 one of the judges.  The other is the jury.  It's my duty to

25 preside over the trial and to determine what testimony and

1  evidence is relevant under the law for your consideration.

2  It's also my duty at the end of the trial to instruct you on

3  the law applicable to this case.

4          You, as jurors, are judges of the facts.  But in

5  determining what actually happened in this case, that is, in

6  reaching your decision as to the facts, it's your sworn duty

7  to follow the law I am now in the process of defining for you.

8          You must follow all of my instructions as a whole.

9  You have no right to disregard or give special attention to

10 any one instruction or to question the wisdom or correctness

11 of any law I may state to you.  That is, you must not

12 substitute or follow your own notion or opinion as to what the

13 law is or ought to be.  It's your duty to apply the law as I

14 give it to you regardless of the consequences.

15         By the same token, it is also your duty to base your

16 verdict solely upon the testimony and evidence in this case

17 without prejudice or sympathy.  That was the promise you made

18 and the oath you took before being accepted by the parties as

19 jurors in this case, and they have a right to expect nothing

20 less.

21         As stated earlier, it's your duty to determine the

22 facts, and in so doing you must consider only the evidence

23 I've admitted in the case.  The term "evidence" includes the

24 sworn testimony of the witnesses in court, the exhibits

25 admitted in the record, and the stipulations, if any, of the

1 parties.

2 The attorneys for the parties in this lawsuit have

3 quite properly referred to some of the governing rules of law

4 in their arguments. If, however, any difference appears to

5 you between the law as stated by counsel and that stated by

6 the court in these instructions, you are of course to be

7 governed by the Court's instructions. You must apply the law

8 that I give you to the facts in this case.

9 Remember that any statements, objections or arguments

10 made by the lawyers are not evidence in the case. The

11 function of the lawyers is to point out those things that are

12 most significant or most helpful to their side of the case,

13 and in so doing to call your attention to certain facts or

14 inferences that might otherwise escape your notice. In the

15 final analysis, however, it is your own recollection and

16 interpretation of the evidence that controls in this case.

17 What the lawyers say is not binding upon you. Also, during

18 the course of the trial I occasionally made comments to the

19 lawyers or asked questions of a witness or admonished a

20 witness concerning the manner in which he or she should

21 respond to the questions of counsel. Do not assume from

22 anything I may have said or any questions I may have asked

23 that I have any opinion concerning any of the issues in this

24 case. Except for my instructions to you on the law, you

25 should disregard anything I may have said during the trial in

1  arriving at your own findings as to the facts.

2       While you should consider only the evidence in the

3  case, you are permitted to draw such reasonable inferences

4  from the testimony and exhibits as you feel are justified in

5  the light of common experience.  In other words, you may make

6  deductions and reach conclusions which reason, common sense,

7  and life experience leads you to draw from the facts which

8  have been established by the testimony in evidence in the

9  case.

10      The evidence may be either direct or circumstantial.

11 Direct evidence is the testimony of one who asserts actual

12 knowledge of a fact, such as an eyewitness, which directly

13 proves a fact if you believe that witness.  Circumstantial

14 evidence is simply a chain of circumstances that indirectly

15 proves a fact.

16      It is your job to decide how much weight to give the

17 direct and circumstantial evidence.  The law makes no

18 distinction between the weight to be given to either direct or

19 circumstantial evidence.  You should consider all of the

20 evidence, both direct and circumstantial, and give it whatever

21 weight you believe it deserves.

22      In your consideration of the evidence in this case,

23 you are not limited to the statements of the witnesses.  In

24 other words, you are not limited to what you see and hear as

25 the witness testifies.  You're permitted to draw, from the

facts which you find to have been proven, such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.  That is, you may make deductions and reach conclusions which reason and common sense leads you to draw from the facts which have been established by the testimony and evidence in the case.

Now, I've said that you must consider all of the evidence.  That does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or believability of each witness and the weight to be given to his or her testimony.  In weighing the testimony you should rely on your own common sense and everyday experience.  There's no fixed set of rules to use in deciding whether you believe a witness, but it may be helpful -- but it may help you to think about the following questions:

One, was the witness able to see, hear or be aware of the things about which the witness testified?  Two, how well was the witness able to recall and describe those things?  Three, how long was the witness watching or listening?  Four, was the witness distracted in any way?  Five, did the witness have a good memory?  Six, how did the witness look and act while testifying?  Seven, was the witness making an honest effort to tell the truth or did the witness evade questions?  Eight, did the witness have any interest in the outcome of the

case?  Nine, did the witness have any motive, bias or

prejudice that would influence the witness's testimony?  Ten,

how reasonable was the witness's testimony when you consider

all of the evidence in the case?  Eleven, was the witness's

testimony contradicted by what that witness has said or done

at another time by the testimony of any other witnesses or by

other evidence?

Now, there may be discrepancies or differences within

witnesses' testimony or between the testimony of different

witnesses.  This does not necessarily mean that a witness

should be disbelieved.  Sometimes when two people observe an

event, they will see or hear it differently.  Sometimes a

witness may have an innocent lapse of memory.  Witnesses may

testify honestly but simply may be wrong about what they

thought they saw or remembered.  You should consider whether

discrepancy relates to an important fact or only to an

unimportant detail.

A witness may be discredited or impeached by

contradictory evidence by showing that he or she testified

falsely concerning a material matter or by evidence that at

some other time the witness said or did something or failed to

say or do something, which is inconsistent with the witness's

present testimony.  If you believe that any witness has been

so impeached, then it is your exclusive province to give the

testimony of that witness such credibility or weight, if any,

1  as you may think it deserves.

2       You may conclude that a witness deliberately lied

3  about a fact that is important to your decision in the case.

4  If so, you may reject everything that witness has said.  On

5  the other hand, if you decide that the witness lied about some

6  things but told the truth about others, you may accept the

7  part you decide is true and may reject the rest.

8       Further, you should consider all of the surrounding

9  circumstances at the time of the event or occurrence when

10 weighing the testimony of a witness.  A statement of fact

11 should be disregarded if you find the statement is inherently

12 impossible or contrary to universally recognized physical laws

13 or well established physical facts.

14      You are not required to accept testimony, even though

15 the testimony is uncontradicted and the witness is not

16 impeached.  You may decide, because of the witness's

17 appearance, bearing and demeanor, or because of the inherent

18 improbability of his or her testimony, or for other reasons

19 sufficient to you, that such testimony is not worthy of

20 belief.

21      On the other hand, the weight of the evidence is not

22 necessarily determined by the number of witnesses testifying

23 as to the existence or non-existence of any fact.  You may

24 find that the testimony of a smaller number of witnesses as to

25 any fact is more credible than the testimony of a larger

1 number of witnesses to the contrary.

2        Now, usually witnesses are not permitted to testify

3 as to opinions or conclusions. However, a witness who has

4 scientific, technical or other specialized knowledge, skill,

5 experience, training or education may be permitted to give

6 testimony in the form of an opinion. Those witnesses are

7 often referred to as expert witnesses.

8        You should determine the weight that should be given

9 to each expert's opinion by considering, one, the education,

10 qualifications, and experience of the witness: Two, the

11 credibility of the witness; three, the facts relied upon by

12 the witness to support the opinion; and, four, the reasoning

13 used by the witness to arrive at the opinion.

14        You should consider each expert opinion and give it

15 the weight, if any, that you think it deserves. You are not

16 required to accept the opinion of any expert.

17        An expert witness may be asked to assume that certain

18 facts were true and to give an opinion based upon that

19 assumption. This is called a hypothetical question. You must

20 determine if any fact assumed by the witness has not been

21 established by the evidence and the effect of that omission,

22 if any, upon the value of that opinion.

23        One important principle of law is that of the burden

24 of proof. The party who has the burden of proof on a

25 particular issue bears the responsibility or duty of

1  persuasion on that issue.  It may help you to think of a set

2  of balancing scales.  At the beginning of the trial, those

3  scales on any given issue are in equal balance.  They are

4  level.  If a party has the burden of proof on a particular

5  issue, it is that party's responsibility to tilt the scales in

6  their favor.  In other words, if the scales are still level at

7  the end of the proof, the party has failed to carry the

8  burden; that is, failed to persuade you that his or her theory

9  of that issue is more probable than not.

10      In a civil case, the party who has the burden of

11  proof on a particular issue must carry that burden by a

12  preponderance of the evidence.  This means, simply, the

13  greater weight of the evidence.  In other words, to establish

14  a claim by a preponderance of the evidence merely means to

15  prove the claim is more likely so than not so.

16      You should consider all the evidence pertaining to

17  every issue, regardless of who presented it.  In determining

18  whether any fact in issue has been proven by a preponderance

19  of the evidence, you may consider the testimony of the

20  witnesses, regardless of who called them, all exhibits

21  received in evidence, regardless of who produced them, and any

22  other evidence as I explained that term to you earlier.

23      In this case, Ms. Corley has the burden of

24  establishing by a preponderance of the evidence all of the

25  facts necessary to prove Wal-Mart was at fault, that is, that

1 Wal-Mart was negligent and any damages which arose from that

2 fault.

3        Wal-Mart has the burden of establishing by a

4 preponderance of the evidence all of the facts necessary to

5 prove that Ms. Corley was at fault, that is, that she was

6 negligent.

7        This case should be considered and decided by you as

8 an action between persons of equal standing in the community,

9 of equal worth, and holding the same or similar stations in

10 life.  The fact that a corporation is a party must not

11 influence you in your deliberations or in your verdict.

12 Corporations and persons are equal in the eyes of the law.

13 Both are entitled to the same fair and impartial treatment and

14 to justice by the same legal standards.

15        There's no evidence before you that any party has or

16 does not have insurance.  Whether or not insurance exists has

17 no bearing on any issues in this case.  You may not discuss

18 insurance or speculate about insurance based on your general

19 knowledge.

20        There are sound reasons for this rule.  A party is no

21 more or less likely to be negligent because a party does or

22 does not have insurance.  Injuries and damages, if any, are

23 not increased or decreased because a party does or does not

24 have insurance.

25        A stipulation is an agreement.  The parties in this

case have stipulated that the average life expectancy for an individual in Ms. Corley's position is 35 years. They are bound by this agreement and in your consideration of the evidence, you are bound to consider that this is the average life expectancy.

You should be aware, however, that many persons live longer, and many die sooner than the average. This 35-year figure may be considered by you in connection with other evidence relating to the probable life expectancy of plaintiff, including evidence of the plaintiff's health, occupation, habits, and other activities.

Certain testimony has been presented by deposition. A deposition is testimony taken under oath before the trial and preserved in writing or on videotape. You are to consider that testimony as if it had been given in court.

During the course of the trial, you may have heard the reference made to the word "interrogatory." An interrogatory is a written question that must be answered under oath in writing. You are to consider interrogatories and their answers as if the questions have been asked and answered in court.

Negligence is the failure to use ordinary or reasonable care. It is either doing something that a reasonably careful person would not do or the failure to do something that a reasonably careful person would do under all

1  of the circumstances in the case.  The mere happening of an

2  injury or accident does not in and of itself prove negligence.

3      A person may assume that every other person will use

4  reasonable care, unless a reasonably careful person has cause

5  for thinking otherwise.

6      In the absence of reasonable cause for thinking

7  otherwise, a person who is using ordinary care has the right

8  to assume that other persons are ordinarily intelligent and

9  possess normal sight and hearing.

10      In deciding this case you must determine the fault,

11  if any, of each of the parties.  If you find more than one of

12  the parties at fault, you will then compare the fault of the

13  parties.  To do this, you will need to know the definition of

14  fault.

15      A party is at fault if you find that the party was

16  negligent and that the negligence was a cause in fact and

17  legal cause of the injury or damage for which a claim is made.

18      Fault has two parts:  Negligence and causation.

19  Negligence is the failure to use reasonable care.  It is

20  either doing something that a reasonably careful person would

21  not do or the failure to do something that a reasonably

22  careful person would do under the circumstances similar to

23  those shown by the evidence.  The mere happening of an injury

24  or accident does not in and of itself prove negligence.  A

25  person may assume that every other person will use reasonable

1 care unless the circumstances indicate the contrary to a

2 reasonably careful person.

3          The second part of fault is causation.  Causation has

4 two components:  A, causation in fact; and, B, legal cause.

5          A cause in fact of the plaintiff's injuries is a

6 cause which directly contributed to the plaintiff's injury and

7 without which the plaintiff's injury would not have curred --

8 would not have occurred.  To be a cause in fact, it is not

9 necessary that a negligent act or omission be the sole cause

10 of plaintiff's injury, only that it be a cause.

11          Once you've determined that a party's negligence was

12 a cause in fact of plaintiff's injury, the next question you

13 must decide is whether the party's negligence was also a legal

14 cause of the party's (sic) injury.

15          Two requirements must be met to determine whether a

16 party's negligent acts or omissions was or were a legal cause

17 of the injury or damage.  One, the conduct must have been a

18 substantial factor in bringing about the harm being complained

19 of.  And, two, the harm giving rise to the action could not

20 have been reasonably foreseen or anticipated by a person of

21 ordinary intelligence or prudence.

22          To be a legal cause of an injury, there's no

23 requirement that the cause be the only cause, the last act or

24 the one nearest to the injury, so long as it is a substantial

25 factor in producing the injury or damage.

1    The foreseeability requirement does not require the

2   person guilty of negligence to foresee the exact manner in

3   which the injury takes place or the exact person who would

4   have been injured.  It is enough that the person guilty of

5   negligence could foresee or through the use of reasonable care

6   should have foreseen the general manner in which the injury or

7   damage occurred.

8    A single injury can be caused by the negligent acts

9   or omissions of one or more persons.

10    If you find that a party was negligent and that the

11   negligence was a cause in fact and also a legal cause of the

12   injury or damage for which a claim was made, you have found

13   that party to be at fault.  The plaintiff has the burden to

14   prove the defendant's fault.  If the plaintiff fails to do so,

15   you should find no fault on the part of defendant.  Likewise,

16   the defendant has the burden to prove the plaintiff's fault.

17   If the defendant fails to do so, you should find no fault on

18   the part of the plaintiff.  If you find more than one person

19   at fault, you must then determine the percentage of fault

20   chargeable to each of them.

21    You must also determine the total amount of damages

22   sustained by any party claiming damages.  You must do so

23   without reducing those damages by any percentage of fault you

24   may have charged to that party.  I'll instruct you on the law

25   of damages in a few minutes.

1    It's my responsibility under the law to reduce the

2  amount of damages you assess against any party by the

3  percentage of fault, if any, that you assign to that party.

4    A party claiming damages will be entitled to damages

5  if that party's fault is less than 50 percent of the total

6  fault in the case.  A party claiming damages who is 50 percent

7  or more at fault, however, is not entitled to recover any

8  damages whatsoever.

9    You've been instructed that if you find more than one

10 party at fault, you must apportion the fault of each party.

11    In making the apportionment of percentage of fault,

12 you should keep in mind that the percentage of fault

13 chargeable to a party is not to be measured solely by the

14 number of particulars in which a party is found to have been

15 at fault nor does the fact that both parties are claiming the

16 same act of negligence against each other necessarily mean

17 that both must be equally at fault.

18    You should weigh the respective contributions of the

19 parties, considering the conduct of each as a whole, determine

20 whether one made a larger contribution than the other, and if

21 so, to what extent it exceeds that of the other.

22    The percentage of fault assigned to any person

23 depends on all of the circumstances of the case.  The conduct

24 of each person may make that person more or less at fault,

25 depending on all of the circumstances.  In order to assist you

in making this decision, you may consider the following factor
or factors. You may also consider any other factors that you
find to be important under the facts and circumstances. But
the determination of fault on the part of any person and the
determination of the relative percentages of fault, if any,
are matters for you alone to decide.

One, whose conduct more directly caused the injury of
the plaintiff; two, how reasonable was the person's conduct in
confronting a risk, for example, did the person know of the
risk or should the person have known of it; three, did the
person fail to reasonably use an existing opportunity to avoid
injury to another; four, was there a sudden emergency
requiring a hasty decision; five, what was the significance of
what the person was attempting to accomplish by the conduct
such as an attempt to save another's life.

One who owns, occupies or leases property is under a
duty to use ordinary care, which is the same care that
ordinarily careful persons would use to avoid injury to
themselves or others under the same or similar circumstances.
This duty arises from the position of control, which the
person in possession occupies; he generally has superior
knowledge of a perilous condition and is the person normally
best able to prevent any harm to others.

Thus, an owner or occupier of property has a duty to
use reasonable care to inspect its property to discover

dangerous or unsafe conditions and to use reasonable care and

diligence in maintaining the property in a safe condition.

Further, an owner or occupier of property who either knew or

should have known of a dangerous condition on its premises has

a duty to either repair or remove the condition or to help

others avoid injury by warning them of the condition if it

cannot be reasonably removed or repaired.

An owner or occupier of property may have either

actual or constructive notice of a dangerous condition.

Constructive notice can be established by proving that the

dangerous condition existed for a sufficient length of time

that the premises owner or occupier, by exercising due care,

should have discovered the dangerous condition.

Therefore, to recover for an injury caused by an

unsafe condition of the property, the plaintiff must show that

the defendant either created the unsafe condition or knew of

it long enough to have corrected it or given adequate warning

of it before plaintiff's injury or that the unsafe condition

existed long enough that the defendant, using ordinary care,

should have discovered and corrected or adequately warned of

the unsafe condition.  An unsafe condition is a condition

which creates an unreasonable risk of harm.

On the other hand, an owner, occupant or lessor of

property is not an insurer of the safety of those who enter an

establishment and does not have a duty to guarantee the safety

1 of those entering upon the property.  Further, the duty

2 imposed on the premises owner or occupier does not include the

3 responsibility to remove or warn against conditions from which

4 no unreasonable risk was to be anticipated.

5       You should consider all the surrounding circumstances

6 in deciding if Wal-Mart exercised ordinary care.

7       The plaintiff has a duty to use reasonable care for

8 plaintiff's own safety and to make responsible use of

9 plaintiff's senses.  The plaintiff has a duty to see or be

10 aware of an unsafe condition that is obvious or should be

11 discovered through the use of reasonable care.

12       I now turn to the question of damages and what can be

13 considered in determining an award of money damages in this

14 case.  By including these instructions on damages, I do not

15 wish to suggest or imply anything about the issue of liability

16 or about whether or not damages have been proven in this case.

17       If, under the Court's instructions, you find that the

18 plaintiff is entitled to damages, then you must award

19 plaintiff damages that will reasonably compensate the

20 plaintiff for claimed loss or harm which has been proven by a

21 preponderance of the evidence, provided you also find it was

22 or will be suffered by the plaintiff and was legally caused by

23 the act, omission or condition upon which you base your

24 finding of liability.

25       Each of these elements of damages is separate.  You

1   may not duplicate damages for any element by also including

2   the same loss or harm in any other -- in another element of

3   damages.  In determining the amount of damage, you should

4   consider the following elements:

5        Medical expenses.  Medical expenses are the cost of

6   medical care, services and supplies reasonably required and

7   actually given in the treatment of the plaintiff as shown by

8   the evidence, and the present cash value of similar services

9   likely to be required in the future.

10       Physical pain and mental suffering.  Physical pain

11  and mental suffering is reasonable compensation for any

12  physical pain and suffering, physical and mental discomfort

13  suffered by the plaintiff, and the present cash value for pain

14  and suffering likely to be experienced in the future.  Mental

15  suffering includes anguish, grief, shame or worry.

16       Loss of enjoyment of life.  Loss of enjoyment of life

17  takes into account the loss of the normal enjoyments and

18  pleasures in life in the future as well as limitations on the

19  person's lifestyle resulting from the injury.

20       Permanent injury.  Permanent injury is an injury that

21  the plaintiff must live with for the rest of the plaintiff's

22  life that may result in inconvenience or loss of physical

23  vigor.  Damages for permanent injury may be awarded whether or

24  not it causes any pain or inconvenience.

25       Pain and suffering, permanent injury, disfigurement,

and loss of enjoyment of life are separate types of losses.

Plaintiff is entitled to recover for these losses if the

plaintiff proves by a preponderance of the evidence that each

was caused by the defendant's fault.

No definite standard or method of calculation is

prescribed by law by which to fix reasonable compensation for

pain and suffering and loss of enjoyment of life.  Nor is the

opinion of any witness required as to the amount of such

reasonable compensation.  In making an award for pain and

suffering and/or loss of enjoyment of life, you shall exercise

your authority with calm and reasonable judgment and the

damages you fix shall be just and reasonable in light of the

evidence.

A person who has a condition or disability at the

time of an injury is entitled to recover damages only for any

aggravation of the pre-existing condition.  Recovery is

allowed even if the pre-existing condition made plaintiff more

likely to be injured and even if a normal, healthy person

would not have suffered substantial injury.

A plaintiff with a pre-existing condition may recover

damages only for any additional injury or harm resulting from

the fault you may have found in this case.

If you find that defendant's fault aggravated

plaintiff's pre-existing condition, you must apportion the

amount of disability and pain between that caused by the

1  pre-existing condition and that caused by the incident.  If,

2  however, you find that defendant's fault aggravated

3  plaintiff's pre-existing condition and you find that

4  plaintiff's pre-existing condition has caused plaintiff no

5  harm, pain or suffering before this incident, then defendant

6  is responsible for all harm caused by the incident even if it

7  is greater because of the pre-existing condition than it might

8  otherwise have been.

9          If you are to determine a party's damages, you must

10  compensate that party for loss or harm that is reasonably

11  certain to be suffered in the future as a result of the injury

12  in question.  You may not include speculative damages, which

13  is compensation for future loss or harm that, although

14  possible, is conjecture or not reasonably certain.

15          In determining the damages arising in the future, you

16  must determine the present cash value of those damages.  That

17  is, you must adjust the award of those damages to allow for

18  the reasonable earning power of money and the impact of

19  inflation.

20          Present cash value means the sum of money needed now

21  which, when added to what that sum may reasonably be expected

22  to earn in the future when invested, would equal the amount of

23  damages, expenses or earnings at the time in the future when

24  the damages from the injury will be suffered or the expenses

25  must be paid or the earnings would have been received.  You

1  should also consider the impact of inflation, its impact on

2  wages, and its impact on purchasing power in determining the

3  present cash value of future damages.

4         You are cautioned to avoid what is known as a

5  gambling verdict.  A gambling verdict is one which would be

6  arrived at by each of you by setting down the amount which

7  each of you considers the plaintiff is entitled to receive.

8  The eight amounts are then added, the total is divided by

9  eight, and you've agreed beforehand to be bound by this

10  result.  A verdict achieved in such manner would be illegal

11  and could not stand.  Fair and just compensation, in an amount

12  which all of you can agree upon by your own free will after

13  that particular amount has been discussed and all of you are

14  satisfied with it, can be the only basis of a legal verdict

15  rendered for the plaintiff.  The proper verdict will be one

16  you reach as a result of free, frank and open-minded

17  deliberations as fair and just under the law and evidence of

18  this case.

19         I also instruct you that sympathy or hostility must

20  not enter into your deliberations as jurors no matter what

21  your sympathy or hostility may lead you to think.  Sympathy or

22  hostility has no place in the trial of a lawsuit or in making

23  up your minds as to what your verdict shall be.  Do not permit

24  any emotional considerations to enter into your deliberations

25  at all.

1          Some of you have taken notes during the trial.  Once

2    you retire to the jury room you may refer to your notes but

3    only to refresh your own memories of the witnesses' testimony.

4    You're free to discuss the testimony of the witnesses with

5    your fellow jurors, but each of you must rely upon your own

6    individual memory as to what a witness did or did not say.

7          In discussing the testimony, you should not read your

8    notes to your fellow jurors or otherwise tell them what you

9    have written.  You should not use your notes to persuade or

10   influence other jurors.  Your notes are for your own personal

11   use.

12         The verdict which you render in this case must

13   represent the considered judgment of each juror.  In order to

14   return a verdict, it is necessary that each of you agree.

15   Your verdict must be unanimous.

16         It is your duty, as jurors, to consult with one

17   another, to deliberate with a view to reaching an agreement,

18   if you can do so without violating your individual judgment.

19   You must each decide the case for yourself but only after an

20   impartial consideration of the evidence in the case with your

21   fellow jurors.  In the course of your deliberations, do not

22   hesitate to re-examine your own views and to change your

23   opinion if convinced it is erroneous.  But do not surrender

24   your honest conviction as to the weight or effect of evidence,

25   solely because of the opinion of your fellow jurors or for the

mere purpose of returning a verdict.  Remember at all times

that you are not partisans or advocates.  You are judges,

judges of the facts.  Your sole interest is to seek the truth

from the evidence in the case.

Upon retiring to the jury room, you will select one

of your number to act as your foreperson.  The foreperson will

preside over your deliberations and will be your spokesperson

here in court.

I've prepared a verdict form for your convenience.

You'll take this form to the jury room.  When you've reached a

unanimous agreement as to your verdict, you will have your

foreperson fill in, date, and sign the form which sets forth

the verdict upon which you unanimously agree.  Then notify the

Court security officer that you've reached a verdict.

During your deliberations, you'll have the

opportunity to review the exhibits which have been admitted

into evidence, as well as any notes which you've taken during

the course of the trial.  Once you've reached a verdict,

you'll leave both the exhibits and your notes in the jury

room.

If it becomes necessary during your deliberations to

communicate with the Court, please reduce your message or

question to writing signed by the foreperson.  Pass the note

to the Court security officer who will bring it to my

attention.  I will then respond as promptly as possible either

1  in writing or by having you return to the courtroom so that I

2  can address you orally.  I caution, however, with regard to

3  any message or question you might send, that you should never

4  state or specify your numerical vote or division at that time.

5          Finally, I add the caution that nothing said in these

6  instructions or in the verdict form is meant to suggest or

7  convey in any way or manner what verdict I think you should

8  find.  What the verdict shall be is your sole and exclusive

9  duty and responsibility.  You may now retire to the jury room

10  and begin your deliberations.

11          Do the parties have any objections to the jury

12  instructions or how I read those instructions?

13          MR. MCELHANEY:  No, your Honor.

14          THE COURT:  All right.  You're going to get the

15  verdict form, looks like this.  Also, you will get your own

16  copy of these instructions, so you weren't required to

17  memorize all of that.  You'll have a chance to read it again.

18          So we will -- this will take a few minutes because

19  we've got to get the exhibits together and get them to you,

20  and we'll figure out what y'all want to do for lunch.  All

21  right.  Thanks.

22          (Whereupon, the jurors exited the courtroom.)

23          THE COURT:  Yes.

24          MR. ROWLETT:  One question about page 20, your Honor.

25  I think you might have added the word "not" but I'm not sure

1  because I was -- numbered paragraph 2, the harm giving rise to

2  the action could, I think you said could not and the page

3  said -- didn't have the not.  And I couldn't assess it

4  quickly.

5          THE COURT:  I don't know.

6          MR. ROWLETT:  I don't know if it's a big deal.

7          THE COURT:  They're going to get -- well --

8          MR. ROWLETT:  I just wanted to look at it and make

9  sure it's written when it goes back as you wanted it written.

10          THE COURT:  It's written as you have it in front of

11  you.  If I didn't read it that way --

12          MR. ROWLETT:  Well, you added a not, and I just

13  didn't know if the not should be in writing or not.

14          THE COURT:  No.  I've got the same copy you did.  I

15  just must have added it.

16          Okay.  Well, good job on the trial.  It was one of

17  the better tried cases that I've seen.  So we'll see how it

18  goes.

19          If y'all will go through and make sure that all of

20  the exhibits that were actually entered go back, and leave

21  your contact information so we can contact you.

22          MR. ROWLETT:  Hang here or --

23          THE COURT:  You can do whatever you want to do.  You

24  know, it's 12:30.  They're going to eat lunch.  I don't know

25  when they'll actually get started, but do whatever you want to

1　do.  Just leave a cell phone number so we can call you.  And

2　if they have a question, sometimes -- I don't know -- it's

3　probably 50-50 and whether it's even necessary to let y'all

4　know they've had a question.  Most of the time it's, you know,

5　something that --

6　　　　　　MR. ROWLETT:  Water fountain.

7　　　　　　THE COURT:  Yeah, that, can we take a smoke break.

8　Those don't come in.  It's kind of -- you know, they may ask

9　something about the jury instructions.  That always goes back.

10　It says what it says, and there's no additional.  But if it

11　gets to be something confusing and they really do need some

12　instruction, then I'll have y'all come back and talk to you,

13　see if we can agree on an answer.

14　　　　　　MR. ROWLETT:  We're okay to go maybe next door for

15　lunch?

16　　　　　　THE COURT:  Yeah.  You can go wherever you want to

17　go.  Just leave a number.  All right.  Thanks.

18　　　　　　COURTROOM DEPUTY:  All rise, please.

19　　　　　　MR. MCELHANEY:  Thank you, your Honor.

20　　　　　　(Whereupon, a recess was taken from 12:33 p.m. until

21　5:04 p.m.)

22　　　　　　COURTROOM DEPUTY:  All rise, please.

23　　　　　　THE COURT:  Thanks.  Y'all can be seated.  Okay.

24　Quickly, we're having some difficulty reaching a verdict, so I

25　am going to send them home for the evening, let them come back

1    tomorrow and continue.

2          And they also asked to see one of the video

3    depositions.  I'm going to let them know that's not evidence;

4    they'll just have to remember that one.  So let's bring the

5    jury back.  Thanks.

6          (Whereupon, the jurors entered the courtroom.)

7          THE COURT:  All right.  Thanks.  Y'all can be seated.

8    Did I understand -- Ms. Worthy, are you the foreperson?

9          JUROR:  Yes.

10          THE COURT:  Okay.  It's my understanding there is

11    some difficulty in reaching a unanimous verdict?

12          JUROR:  Yes.

13          THE COURT:  I want to give you some instructions

14    about that.  I'm not going to end this just yet.  I'm going to

15    ask that you continue your deliberations tomorrow morning in

16    an effort to agree on a verdict and dispose of this case.  I

17    have a few additional comments I want you to consider tonight

18    and when you come back tomorrow.

19          This is obviously an important case.  If you should

20    fail to agree on a verdict, the case is left open and may have

21    to be tried again.  Any future jury must be selected in the

22    same manner and from the same sources you were chosen, and

23    there's no reason to believe that the case would ever be

24    submitted to eight men and/or women more conscientious, more

25    impartial or more competent to decide it or that more or

1    clearer evidence could be produced.

2            Remember at all times that no juror is expected to

3    yield a conscious opinion she may have as to the weight or

4    effect of the evidence, but remember also that after full

5    deliberation and consideration of the evidence in this case,

6    it's your duty to agree on a verdict if you can do so without

7    surrendering your conscientious opinion.  You may be as

8    leisurely in your deliberations as the occasion may require

9    and should take all of the time you may feel is necessary.

10           I'll ask you to retire for the day and continue your

11   deliberations tomorrow with these additional comments in mind

12   to be applied, of course, in conjunction with all of the

13   instructions I've previously given you.  I want you to come

14   back tomorrow morning, and let's start the process again.

15           There was also a question about wanting to review

16   some videotaped testimony.  That testimony on videotapes --

17   there was an instruction about videotaped depositions.  It's

18   testimony like any other in the courtroom so that -- so the

19   videotape itself is not evidence as a videotape.  The

20   testimony is the evidence, and so you have to remember it like

21   you do any other testimony, whether it was here in court or in

22   another deposition.

23           Okay.  All right.  Remember my instructions.  Don't

24   talk about the case.  Don't do any outside research.  But

25   things always look different in the morning.  So come back

1  rested and relaxed, and we'll get started again.  Okay.  Thank

2  you.

3          JUROR:  What time?

4          THE COURT:  9:00 o'clock.

5          (Whereupon, the jurors exited the courtroom.)

6          THE COURT:  All right.  I'll see y'all back here in

7  the morning at 9:00.

8          MR. MCELHANEY:  Thank you, your Honor.

9          COURTROOM DEPUTY:  All rise, please.

10          (Whereupon, the proceedings were adjourned at 5:08

11  p.m.)

12                              -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      REPORTERS CERTIFICATE

2

3

4          I, Wynette C. Blathers, Official Court Reporter for

5    the United States District Court for the Middle District of

6    Tennessee, with offices at Nashville, do hereby certify:

7          That I reported on the Stenograph machine the

8    proceedings held in open court on November 6, 2014, in the

9    matter of SABRINA RECHELLE CORLEY V. WAL-MART, Case No.

10   3:12-CV-01250; that said proceedings in connection with the

11   hearing were reduced to typewritten form by me; and that the

12   foregoing transcript (Volume III of IV, Pages 1 through 103)

13   is a true and accurate record of the proceedings.

14          This the 2nd day of January, 2015.

15

16

17

18                         _____

                           /s/ Wynette C. Blathers, RMR, CRR
19                             Official Court Reporter

20

21

22

23

24

25